# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**MICHAEL BRYANT, JOHN DRAKE, BECKY KELLEY AND HERBERT LOWE,**

**Plaintiffs,**

**v.**

**VERNON JONES, MARILYN BOYD DREW, MORRIS WILLIAMS, RICHARD STOGNER and JOE STONE in their individual and official capacities,**

**Defendants.**

**1:04-cv-2462-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendant Richard Stogner's Renewed Motion for Summary Judgment ("Stogner MSJ") [256], Defendant Joe Stone's Renewed Motion for Summary Judgment ("Stone MSJ") [257], Defendant Vernon Jones's Renewed Motion for Summary Judgment ("Jones MSJ") [259], Defendant Marilyn Boyd Drew's Renewed Motion for Summary Judgment ("Drew MSJ")

[262], and Defendant Morris Williams's Renewed Motion for Summary Judgment

("Williams MSJ") [263].[1]

## I.     INTRODUCTION

This case concerns alleged discriminatory employment practices in DeKalb

County.  The claims are brought by three white managers and one black manager.

The white managers, Becky Kelley, Michael Bryant and John Drake, claim they

were discriminated against and suffered a hostile work environment based on their

race.  The black manager, Herbert Lowe, claims he suffered illegal retaliation

because he refused to participate in discrimination against white county managers.

The allegations center around employment practices that allegedly commenced

with the change in DeKalb County leadership in 2001.

Defendant Vernon Jones, a black male, was elected DeKalb County's Chief

Executive Officer ("CEO") in November 2000 and assumed office on January 1,

2001.  Typical of administration changes in government, a number of

organizational and reporting structure changes occurred when Jones become the

---

[1] Defendants also filed a Joint Motion to Supplement Exhibit [282], asking the Court to permit them to supplement Exhibit 27 of Volume II of the Declarations, Deposition Excerpts and Exhibits in Support of Defendants' Renewed Motions for Summary Judgment by including an inadvertently omitted page.  There is no opposition to this motion, and it is **GRANTED**.

CEO.  Plaintiffs allege these structural changes were implemented, in part, to enact a plan to replace white county managers with black county managers in order to increase the overall number of minorities in county government managerial positions, and that this was done to benefit Defendant Jones politically.  Plaintiffs allege this plan directly impacted the Parks and Recreation Department ("Parks Department or "the department") and them personally.  They claim Defendants' discriminatory policies caused them to suffer adverse employment actions, created a hostile work environment with the goal of coercing them to terminate their employment, and generally constituted actionable racial discrimination.

## II.    FACTUAL BACKGROUND

### A.    The Parties

On January 1, 2001, Kelley, Bryant and Drake were managerial employees of the Parks Department.  Plaintiff Becky Kelley, a white female, had been employed by DeKalb County since 1976.  Sixteen years after becoming a county employee, in 1992 she was appointed as the Director of the Parks Department with authority over the department's operation and programs.  Kelley was serving in this position when Jones assumed his duties as CEO in January 2001.  Plaintiff Michael Bryant, a white male, was hired by DeKalb County in 2000 as the Deputy

Director of Revenue Management and Support in the Parks Department, and he reported to Kelley.  He was serving as Deputy Director on January 1, 2001, when Jones became CEO.  Plaintiff John Drake, a white male, was hired by DeKalb in 1975 and became the Assistant Director of the Purchasing and Contracting Department in 1997.  He was serving in this position on January 1, 2001.  Plaintiff Lowe, a black male, started employment with DeKalb County on September 16, 2002.  He was hired as the Deputy Director of Strategic Management and Development for the Parks Department.

Plaintiffs allege that Defendants, all of whom were senior managers either in DeKalb County generally or the Parks Department specifically, played central roles in a plan to discriminate against white Parks Department managers.  There are five Defendants alleged to be involved in the plan to discriminate against Plaintiffs.  Defendant Vernon Jones, a black male, is the elected DeKalb County CEO.  Defendant Richard Stogner, a white male, was hired by Jones as his executive assistant.  Stogner assumed his position when Jones took office.  Defendant Joe Stone, a black male, is the DeKalb County Director of Human Resources with overall supervisory authority over human resources, hiring, assignment and  other personnel functions within the county.  Defendant Morris

4

Williams, a black male, is the Assistant County Administrator with supervisory responsibility for a variety of county departments, including the Parks Department. Defendant Marilyn Boyd Drew, a black female, was first hired in April 2001, initially as the Parks Department's Director of Recreation Services, but was promoted ten months later to the position of Acting Director of the Parks Department, replacing Plaintiff Kelley.  Drew became the permanent Director of the department a month later.

Plaintiffs Bryant Drake and Kelley allege that once Defendants took their management positions under Jones, they began a systematic effort to adversely affect Plaintiffs' work duties and environment, which was calculated to force the white Plaintiffs to terminate their county employment so that black managers could be hired to replace them.  Plaintiff Lowe alleges he opposed the plan to discriminate against white managers, and Defendants responded by engaging in administrative maneuvers which resulted in the abolishment of his position. Defendants, he alleges, engaged in unlawful retaliation against him for his opposition to illegal discrimination.  The alleged impact on each Plaintiff is discussed separately.

B.      Discrimination Alleged

*Plaintiff Kelley*

Kelley had served as the Director of the Department of Parks and Recreation for nine years when Jones became the CEO.  There is no evidence in the record suggesting that Kelley did not perform her job duties well and to the satisfaction of her superiors.  Almost immediately after Jones assumed office, Kelley claims he began to confront her.  On one occasion, Jones became very angry with Kelley on a phone call.  A second confrontation occurred when, in a private meeting in Jones's office, Jones yelled and screamed at Kelley and approached her in such a way that Kelley believed Jones was going to hit her.  At this meeting, Jones imposed restrictions on Kelley's duties as Director of the Parks Department, including prohibiting her from communicating with the press and from speaking to members of the DeKalb County Board of Commissioners ("the Board"), responsibilities Kelley had been performing in her capacity as Director.  Kelley stated that on two occasions Defendant Stogner told her that "she didn't understand the geopolitical issues of DeKalb County and that she could not relate to powerful black men."

6

Kelley's Director responsibilities were, as she viewed it, further limited after January 2001. Before January 2001, she was, as department Director, responsible for reviewing applicants seeking employment in her department. After January 2001, she was prohibited from interviewing candidates unless Defendant Williams was present. Consistent with this changed policy, in early 2001, Kelley and Williams interviewed candidates for the Deputy Director of Recreation in the Parks Department. Kelley considered a white male to be one of the top candidates for the position, but Williams told Kelley they could not recommend a white candidate to Jones because he would not accept a white candidate. The white candidate was not recommended. Kelley was told by Stogner to offer the position to Defendant Drew, a black candidate. Stogner suggested to Kelley that by offering Drew the position, Kelley could "get in good" with Williams. Drew was offered the position, and she was hired on April 30, 2001.

Once Drew was hired, Jones and Williams began to exclude Kelley from discussions and decisions regarding the Parks Department and its operation. Specifically, she was not informed of or consulted about hiring in her department. Stogner commented to Kelley that Jones wanted "to showcase black parks and showcase black employees," which she understood as Stogner's explanation

7

regarding why she was being excluded from department planning discussions and decisions.

On February 12, 2002, Jones issued an executive order implementing significant structural changes in the Parks Department.  The order had a significant impact on Kelley and her duties.  She was removed as Director of the department and reassigned to a group to coordinate the county Greenspace program.  The transfer did not affect her salary and benefits.  Defendant Drew, hired just a few months earlier, was appointed Acting Director to replace Kelley.  Kelley's Greenspace assignment was a significant change in her duties and authority.  She was not given a title, and her reporting chain was changed.  Rather than reporting to the CEO's office, as she had done as the Director of the Parks Department, as a member of the Greenspace group she reported to an Assistant County Administrator.  Drew also attempted to place Kelley in a small windowless office that had been used as a storage area.[2]  As the Greenspace coordinator, Kelley's input was ignored and her recommendations rebuffed to such an extent that she did not consider herself to have any authority or job responsibilities.  She described her job as one that ultimately was reduced to "coloring maps."  About seven months

_____

[2] Kelley objected to this office assignment, considering it demeaning, and ultimately was not moved to the office suggested by Drew.

8

later, on September 25, 2002, she submitted her resignation effective on October 9, 2002.

*Plaintiff Bryant*

When Drew was installed as Director of the Parks and Recreation Department, she implemented changes in department assignments.  Specifically, in June 2002, shortly after she was appointed Director, Drew changed Bryant's job responsibilities by assigning him the duties ordinarily performed by the Director of Recreation.  Although Bryant's job was limited to the recreation area, he maintained his title of Deputy Director of Revenue Management and Support.  His salary and benefits remained the same.  In March 2002, Bryant complained about what he believed was an excessive salary a black contractor was paying to his wife.  The contractor's company had been hired by the Parks Department to perform services at a county golf course.  Drew removed from Bryant responsibility for golf and tennis contracts and reassigned the fiscal and contracting duties for those contracts to Drake.  Day-to-day operational responsibility for the golf and tennis contracts was assigned to Detrick Stanford, a black employee who reported directly to Drew.

On or about August 5, 2002, about 60 days after his duties changed, Bryant was moved out of the department's offices in Decatur and reassigned to an office in Tucker, Georgia.  Bryant claims his supervisory duties and support also were adversely impacted by Drew.  He claims his requests for staffing, information, computers and other requests made to assist in the performance of his duties were not honored.[3]  Bryant claims employees he supervised were assigned duties without his input or knowledge, and he was excluded from meetings and discussions regarding the areas for which he was responsible.  While Drew solicited and received input from black employees, white employees, Bryant claims, were isolated from decision making.  Bryant was not given a performance report before this lawsuit was filed, and the absence of a report affected his receipt of a merit salary increase.[4]  Bryant claims that Drew threatened to terminate him and actually drafted letters suspending him, which she carried around the office in

---

[3]  Bryant claims Drew's treatment of him even impacted his personal life. For example, when he requested comp time in connection with his surgery, Drew denied his request.  When Bryant was ready to return to work after his surgery, Drew refused to allow him to do so, delaying his return for a week beyond the date he requested.

[4]  Other employees, including black employees, apparently also were not timely evaluated.

such a way that they were visible to Bryant in order to let him know she had

drafted the letters.  Bryant was not suspended or terminated.  Bryant's title remains

Deputy Director of Revenue Management and Support Services although he

performs only those limited duties assigned to him by Drew.[5]  In October 2003,

Marvin Billups, a black male, was given the position of Director of Recreation

Services, although Bryant actually performs the tasks that are included in the

Director of Recreation Services job description.

*Plaintiff Drake*

Plaintiff Drake has been employed with DeKalb County for 31 years and has

served as the Assistant Director of the Purchasing and Contracting Department

---

[5] On July 15, 2003, Bryant filed a hostile work environment complaint against Drew with the DeKalb County Human Resources Department.  After the complaint was filed, Bryant sent emails to the DeKalb County EEO Manager, Curtis LeBlanc, to ask about the status of the investigation.  Bryant claims LeBlanc did not respond.  LeBlanc interviewed all listed witnesses on the report with the exception of Plaintiff Lowe, who refused to be interviewed, apparently for fear of retribution from Defendants.  Nine months after Bryant filed the complaint, LeBlanc submitted his findings to Defendant Stone, Director of Human Resources. The report indicated underlying problems in Drew and Bryant's relationship without finding conclusive evidence of discrimination.  Stone and Stogner both reviewed the report and concluded no discrimination occurred and that no further action was necessary.  The human resources department did not contact Bryant or inform him of the results of his complaint.

since 1997.  On February 12, 2002, Jones transferred Drake to the Parks and Recreation Department as its Acting Assistant Director.  Drake negotiated a salary increase in connection with his transfer, and his other benefits remained the same. Drake was interested in being appointed permanent Director of the Parks Department after Kelley was transferred to the Greenspace program in February 2002.  Stogner, however, told him that while he was qualified for the Director position when it was open in 1992, Jones had made "too many political commitments" to consider Drake for Parks Department Director.  Drake was told that he was transferred to the Parks Department to "prop up" Drew, who was made the new Director.

Drake could not compete for the position of permanent Director of the Parks Department because of the manner in which the position was advertised and who was allowed to apply.  The permanent Parks Department Director position was advertised only as an intra-departmental promotion, meaning that only those who were Parks Department employees could apply.  Applications were required to be submitted between February 25, 2002 and March 8, 2002.  Drake's transfer to the Parks Department as its acting Assistant Director was designated by Jones to be effective on March 16, 2002, eight days after the application period closed.

12

According to Drake, after Drew was appointed Acting Director of the Parks Department, she aggressively reduced his job responsibilities, removing from him those responsibilities typically delegated to the Assistant Director and effectively reducing his duties to those of a lower level Deputy Director. When Drew became Director, she also required all Parks Department Deputy Directors to report directly to her instead of to him in his capacity as Assistant Director of the Department. Drew also removed Drake as the Parks Department's representative to the county bond program group, of which he had been a member since 1986. Although he was Drew's Assistant Director, Drew did not consult with him regarding the reorganization of the department, and she neglected to consult with him when his subordinates were hired. Drew excluded Drake from discussions regarding DeKalb County's golf course management and revenue results and operations, even though the golf courses were included in Drake's area of responsibility.[6]

_____

[6] Employees were required to submit to their supervisors performance plans for the areas for which they were responsible which set out objectives for the coming year. Before a review of the previous year could be submitted to human resources, the employee and supervisor were required to complete the performance plan. Drake submitted a performance plan to Drew, but Drew never met with Drake regarding his performance plan, nor did she give him a performance review. Drew claims that she does not know what happened to Drake's performance plan after he submitted it, although she admitted that she found it in her credenza when she conducted her search for documents responsive to discovery.

Plaintiffs Kelley, Bryant and Drake offer this conduct as evidence that Defendants treated them differently than black employees, and that this different treatment was discriminatory.  While Defendants' conduct often appears to be neutral and characteristic of action taken by the new management of a political subdivision, Plaintiff Lowe offers evidence that he was advised of Jones' intention to eliminate white managers to allow the hiring of additional black managers.

*Plaintiff Lowe*

On September 16, 2002, after Drew became the permanent Director of the Parks Department, Lowe, a black male, began work as the department's Deputy Director of Strategic Management and Development.  After he was hired, he was told of a plan to increase the number of black managers in the Parks Department, including the position to which he was hired.  Lowe claims that Stone told him that if white individuals had expressed an interest in the Deputy Director position to which Lowe was hired, they would not have been considered.  Lowe stated that he was told by Jones, Stone, and Drew that it was Jones' agenda to eliminate white managers from the Parks Department so that the number of black department managers would be increased.  Lowe claims specifically that when Drew welcomed him to DeKalb County, she told him that white managers were being

14

eliminated from the Parks Department because the CEO's agenda was to get reelected, and Stone was making sure the CEO's agenda was executed.

Jones told Lowe that the white employees in the Parks Department needed to be removed, and the whole department needed to be reorganized.  Lowe claims Jones told him on several occasions that he wanted a "darker administration."  He also told Lowe that he wanted Kelley, Bryant,  and Drake out of the Parks Department and that Jones referred to Drake as a "white bastard."  Drew told Lowe to "dig up dirt" on white employees in the Parks Department and to make sure white employees were not publicly visible nor in positions where they would have the opportunity publically to accept awards that were received by the Department. Drew told Lowe to withhold information from white employees, including Plaintiffs Kelley, Bryant and Drake, so they would be kept in the dark and made to appear incompetent at their jobs.  Drew told Lowe she transferred Bryant into a recreation function knowing he was not experienced in the recreation area, and he thus would be perceived as incompetent in his duties.  She told Lowe not to discuss important issues with Bryant because she wanted to keep Bryant in the dark so that he would fail.  Drew instructed Lowe not to speak with Plaintiffs Kelley, Bryant, or Drake and the "old white women" in the recreation division.   Lowe claims that

Jones, Stone, Drew and Williams each told him that there was a plan to remove white managers in DeKalb County, that the plan was referred to as a "reorganization," and that there were ways to get rid of employees without firing them.

Lowe told Defendants that he would not participate in their plan to eliminate white employees, and he did not carry out orders given to him that were designed to discriminate against them. Jones told Lowe he was not being a "team player," and stated further that Lowe did not appreciate or understand what Jones was trying to accomplish with his agenda. Eventually, Lowe told Jones he wanted out of the Parks Department, and if he was not moved he would resign.

Thereafter, around May 2003, Lowe's office was moved into Jones' executive suite on the sixth floor of DeKalb County's offices. Although Lowe continued to work for the Parks Department,  Lowe also assisted Jones with special projects.

On July 23, 2003, Drew hired Marvin Billups, a black male, as the Deputy Director of Strategic Management and Development, the same title and position held by Lowe. Billups's employment in this position was characterized as time-limited, meaning the appointment was only up through and including December

16

31, 2003.  Although this position already existed and was being filled by Lowe, because the duplicate position was "time-limited," it was not required to be publically advertised as an open position, and it was not required to be processed through DeKalb County's competitive hiring process.  Before Billups' duplicate Deputy Director position expired, Billups was named Deputy Director of Recreation.  Although his title changed, Billups continued to perform the same tasks as he did in his Deputy Director of Strategic Management and Planning position.

On December 3, 2003, Jones submitted his budget[7] for the County to the Board of Commissioners.  The budget eliminated funding for Lowe's Deputy Director position, and therefore the budget effectively proposed its elimination. On January 27, 2004, the Board of Commissioners adopted the budget and Lowe's position was dissolved.  Of the 600 positions in the budget, Lowe's position was the only one that was abolished.  Because Billups had recently been transferred out of the eliminated position into another one which was funded, he maintained his employment with the county and continued to perform the tasks he performed in

_____

[7] The budget was drafted by Stogner, but ultimately approved and submitted by Jones to the Board for review and approval.

the eliminated position.  Thus, as a practical matter, Lowe was terminated, Billups was not, and Billups continued to perform the Strategic Management and Planning functions of Lowe's position, but under his new Deputy Director of Recreation job title.  On February 3, 2004, Stogner offered Lowe the position of Parks Maintenance Coordinator.  This position was at a lower salary and stature.  Lowe refused to accept it and resigned.[8]

The account set out in this section sets forth Plaintiffs' version of the facts in this case.  Defendants do not contest the changes in the Plaintiffs' job titles and positions, nor do they contest that certain changes were made in Plaintiffs' job titles and positions.  Defendants, however, deny they made each of the statements the Plaintiffs claimed that Defendants made, particularly those that Plaintiffs offer as evidence of Defendants' intention to reduce the number of white managers in

---

[8] The racial composition of managers in DeKalb County shows a material increase in the number of black managers in the county after Jones became CEO. In January 2001, there were 98 managerial employees at pay grade 33 which the CEO had authority to hire.  In January 2001, of those 98 managers, 61 were Caucasian and 33 were African-American.  Four years later, in August 2005, there were 122 managers at pay grade 33.  Of those 122 managers, 58 were Caucasian and 60 were African-American.  Thus, the number of black county managers almost doubled from 2001 to 2005, while the total number of white managers decreased slightly during the same time period.

the county and in the Parks Department specifically.  Defendants deny treating

Plaintiffs differently from the way black managers were treated.  Defendants deny

wrongfully limiting Plaintiffs support or input, and they deny that they requested

Plaintiff Lowe or any other person to participate in an effort to discriminate against

white managers.  They deny that their actions were taken with racial animus or

hostility toward white managerial employees.  They deny that any of the Plaintiffs

were given inferior or less prestigious jobs when they were transferred, and they

deny engaging in any effort to cause Plaintiffs to terminate their employment with

the county.

## III.   PROCEDURAL BACKGROUND

On August 24, 2004, Plaintiffs filed their Complaint against Defendants.

(Compl. [1].)  Plaintiffs' claims include:  violation of equal protection under 42

U.S.C. § 1983 (Count I); intentional race discrimination in violation of § 1983

through 42 U.S.C. § 1981 (Count II); conspiracy to deprive civil rights (Count III),

retaliation (Count IV); violation of first amendment rights (Count V), and

attorney's fees (Count VI.).  (Id. at ¶¶ 89-123.)  On October 1, 2004, Defendants

filed their Answers to the Complaint.  (Answers [10] [11] [12] [13].)  On June 1,

2005, Defendants filed their first motions for summary judgment.  After the

motions were filed, the Court concluded that limited, additional discovery was warranted from March 22, 2006 through May 31, 2006.  [Order Denying Motions for Summary Judgment [235], at 14.]  Having concluded that the summary judgment motions were redundant and unmanageable, the Court ordered that each Defendant file, after completion of the extended discovery period, a single motion for summary judgment addressing the claims asserted by the Plaintiffs.  (Id. at 19.) On June 21, 2006, Defendants filed their Renewed Motions for Summary Judgment, and they are now properly before the Court.  (Motions for Summary Judgment [256] [257] [259] [262] [263]).

## III.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-

movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Each Defendant argues that he is entitled to summary judgment on every one of Plaintiffs' claims.  Defendants argue that Plaintiffs generally complain about

21

their frustrations in the workplace and that none of their complaints are supported

by evidence that Defendants intended to discriminate against white managers.

Ordinarily, whether conduct constitutes discrimination is an issue best suited for a

jury.  The question that is presented to the Court in Defendants' summary

judgment motions is whether Defendants have asserted legal arguments that allow

them to avoid a jury considering, in whole or in part, the conduct Plaintiffs allege.[9]

### B.  Motions for Summary Judgment on Plaintiffs' Claims

#### 1.    Plaintiffs' Conspiracy Claim

Defendants argue that Plaintiffs' claim for conspiracy under 42 U.S.C.

§ 1985 fails because it is barred by the intracorporate conspiracy doctrine.  "Under

the intracorporate conspiracy doctrine, a corporation's employees, acting as agents

of the corporation, are deemed incapable of conspiring among themselves or with

the corporation."  Dickerson v. Alachua County Comm'n, 200 F.3d 761, 767 (11th

Cir. 2000).  The doctrine applies to both private corporations and public entities.

Id.; see also Baker v. Chandler, 161 F. Supp. 2d 1372, 1381 (S.D. Fla. 2001).  "The

. . . doctrine holds that acts of corporate agents are attributed to the corporation

---

[9] Most legal arguments are made by all Defendants, therefore the Court
considers these arguments in common to all Defendants together.  Arguments
uniquely asserted by an individual Defendant are noted in the relevant section.

22

itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy.  Simply put, . . . a corporation cannot conspire with its employees, and its employees, when acting under the scope of their employment, cannot conspire among themselves."  McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036 (11th Cir. 2000).  The issue presented is whether the intracorporate conspiracy doctrine applies to prevent Defendants from being capable of conspiring with one another.  The Court holds that it does.

Dickerson is particularly instructive in the context of a conspiracy claim involving a public entity.  In Dickerson, the plaintiff sued his county employer for demoting him in violation of his constitutional rights, asserting a variety of claims, including a conspiracy under 42 U.S.C. § 1985, a civil rights action under § 1983, and race discrimination claims under § 1981 and Title VII.  Dickerson, 200 F.3d at 764.  The Eleventh Circuit addressed whether, under the intracorporate conspiracy doctrine, the defendant county and its employees could engage in a civil conspiracy to violate the plaintiff's civil rights under § 1985(3).[10]  Id. at 765.  The

_____

[10]  While Plaintiffs do not specify in their Complaint which subpart of § 1985 they are asserting, it is clear that their claim is based on § 1985(3), which prohibits conspiracies for the purpose of depriving persons of equal protection of the laws.  See 42 U.S.C. § 1985(3); (Compl., at ¶ 104) (alleging that "Defendants conspired for the purpose of depriving Plaintiffs of equal protection of the laws . . .

Dickerson court held that the county and its employees were a single legal entity, incapable of conspiring among themselves, and held that the intracorporate conspiracy doctrine barred the plaintiff's conspiracy claim.  Id. at 770.

Plaintiffs argue that two exceptions to the intracorporate doctrine apply in this case to permit their conspiracy claims.  These exceptions are:  (1) the independent personal stake exception; and (2) the series of discriminatory acts exception.  Plaintiffs rely only on Dickerson, which discusses both of the exceptions.  In Dickerson, the Eleventh Circuit observed:  "[O]ther circuits also have either held or considered holding corporate agents capable of conspiring in civil rights cases when those agents . . . have an 'independent personal stake' in the corporate action, or engage in a series of discriminatory acts as opposed to a single action."  Id. at 770.  The Court went on to hold that "[b]ecause none of these exceptions would apply based on the facts of this case, *we do not reach the issue of whether to adopt them in this circuit*."  Id. (emphasis added); see also Denney v. City of Albany, 247 F.3d 1172, 1190-91 (11th Cir. 2001) (Marcus, J.) (applying the intracorporate conspiracy doctrine to plaintiff's claim for discriminatory failure

---

.").  The Court does not consider the Plaintiffs to have alleged any other form of conspiracy.

to promote white employees because the actions related to defendants'
performance of their official, not personal, duties and therefore they were acting as
the city itself, not conspiratorially); Baez v. Seminole County Sch. Bd., No.
6:05CV802ORL31KRS, 2005 WL 2105961, at *9 (M.D. Fla. 2005) (noting that
the Eleventh Circuit and district courts within its Circuit have applied the doctrine
to civil rights cases).[11]  The Dickerson court expressly declined to hold the

_____

[11] A "personal stake" exception to the intracorporate conspiracy doctrine
was recognized in this circuit before Dickerson.  Dickerson's refusal to adopt the
exception in a civil rights context now makes its application uncertain.  In H&B
Equip. Co., Inc. v. Int'l Harvester Co., 577 F.2d 239, 244 (5th Cir. 1978), the Fifth
Circuit stated that an exception to the intracorporate conspiracy doctrine exists
when corporate employees act for their own personal purposes rather than those of
their employer.  This exception, however, generally is applied in anti-trust cases
and in circumstances where the defendant had an independent economic stake in
his actions.  See E.T. Barwick Indus., Inc. v. Walter E. Heller & Co., 692 F. Supp.
1331, 1341 (N.D. Ga. 1987) (for antitrust purposes, an individual employee could
not have conspired with the company to fix prices because the "personal stake"
exception did not apply); Palmer v. Gotta Have It Golf Collectibles, Inc., 106 F.
Supp. 2d 1289, 1301 n.21 (S.D. Fla. 2000) (in an antitrust conspiracy claim, noting
that under the personal stake exception, a corporation can conspire with its agent
when the agent was acting beyond the scope of his authority or for his own benefit,
but finding the exception inapplicable to the case before it).  Although two district
court cases in this circuit have recognized the personal stake exception in a civil
rights context, both were decided before Dickerson.  See Coley v. M&M Mars,
Inc., 461 F. Supp. 1073, 1076 (M.D. Ga. 1978); Saville v. Houston County
Healthcare Auth., 852 F. Supp. 1512, 1539 n.33 (M.D. Ala. 1994).  After
Dickerson's express refusal to adopt the exceptions, their viability as precedent is
questionable.

exceptions were applicable to this circuit.  Plaintiffs rely on <u>Dickerson</u> as their only

authority that the exceptions apply, and they have not cited any Eleventh Circuit

decisions after <u>Dickerson</u> to persuade this Court that the exceptions should be

applied in this case.  <u>See</u> <u>McMillan v. DeKalb County</u>, No. 1:04-cv-3039-BBM

(N.D. Ga. Feb. 14, 2005) (Martin, J.) (dismissing a nearly identical conspiracy

count on the basis of the intracorporate conspiracy doctrine).[12]  The intracorporate

conspiracy doctrine therefore applies, Defendants are incapable of conspiring with

_____

[12]  Even if the exceptions were viable in this circuit, they would not apply
here.  In cases where the personal stake exception was applied, the Defendants had
an economic stake in the conspiracy.  Plaintiffs do not allege any of the Defendants
had an economic stake in the alleged conspiracy to discriminate.  In fact, the only
stake alleged was an unspecified political benefit for Jones, Drew's interest in
attaining a Director position, and Defendants interest in keeping their jobs.  The
benefit is not capable of specification or calculation and is, at best, a speculative
intangible prospect of a benefit which the law, this Court believes, should not
recognize to support the application of this exception to the intracorporate
conspiracy doctrine.  For similar reasons, the Court concludes the "series of
discriminatory acts" exception would not apply, even if it was viable in this circuit.
Plaintiffs make a conclusory statement that Defendants "engaged in a series of
discriminatory acts as opposed to a single action."  Although Defendants are
alleged to have engaged in a variety of acts pursuant to an agreement to
discriminate against whites, there is an absence of any evidence that the parties
agreed to a common purpose as opposed to acting according to an objective
articulated by Jones for a benefit he sought to achieve.  Whether there is sufficient
evidence for a reasonable jury to find in favor of Plaintiffs on this claim is
doubtful, even if there was authority to apply the exception in this case.

themselves, and Plaintiffs' conspiracy claim under § 1985 fails as a matter of law.

Summary judgment is granted to each Defendant on this claim.

> 2.     Statute of Limitations for the Equal Protection and Intentional
>        Race Discrimination Claims (Counts I &II)

Each Defendant next argues that Plaintiffs' equal protection and race

discrimination claims are barred by the applicable statute of limitations.  They

argue that because Plaintiffs must assert their claims under 42 U.S.C. § 1983, the

statute of limitations is two years, and therefore Bryant's transfer claim, Drake's

transfer and failure to promote claims, and Kelley's transfer and hostile work

environment claims are time-barred.  Plaintiffs argue that the statute of limitations

for § 1981 claims applies, and limitations period applicable to § 1981 claims is

four years--not two.

Plaintiffs' complaint alleges a "violation of 42 U.S.C. § 1981 as enforced by

42 U.S.C. § 1983."[13]  (Compl., at ¶ 100.)  This pleading form is required because

the Eleventh Circuit has held in cases involving claims against government

defendants that § 1983 provides the exclusive damages remedy for the violation of

---

[13]  Plaintiffs also note in their Responses to Defendants' motions for
summary judgment that they are bringing their § 1981 claims through the vehicle
of § 1983.

rights guaranteed by § 1981.  Butts v. County of Volusia, 222 F.3d 891, 893 (11th Cir. 2000).  "Congress created a catchall 4-year statute of limitations for actions arising under federal statutes enacted after December 1, 1990, that do not contain statutes of limitations provisions."  Palmer v. Stewart County Sch. Dist., 178 Fed. Appx. 999, 1002-03 (11th Cir. 2006) (citing 29 U.S.C. § 1658 and Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004)).  Section 1981 was amended after December 1, 1990, and is likely covered by the catchall provision.  Section 1983, however, does not have a statute of limitations provision, and it was not enacted or amended after December 1, 1990.  Id. at 1003.  Plaintiffs argue that since their claims are, at their core, § 1981 actions, the four-year limitations period should apply.  Defendants argue the operative statute is § 1983, the vehicle for enforcing § 1981 claims against public defendants.  The statute of limitations for § 1983, claims is "the statute of limitations given by state law, which, in Georgia, is two years."  Id. (citing Williams v. City of Atlanta, 794 F.2d 624, 626 (11th Cir. 1986)); see also O.C.G.A. § 9-3-33.  Thus, Defendants argue the Plaintiffs' equal protection and race discrimination claims--based on § 1981 and brought under § 1983--are barred.

Plaintiffs rely on <u>Jones v. R.R. Donnelley & Sons Co.</u>, to support their argument that *all* § 1981(b) claims are governed by the four-year statute of limitations–even those brought through § 1983.  While <u>Jones</u> supports the conclusion that the four-year catchall limitations period applies to § 1981 actions against private persons, the Supreme Court has been equally clear that where § 1983 is effecting the remedy for a civil rights violation, federal statutory law under 42 U.S.C. § 1988 "is fairly construed as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims.  The federal interests in uniformity, certainty and the minimization of unnecessary litigation all support the conclusion that Congress favored this simple approach."  <u>Wilson v. Garcia</u>. 471 U.S. 261, 275 (1984).

Plaintiffs seek to discredit the reasoning in <u>Wilson</u> by relying on a footnote in <u>City of Rancho Palos Verdes v. Abrams</u>, 544 U.S. 113, 123 (2005), a case brought under the Federal Telecommunications Act.  The <u>Abrams</u> footnote reads:

> The statute of limitations for a § 1983 claim is generally the applicable state-law period for personal injury torts. . . . It may be, however, that this limitations period does not apply to respondent's § 1983 claim.  In 1990, Congress enacted 28 U.S.C. § 1658(a), which provides a 4-year, catchall limitations period applicable to "civil action[s] arising under an Act of Congress enacted after"

> December 1, 1990.  In <u>Jones</u>, we held that this 4-year
> limitations period applies to all claims "made possible by
> a post-1990 [congressional] enactment."  Since the claim
> here rests upon violation of the post-1990 TCA, § 1658
> would seem to apply.

<u>Abrams</u>, 544 U.S. at 123 n.5.  Plaintiffs' reliance on the footnote is misleading.  A

more comprehensive reading of <u>Abrams</u> discredits the interpretation advanced by

Plaintiffs.  The respondent in <u>Abrams</u> argued that the rule that "§ 1983 claims are

governed by the state law statute of limitations for personal-injury torts, does not

apply to §1983 actions to enforce statutes that themselves contain a statute of

limitations."  <u>Id.</u> at 124.  He urged that  "the limitations period in the federal statute

displaces the otherwise applicable state statute of limitations."  <u>Id.</u>  The Supreme

Court rejected this reasoning:

> This contention cannot be reconciled with our decision in
> <u>Wilson</u>, which expressly rejected the proposition that the
> limitations period for a § 1983 claim depends on the
> nature of the underlying right being asserted.  We
> concluded instead that 42 U.S.C. § 1988 is "a directive to
> select, in each State, the one most appropriate statute of
> limitations for *all* § 1983 claims."  We acknowledged
> that "a few § 1983 claims are based on statutory rights,"
> but carved out no exception for them.

<u>Id.</u>  (citations omitted).

The Eleventh Circuit applied this reasoning in <u>Palmer</u>.  178 Fed. Appx. at 1002.  In <u>Palmer</u>, the plaintiff asserted claims under Title VII, § 1981, and §1983 against the defendant school district and Dr. Betty Ray, individually and in her official capacity.  The plaintiff alleged that the defendants racially discriminated against her in pay and benefits.  <u>Id.</u>  The district court granted judgment as a matter of law to the school district and Ray on the plaintiff's Title VII, § 1981, and §1983 claims because the claims were time-barred.  <u>Id.</u> at 1001.  Plaintiff argued on appeal that the district court erred in holding her § 1981 claim was barred by a two-year statute of limitations.  <u>Id.</u> at 1002.  She argued that the four-year catchall statute of limitations applied.[14]

The Eleventh Circuit acknowledged that the four-year catchall statute of limitations applied to statutes enacted after December 1, 1990, that do not contain their own statute of limitations provision.  Because § 1981 was amended by the Civil Rights Act of 1991, the Court raised the question whether the four-year catchall provision might apply.  <u>Id.</u>  The critical issue as to which limitations period applied, in the Court's mind, was whether the plaintiff's cause of action against Ray in her individual capacity arose under the 1991 Act amending § 1981,

---

[14]  The <u>Palmer</u> plaintiff did not challenge the dismissal of her Title VII claim.

or whether it arose under the original version of § 1981. The court remanded the case for consideration of that issue. Id.

The Court then noted "[a]s previously stated, a § 1981 claim against a state actor must be brought under § 1983. Therefore, [plaintiff] has no cause of action under § 1981, except against Ray in her individual capacity." Id. The court noted that the two-year state statute of limitations applies to § 1983 claims, holding that "with the exception of the dismissal of the § 1981 claim against Ray in her individual capacity, we affirm the dismissal of the [claims] as time-barred." Id.[15]

In so holding, the Eleventh Circuit acknowledged that "[s]ection 1983 provides the sole cause of action against state actors for violating § 1981." Id. (citing Butts v. County of Volusia, 222 F.3d 891, 892-94 (11th Cir. 2000)); see also AUI, LLC, v. DeKalb County, No. 1:05-cv-2273-BBM (N.D. Ga. Aug. 28, 2006) (Martin, J.) (holding that plaintiff's cause of action properly arises under § 1983, not § 1981, since § 1983 is the exclusive remedy against state actors for violations of § 1981 and applying the two-year statute of limitations to plaintiff's

_____

[15] The Palmer opinion is not entirely clear whether the plaintiff in Palmer brought an action against the school district under § 1983 enforcing § 1981, or whether the plaintiff simply asserted both § 1981 and § 1983 claims against the defendants.

claims); <u>Marshall v. Daleville City Bd. of Educ.</u>, No. 1:05cv386-WHA, 2006 WL

2056581, at *2 (M.D. Ala. July 24, 2006) ("Section 1981 claims against state

actors must be brought pursuant to § 1983 . . . Therefore, the statute of limitations

for a § 1981 claim asserted pursuant to § 1983 is governed by state law.").

Because Plaintiffs bring their claims for violation of § 1981 through § 1983, as

they must against state actors, the Court concludes that the two-year statute of

limitations for § 1983 actions applies to Plaintiffs' claims.[16]

Applying the two-year limitations period, Defendants argue that Bryant's

transfer claim, Drake's transfer and failure to promote claims, and Kelley's

demotion and hostile work environment claims are barred.[17]  They argue:  (1)

---

[16]  In response to Defendants' motions for summary judgment asking the Court to apply the two-year statute of limitations to all Plaintiffs' claims, Plaintiffs do not contend that they also assert § 1981 claims against Defendants in their individual capacities.  In fact, they state that they bring their § 1981 claims through § 1983.  Because Plaintiffs have abandoned this individual capacity argument, the Court does not consider whether those claims would be time-barred under the limitations period applicable to § 1981 actions.

[17]  Williams also argues that Bryant's hostile work environment claim arose no later than February 2002, and therefore it is time-barred.  Williams misinterpret's Plaintiffs claims in this action and attempts to treat each act complained of by Bryant as a separate cause of action instead of viewing the denial of compensatory time and failure to allow Bryant to return to work as part of Bryant's claim for a hostile work environment.  In fact, one of the actions Bryant alleges contributed to his hostile work environment is Drew's act of preparing

Plaintiff Kelley was transferred to the Greenspace program in February 2002.

Because the Complaint was filed on August 24, 2004, more than five months after

the two-year statute of limitations expired, Kelley's discriminatory transfer claim is

barred; (2) Kelley's hostile work environment fails because an act contributing to

the hostile work environment must have occurred within the limitations period, and

Kelley does not identify any evidence of any such act occurring after August 24,

2002. The Court agrees that Kelley has not alleged sufficient facts occurring

within the limitations period to support her demotion claim, and summary

judgment is granted on Kelley's demotion claim.

Kelley does, however, allege an act contributing to her alleged hostile work

environment which occurred within the limitations period. She alleges she was

constructively discharged, which occurred when she gave her resignation on

September 25, 2002.[18]  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101,

termination letters for him and intimidating him by leaving their contents open so
that Bryant could see them. This occurred in 2004, and since this act took place
within the limitations period, Bryant's hostile work environment claim is not time-
barred.

[18]  Plaintiffs also argue, by way of their response to Defendants' Statement of
Material Facts, that an additional act contributing to Kelley's hostile work
environment occurred within the limitations period. (II Pl. SMF, at ¶ 35.)
Plaintiffs state that during the Spring of 2002, Kelley received approval from

105 (2002) (holding, in the context of the timing of filing a charge of
discrimination with the EEOC, that if an act contributing to the claim occurs within
the filing period, the entire time period of the hostile environment may be
considered for purposes of determining liability).

"Constructive discharge negatively affects an employee's job status, and
therefore constitutes an adverse employment action.  In other words, where
working conditions are so intolerable that a reasonable person would have felt
compelled to resign, the employer's conduct is an adverse employment action."
Akins v. Fulton County, 420 F.3d 1293 , 1300-01 (11th Cir. 2005); see also Rowell
v. Bellsouth Corp., 433 F.3d 794, 805 (11th Cir. 2005) ("[T]he doctrine of
constructive discharge enables an employee who has resigned to demonstrate that

---

Stogner to relocate her office to Arabia Mountain, Georgia, in order to work on the
Arabia Mountain Project.  Kelley began to set up an office there in anticipation of
relocating.  (Id.)  Kelley claims, without specifying a date, that in the summer of
2002, Kelley was told by Tina Arbes that she could not relocate to Arabia
Mountain.  (Id.)  Kelley believes this was part of Defendants' plan to frustrate her
so that she would terminate her employment.  Plaintiffs failed to present this
evidence in response to Stogner's motion for summary judgment, and Plaintiffs did
not specify any dates for these actions other than one seasonal reference.  "Summer
of 2002" is too vague to provide sufficient evidence that this was an act
contributing to the hostile work environment which occurred between August 24
and September 25, 2002.  It may, however, be considered along with all other
contributing evidence because Kelley's constructive discharge occurred within the
limitations period.

he suffered an adverse employment action by showing that the resignation was an involuntary response that was the product of intolerable working conditions--that is that he had only a choice between retirement and discharge."); Van der Meulen v. Brinker Int'l, 153 Fed. Appx. 649  (11th Cir. 2005); Mitchell v. Overbey, 2005 U.S. Dist. LEXIS 17489, at * 19 (M.D. Ga 2005), aff'd by Mitchell v. Pope, 2006 U.S. App. LEXIS 17868 (11th Cir. July 14, 2006) (holding that because plaintiff's constructive discharge occurred within the 180-day limitations period for filing an EEOC complaint, the complaint for hostile work environment and constructive discharge was timely filed, and the Court would consider all of the allegations pertaining to any acts by defendants contributing to the hostile work environment). Because Kelley offers evidence that her constructive discharge, an act contributing to her hostile work environment, occurred within the limitations period, the Court finds that her hostile work environment claim is not time-barred.  See Scott v. Lee Cty Youth Dev. Ctr., 232 F. Supp. 2d 1289, 1296-97 (M.D. Ala. 2002) (noting that, under the Supreme Court's decision in Morgan, in theory, Plaintiffs should be able to contend their constructive discharge was a component act of their hostile work environment).

Drake was transferred to the position of Assistant Director of Parks and Recreation in February 2002. The Director of Parks and Recreation position opening was posted on February 25, 2002 and closed on March 8, 2002. Defendant Drew was promoted to the position on March 16, 2002. The Complaint was filed on August 24, 2004. The Court agrees that both Drake's discriminatory transfer and failure to promote claims accrued more than two years after the Complaint was filed and are time-barred.

Bryant was assigned to his Recreation Services duties on June 10, 2002. The Complaint was filed on August 24, 2004, therefore Bryant's discriminatory transfer claim also is barred by the statute of limitations.

Plaintiffs seek to avoid these statute of limitations bars by arguing that their claims are tolled by the discovery rule and the continuing tort doctrine. They rely on Mullinax v. McElhenney for the preposition that the statute of limitations for a § 1983 claim does not begin to run on the date the acts occurred, but rather when the Plaintiffs realize (a) they are injured, and (b) that Defendants inflicted the injury. 817 F.2d 711 (11th Cir. 1987). Bryant, Drake and Kelley claim they did not learn until 2004 that they were injured by Defendants' alleged discriminatory conduct.

When a § 1983 action accrues is a matter of federal law.  Mullinax, 817 F.3d at 716.  "The statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."  Id. (citations and quotations omitted). Therefore, a § 1983 action does not accrue until the plaintiff "knows or has reason to know that he has been injured . . . [and] until the plaintiff is aware or should have been aware who has inflicted the injury."  Id.

The discovery rule does not save Plaintiffs' claims here.  Kelley testified she believed, at least by February 2002, that she had been discriminated against because of her race.  (Kelley Dep., attached to Ex. to Pl. SMF Vol. 1 as Ex. J, at 131-32.)[19]  Drake testified that when he was passed over for promotion and

_____

[19] Plaintiffs point to a paragraph in Plaintiff Kelley's affidavit as evidence that she did not learn until 2004 that she was injured by Defendants' conduct.  The paragraph cited is insufficient to create a genuine issue of material fact about whether Kelley knew she had been injured and who had injured her.  In fact, Kelley states in her affidavit that she repeatedly spoke with and complained to Stogner about the hostile work environment and racial discrimination she was experiencing, and that she met privately with Defendant Stone as far back as July 2001 to report her complaints.  (Kelley Aff., attached to Ex. to Pl. SMF as Ex. D, at ¶ 25.)  Kelley's affidavit and other testimony demonstrates she was aware she was experiencing an injury, that she knew who was responsible for it and believed the conduct she experienced was motivated by discrimination.  The fact that the proof of her suspicions improved when Plaintiff Lowe came forward in the spring of 2004 does not affect what she knew and when she knew it for purposes of the

transferred, he "certainly thought at that time that race was an issue." (Drake Dep., attached to Ex. to Pl. SMF as Ex. K, at 157.) Bryant testified that when his office was moved to Tucker, around May of 2002, he thought he was being discriminated against. (Bryant Dep., at 438-440.) The necessary conclusion reached here is that Kelley, Bryant and Drake all were aware, before August 24, 2002, they had been injured because of Defendants' actions, knew who had made the adverse employment decisions affecting them, and believed the adverse action taken was race discrimination.

Plaintiffs Kelly, Drake and Bryant next argue that the statute of limitations does not bar these claims because they constitute continuing torts, and the limitations period does not accrue until the elimination of the continuing tort -- the pattern of mistreatment -- which continued beyond August 24, 2004.[20] The

Court's limitations period analysis.

[20] "In Section 1983 cases, the length of the limitations period, and the closely related questions of tolling and application, are to be governed by state law." Griffin Indus., Inc. v. Couch, 2006 U.S. Dist. LEXIS 17285, at *16 n.4 (N.D. Ga. Mar. 23, 2006) (citing Wilson, 471 U.S. at 276-77). Determining when a § 1983 claim accrues is a question of federal law. Id. (citing Mullinax and noting that while Plaintiff characterized the discovery rule as a tolling mechanism under Georgia law, Plaintiff was actually referring to the issue of when its § 1983 claim accrued under federal law).

continuing tort doctrine tolls the limitations period where the injury resulting from a tortious act is not immediately apparent, and the victim could not in the exercise of ordinary care have learned of it.  Everhart v. Rich's, 229 Ga. 798, 802 (1972).

In Everhart, plaintiffs claimed personal injury and property damage caused by a set of draperies sold by the defendant.  The plaintiffs alleged that they became ill years after hanging the draperies in their bedroom.  They claimed that when they became ill, they first discovered that billions of particles had broken loose from the draperies, the particles had been carried through the house, and it was these particles that caused their physical injury and property damage.  Their action was based on the Defendant's alleged failure to warn of the danger from the particles.  The Defendant argued the action was barred by the applicable statute of limitations.

The Georgia Supreme Court in Everhart held that when continued exposure is caused by a continued failure to warn, the tort is of a continuing nature.  Where a tort is continuing in nature, the statute of limitations does not begin to run until "such time as the continued tortious act producing injury is eliminated, e.g. by an appropriate warning in respect to the hazard."  Everhart, 229 Ga. at 802; see also Ballew v. A.H. Robins Co., 688 F.2d 1325, 1327-38 (11th Cir. 1982) (overturning

district court's grant of summary judgment based upon statute of limitations defense in a personal injury case involving an intrauterine device implanted in plaintiff because of continuing nature of tort and absence of warning).

The Georgia law continuing tort theory simply does not apply to Plaintiffs' claims.  The continuing tort theory applies where a plaintiff could not have discovered the injury the plaintiff alleges to have suffered, such as where a doctor leaves a sponge inside a patient during surgery or where draperies release invisible and harmful particles into the air without the plaintiff's knowledge.  The continuing tort doctrine does not apply to Kelley's wrongful transfer claim, Drake's transfer and failure to promote claims and Bryant's transfer claim because they each were aware of the injury more than two years before the Complaint was filed.  See Everhart, 229 Ga. at 802; Harrison v. Beckham, 238 Ga. App. 199, 204 (1999) ("Georgia courts have consistently held that in a continuing tort a cause of action accrues when a plaintiff discovers, or with reasonable diligence should have discovered, both the injury and the cause thereof.")

Plaintiffs Kelley, Drake and Bryant also rely on two federal cases from this district applying a continuing tort theory in a different context.  In Coleman v. Miller, an African-American plaintiff sued the governor and the State of Georgia

41

for civil rights violations under § 1983, among other statutes, claiming the Georgia state flag, which displayed the Confederate battle emblem, violated his equal protection, First Amendment, and other civil rights.  885 F. Supp. 1561, 1568 (N.D. Ga. 1995).  The defendants in <u>Coleman</u> argued that Georgia's two-year statute of limitations for personal injury barred the plaintiff's claims.  The district court held, without elaboration or explanation, that under the continuing tort doctrine, the claims were not time-barred.  <u>Id.</u>  The Court does not find the decision in <u>Coleman</u> helpful on this issue.  The facts of the case are not well-developed, and the greater weight of the authorities and the Court's reasoning based on them results in the conclusion that the continuing tort principle does not apply here.

Plaintiffs also rely on <u>S.W. Daniel, Inc. v. Urrea</u>, 715 F. Supp. 1082 (N.D. Ga. 1989).  In <u>S.W. Daniel</u>, the defendant special agent, in an action for malicious interference with business and contractual relations, argued that the plaintiffs' claims were barred by the two-year statute of limitations.  715 F. Supp. 1082 (N.D. Ga. 1989).  The plaintiffs had alleged that the defendant had engaged in a series of actions designed to interfere with their business and contractual relations during a criminal trial against them beginning in July 1984 and continuing through November of 1986.  <u>Id.</u> at 1084.  The plaintiff claimed that the defendant's false

testimony during pretrial hearings, which occurred less than two years from the filing of the complaint, was one such criminal activity on which the Plaintiff's claims were based.  The plaintiffs argued that they had alleged a continuing tort which ended less than two years before filing of the complaint, and thus their claims were not time-barred.

The S.W. Daniel court noted that whether the defendant's earlier actions of seizing documents, foreclosing a supplier, and censuring advertisements constituted a continuing tort was a question of federal law and that "a cause of action for a continuing tort accrues when the wrongful conduct terminates.  The continuing tort principle addresses itself to persistent wrongful conduct, not mere persistent injury accruing from an earlier wrong."  Id. at 1087.  Typical examples of persistent wrongful conduct -- as applied to persistent tort injury -- are persistent denials of medical care and conduct constituting a pattern of mistreatment, such as refusing to provide psychiatric or other medical care, shower, telephone or visiting privileges to a prisoner.  The court observed that "[o]ther wrongs which cause harm into the future, but nevertheless result from a single act of misconduct, are not continuing torts in the absence of continuing illegal acts."  Id.  Acknowledging this distinction, the S.W. Daniel court found there was no continuing tort.  Id.; see

<u>also</u> <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 257 (1980) (holding no

continuing tort occurred where plaintiff alleged an "ongoing violation" of his civil

rights, because "[m]ere continuity of employment, without more, is insufficient to

prolong the life of a cause of action for employment discrimination" and that

plaintiff must identify the alleged discriminatory acts that continued until

termination of his employment).

Plaintiffs Kelley, Drake and Bryant do not allege a continuing tort under

federal law.  Discriminatory transfer, failure to promote, demotion and hostile

work environment claims all are based, as here, on individual, discrete acts of

alleged discrimination.[21]  While Plaintiffs allege persistent discrimination over a

period of time, that is not sufficient to invoke the continuing tort exception to the

application of the statute of limitations.  "The proper focus is upon the time of the

---

[21]  The law is settled regarding the statute of limitations for Plaintiffs' claims
for hostile work environment.  If one act contributing to a plaintiff's hostile work
environment occurs within the statute of limitations period, all conduct
contributing to the hostile work environment may be considered.  The Supreme
Court has noted the different nature of hostile work environment claims as
compared to discrete acts of discrimination.  "Hostile environment claims are
different in kind from discrete acts.  Their very nature involves repeated conduct.
The unlawful employment practice therefore cannot be said to occur on any
particular day.  It occurs over a series of days or perhaps years and, in direct
contrast to discrete acts, a single act of harassment may not be actionable on its
own."  <u>Morgan</u>, 536 U.S. at 123.

discriminatory acts, not upon the time at which the consequences of the acts became most painful." Ricks, 449 U.S. at 258 (noting that while the complaint did allege a variety of unusual incidents occurring within the limitations period, including one where plaintiff was physically attacked by the education department chairman, these incidents were not independent acts of discrimination).

Plaintiffs' blanket conclusory statements that they did not learn until 2004 that they were injured by Defendants' discriminatory conduct, are not enough to avoid the limitations period bar. The evidence further shows that they knew before August 24, 2002, of the injuries they allege to have suffered, who caused the injuries and the suspected motivation behind the conduct. Kelley's transfer claim, Drake's transfer and failure to promote claims, and Bryant's reassignment claims are time-barred and are required to be dismissed. Summary judgment is granted to each Defendant on these claims.

### 3. Bryant, Drake, and Kelley's Hostile Work Environment Claims

Defendants next argue that Bryant, Drake, and Kelley have failed to put forth sufficient evidence to sustain a claim for a racially hostile work environment. To establish a hostile work environment claim under Title VII, a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome

harassment; (3) that the harassment was based on a protected characteristic of the employee, such as the employee's race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1279-80 (11th Cir. 2003) (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)).

Defendants first challenge the third element of a hostile work environment claim, arguing that Bryant, Drake, and Kelley have failed to put forth evidence, aside from their own speculation, that any of the acts they complain of were race-based. The Court disagrees. Plaintiffs have presented sufficient evidence to create a genuine issue of fact as to whether the acts complained of by Plaintiffs were motivated by race. The evidence that Defendants targeted Bryant, Drake, and Kelley based on their race is unusually compelling.

For example, Lowe testified that Stone told Lowe after he was hired that other white persons, even if they had been interested in his job, would not have been considered for his job. (Pl. SMF, at ¶ ; Lowe Dep., attached to Ex. to Pl. SMF

as Ex. N, at 127.)  Drew, upon welcoming Lowe to DeKalb County, told him that

they were eliminating the existing white people in the Parks Department and

replacing them with black managerial employees because the CEO's agenda was to

get reelected, and Stone was making sure the agenda was executed.  (Pl. SMF, at ¶

17; Lowe Dep., at 139-40.)  Jones stated to Lowe on multiple occasions that he

wanted a "darker administration."  (Pl. SMF, at ¶ 17, Lowe Dep., at 381.)  Jones

also referred to Plaintiff Bryant as a "white bastard."  (Pl. SMF, at ¶¶ 18-19; Lowe

Dep., at 354.)  Defendant Drew told Lowe that she did not trust the white

employees in her department and asked him to "dig up dirt" on white employees.

(Pl. SMF, at ¶ 18; Lowe Dep., 476-77.)

     Lowe also testified that Drew told Lowe that she transferred Bryant into a

position involving recreation because Bryant did not know anything about

recreation, and thus Drew believed Bryant would be perceived as incompetent.

Drew told Lowe not to speak with Drake about important issues because she wanted

to keep him in the dark hoping he would fail in his recreation position. (Pl. SMF, at

¶ 18; Lowe Dep., at 515.)  Before department meetings, Drew would meet with

Lowe to discuss how she could frame issues so as to annoy Bryant and Drake.

(Lowe Dep., at 516.)  Defendants Jones, Stone, Drew and Williams, on separate

occasions, each told Lowe that there was a plan to discriminate against white employees in DeKalb County, and that Defendants called the reassignment of Plaintiffs' duties a "reorganization."  Defendant Stone told Lowe there were ways to get rid of employees without firing them.  (Lowe Aff., attached to Ex. to Pl. SMF as Ex. C, at ¶¶ 10-11.)

The evidence of the large increase in black employees in the departments over which Jones had control during his tenure, and the corresponding reduction, albeit slight, in the number of white employees, constitutes corroborating evidence of racially motivated conduct.  (Pl. SMF, at ¶¶ 73-79.)  Plaintiffs have met their burden to come forward with evidence that would allow a reasonable jury to conclude the acts complained of by Plaintiffs were motivated by race.

Defendants next argue that Plaintiffs have not shown the fourth hostile work environment element -- that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  The Eleventh Circuit, in Mendoza v. Borden, 195 F.3d 1238 (11th Cir. 1999), observed:  "[e]stablishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component."  Id. at 1246.  That is,

considering all the circumstances, "[t]he environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive."  Id. (citations and quotations omitted).  The Mendoza Court identified "four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir.1997)).  Courts are required to view the conduct in context, not as isolated acts, and make a decision based on the totality of the circumstances.  Id.  "Only when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employment and create an abusive working environment is the law violated."  Barrow v. Ga. Pacific Corp., 144 Fed. Appx. 54, 56 (11th Cir. 2005) (quotations and citations omitted).

Taking the facts in the light most favorable to Bryant, he has put forth the following evidence regarding his hostile work environment claim:  Bryant's responsibilities were significantly reduced by Drew in June when she issued her

memorandum of temporary assignments (Pl. SMF, at ¶ 138); Drew treated white subordinates differently than black employees, at one time requiring a white employee to write a memo of explanation when she brought her grandchild in the office while not requiring black employees to do the same (Id. at ¶ 139); Drew isolated white deputy directors from decision making while seeking increased input from black deputy directors (Id. at ¶ 141); Drew required white employees to schedule appointments to speak with her while giving black employees free access; Drew gave preference to black employees to attend conferences; Drew gave preference to black employees for leadership positions; and Billups, a black employee with less tenure, was hired at a higher salary than Bryant.  (Id.)

Bryant further alleges in support of his hostile work environment claim that Drew's actions included:  denying Bryant's staffing requests, withholding staffing, information and computers from him, denying him comp time when Bryant had surgery, refusing to allow Bryant to return to work after his surgery when he requested and making him wait an additional week to return, assigning subordinates duties without his knowledge, excluding him from meetings and discussions, failing to prepare his performance evaluation which would allow him to get a raise, intentionally framing discussions in meetings to frustrate and annoy him, and

threatening Bryant by preparing suspension letters for him and carrying them so that Bryant saw their contents.  (Id. at 142-43, 147, 149-50.)

Taking the facts in the light most favorable to Drake, the following acts contributed to his hostile work environment:  Drew removed from Drake the responsibilities of an assistant director--the second most senior manager in the Parks Department--and instead treated him as a lower-level deputy director; Drew told all department deputy directors to report directly to her instead of Drake--a policy inconsistent with his job description; Drew removed Drake as the Parks Department's representative to the bond program--a responsibility he had since 1986; Drew did not allow Drake to participate in the hiring of deputy directors, even though he was the Assistant Director; Drew did not seek input from Drake regarding the reorganization of the Parks and Recreation Divisions; Drew hired Drake's subordinates without his knowledge or input; Drew restricted Drake from speaking to the media, giving this responsibility instead to Lowe, Drake's subordinate; Drew delegated to Lowe the responsibility to run the Parks Department when Drew was gone, instead of allowing Drake, the Assistant Director to exercise this delegated authority; Drew placed a memo in Drake's file stating that Drake had left the office on an "unauthorized doctor's appointment," apparently

because he had told her that he had a sinus infection, but the doctor instead

diagnosed Drake with "acute asthmatic bronchitis;"[22] Drew excluded Drake from

discussions regarding DeKalb County's golf course management and revenue even

though this area was Drake's responsibility; Drew did not provide Drake with a

performance appraisal or work plan; and Drew intentionally sought to aggravate

and annoy Drake in department meetings.

Taking the facts in the light most favorable to Kelley, she offers the

following evidence to support her hostile work environment claim:  Defendant

Jones angrily confronted her on several occasions, and on one occasion, Jones

approached her, yelling and screaming in a physically threatening manner (Pl. SMF,

at ¶ 102);  Jones told Kelley not to speak to the press as Parks Department Director

or speak with members of the Board of Commissioners, though her previous job

duties included these tasks (Pl. SMF, at ¶¶ 103-104);  Stogner told Kelly that she

didn't understand the geopolitical issues of DeKalb County and that she could not

---

[22]  When questioned about the memo, Drew was evasive and denied directing her secretary to place the negative information in Drake's file.  She implied that her secretary might have decided Drake's doctor's appointment was unauthorized and written the memo on her own.  Drew testified that she had no memory of the memo and that she could not speak to the relevance of placing such a comment in Drake's file.  (Drew Dep., at 179-186.)

relate to powerful black men (Pl. SMF, at ¶ 105);  Stogner also told Kelley that

Jones wanted to showcase black parks and black employees, implying that Jones

did not want white employees, including her, to represent the Parks Department (Id.

at ¶ 116); Kelley was not permitted to make hiring decisions or to conduct applicant

interviews on her own; Williams told Kelley that a white candidate could not be

recommended for the position of Deputy Director of Recreation because Jones

would not accept it (Pl. SMF, at 110); After Drew was hired to fill the Deputy

Director position, Jones and Williams isolated Kelley by bypassing her in the

decision-making process and by communicating directly with Drew (Pl. SMF, at ¶

114); Kelley was demoted from her position as Director of the Parks Department

and reassigned to the Greenspace group where she was to work in a group with no

title and no supervisory authority (Id. at ¶ 121); Kelley's proposals for the

Greenspace bond program were repeatedly rebuffed by Stogner and her supervisor,

Tina Arbes; Kelley was designated to be moved from her former Director's office

into a small, windowless office that used to be a storage area (Pl. SMF, at ¶ 131);

Stogner approved Kelley's request to move her office to Arabia Mountain and

allowed her to spend money preparing, then withdrew permission at the last minute

in order to frustrate Kelley, Kelley's transfer to the Greenspace group was

personally and professionally humiliating, and it was uniformity perceived as a

demotion (Id. at ¶ 127, 129, 132); Kelley eventually had no meaningful job

responsibilities and her duties were reduced to spending most of her time "coloring

maps."  (Id. at 133.)

The Court first finds that Bryant, Drake, and Kelley subjectively believed[23]

they were being harassed based on their race.[24]  Thus the Court's focus is on the

objective component.  The Court is required to look at the conduct in context, not as

isolated acts and to evaluate on the totality of the circumstances whether Plaintiffs

have put forth sufficient evidence for a reasonable jury to find that the conduct was

sufficiently severe and pervasive.  The Court concludes they have.

---

[23]  Kelley, Bryant and Drake have presented evidence that they found the actions subjectively offensive, as demonstrated by their testimony and Bryant's EEO complaint against Drew for creating a hostile work environment.

[24]  This is a unique case in that there is significant evidence of a plan to discriminate, but the actions, while offensive and harmful, were neutral on their face.  The Court concludes there is sufficient evidence of hostile work environment for this case to be submitted to a jury, noting that Title VII's objective of prohibiting race discrimination in the work place would be thwarted if a supervisor were able to embark on a plan to wrongfully discriminate, but avoid accountability by carefully characterizing discrimination as the restructuring or reorganization of a workforce and avoiding obviously racial references or comments.

Bryant, Drake, and Kelley do not complain about random, isolated incidents occurring over several years.  The alleged conduct occurred with significant frequency–many of the "incidents" occurred repeatedly and constantly beginning in early 2001.  Bryant and Drake both submit evidence that their job responsibilities, especially their supervision and leadership authority, were drastically limited by Drew.  Kelley submits evidence that her supervision and leadership authority were drastically limited by Jones, Stogner, and Williams.  The severity of the conduct is evidenced by the fact these actions were taken by Bryant, Drake, and Kelley's superiors–the people who had authority to adversely affect their employment.  "When the conduct in question is that of a supervisor, even isolated instances may more clearly rise to the level of actionable harassment."  Lex K. Larson, Employment Discrimination 52-13, at § 52.03 Vol. 3 (2nd ed. 2006).

Although no physically threatening or humiliating actions were taken publicly against Bryant or Drake[25] and no racially derogatory comments were made directly to any of the three, this is the only factor not shown by Plaintiffs' evidence.  The actions alleged significantly altered the terms and conditions of Bryant, Drake,

---

[25]  Kelley does allege an incident where Jones screamed at her and approached her as if he was going to hit her.

and Kelley's employment by undermining their ability to perform their job, removing responsibilities from them, and hampering their ability to perform their supervision function to the point that Plaintiffs barely had any responsibility left. See Croker v. Boeing Co., 437 F. Supp. 1138, 1193 (E.D. Pa. 1977) (holding the "overwhelming evidence of harassment . . . included unusually close supervision, denied transfer requests, reprimands concerning dress, use of racially demeaning language and an attempt to prevent [the plaintiff] from obtaining a promotion" was sufficiently severe and pervasive).  Plaintiffs present evidence that these actions degraded their credibility, authority and stature in the positions they held, and even though the acts were disguised as neutral managerial decisions, Plaintiffs offer significant evidence that the harassment was based on race.  In fact, Plaintiffs submit evidence that Defendants intended to engage in discrimination carefully calculated to cause Plaintiffs to terminate their employment.  The Court here concludes that the environment alleged by Bryant, Drake, and Kelley in which white managers were treated with hostility and black managers were favored, especially where the terms and conditions of Plaintiffs' employment were so severely altered, could be perceived by a reasonable jury to be pervasively and discriminatorily hostile and abusive.

Plaintiffs' claims differ from those in the cases relied on by Defendants to support their argument that the conduct here is not sufficient to meet the objective standard.  In the cases cited by Defendants, the acts complained of were isolated over several years and did not sufficiently alter the terms and conditions of the plaintiff's job.  See Barrow, 144 Fed. Appx. at 56 (finding no hostile work environment where plaintiff gave evidence of isolated, sporadic instances of racial harassment over his more than fourteen years of employment); Mendoza, 195 F.3d at 1248 (holding that plaintiff did not endure conduct that was so severe or pervasive that it altered the terms or conditions of her employment and that three of the four factors of a hostile work environment–physically threatening or humiliating conduct, interference with job performance, and severity–were absent).  Viewing the evidence in the light most favorable to Plaintiffs and resolving all reasonable doubts in Plaintiffs' favor, the Court concludes that, under the totality of the circumstances, Plaintiffs have put forth sufficient evidence to show a genuine dispute of material fact exists regarding Kelley, Bryant and Drake's hostile work environment claims and that a reasonable jury could find an actionable hostile work environment.  Defendants are therefore not entitled to summary judgment on these hostile work environment claims.

Individual Defendant Culpability

Defendants Jones, Williams, Stogner and Stone each argue that Bryant and Drake cannot show that they personally participated in the alleged constitutional violation or that there is a causal connection between their actions and the violation alleged.  Drew argues that there is no evidence that she personally participated in Kelley's hostile work environment and that there is an insufficient causal connection between Drew's conduct and Kelley's harassment claim.

"It is axiomatic, in section 1983 actions, that liability must be based on something more than a theory of respondeat superior."  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).  "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation."  Id.  This causal connection can be shown "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."  Id. (finding no "obvious, flagrant, rampant" and continued abuse and that prison supervisors were unaware of any problems, therefore there was no supervisory liability); see also Cross v. Ala. Dep't of Mental Health, 49 F.3d 1490, 1508 (11th Cir. 1995) (finding

liability under § 1983 where supervisors were on notice of the need to correct the discrimination and failed to do so, stating that the deprivations that constitute widespread abuse sufficient to notify the supervising official were obvious, flagrant, rampant and of continued duration, rather than isolated occurrences).

*Jones's Role in the Alleged Hostile Work Environment*

Plaintiffs have offered evidence that Jones told Lowe that it was his plan to advance his political objectives by increasing the number of black county managers and eliminating whites managers from county positions.  (Lowe Dep., at 139, 353.) Lowe testified that Jones stated on multiple occasions in his presence, and in the presence of Williams, Stone and Drew, that he wanted a "darker administration." (Lowe Dep., at 381.)  Jones allegedly told Lowe that "we don't fire people around here; we eliminate their position."  (Lowe Dep., at 339.)  Lowe also testified:  Jones called Bryant a "white bastard who's nothing more than a racist and need[s] to go." (Lowe Dep., at 353-54.)  Jones told Lowe that he did not like Kelley because she eliminated black people from the parks of DeKalb County, thereby allowing white associations to control the parks, and that the relationship between Kelley, the white associations and the parks needed to be dismantled.  (Lowe Dep., at 354.)

59

This evidence is sufficient to demonstrate that Jones, as CEO of DeKalb County, was aware of the pervasive hostile work environment that was being instituted.[26]  This evidence is sufficient to show that there is a causal connection between Jones and the alleged hostile work environment experienced by Drake, Bryant, and Kelley.  Jones's motion for summary judgment on Bryant, Drake, and Kelley's hostile work environment claim is therefore denied.

*Drew's Role in the Alleged Hostile Work Environment*

First, the Court finds the evidence clearly is sufficient for a jury to determine Drew's accountability for the adverse employment action alleged by Bryant and Drake.[27]  Plaintiffs' evidence is sufficient to show that Drew was not only aware of and supported the discriminatory objective of increasing the number of black

---

[26]  Plaintiffs argue that Jones created the discriminatory hostility.  A jury will have to evaluate ultimately whether discrimination occurred and, if so, who was responsible for it.  The Court simply finds there is sufficient evidence to prohibit summary judgment in favor of Jones on this claim.

[27]  Drew also argues that various actions named by Bryant as evidence of Drew's harassment and disparate treatment of him are not adverse actions, including the failure to provide a performance review, denying his requests to use compensatory time, and refusing to grant his request to return to work on light duty after surgery.  (Drew MSJ, at 23.)  The Court finds these acts may have, when viewed in an overall context, contributed to the hostile work environment claim even though they may not constitute discrete, actionable acts of discrimination.

county managers by eliminating white managers, but she played a prominent role in the violations alleged by Bryant and Drake.

As for Kelley's hostile work environment claim, the evidence of Drew's involvement consists of an incident where Drew attempted, after becoming Director, to have Kelley removed from her office and placed into a much smaller office that formerly was used as a storage area.  Plaintiffs' evidence indicates that the decision to transfer Kelley to the Greenspace program was not made by Drew, but was made before Drew became Director of the Parks Department.  After Kelley was transferred to the Greenspace program, she reported, through Tina Arbes, to Defendant Stogner–not Drew.[28]  The evidence, therefore, is that Drew did not have supervisory authority over Kelley and was not otherwise sufficiently connected to the acts Kelley alleges contribute to her hostile work environment to hold Drew liable for acts complained of by Kelley.  Accordingly, Drew's motion for summary judgment on Kelley's hostile work environment claim is granted.

_____

[28]  Kelley states in her affidavit that Drew was involved in the day-to-day operations of the Greenspace program because she was responsible to Williams for its implementation.  (Kelley Aff., at ¶ 24.)  Kelley cites Jones's February order as evidence, but the order does not support such a conclusion.  Regardless, this extremely minimal evidence is insufficient to show that Drew was responsible for Kelley's hostile work environment or that she exercised supervisory authority over Kelley such that she would be on notice and obligated to correct the violations.

*Williams's Role in the Alleged Hostile Work Environment*

Defendant Williams argues that there is no evidence that he was responsible for the alleged hostile environment alleged by Drake, Bryant, and Kelley. (Williams MSJ, at 15, 27.)  Plaintiffs' evidence of Williams' involvement in Drake and Bryant's hostile work environment, taken in the light most favorable to them, is:  Williams told Lowe that Lowe was expected to be a "team player" and to assist in their efforts to eliminate white employees (Pl. SMF, at 21); Stogner told Kelley to offer Drew a salary higher than Bryant so she could "get in good" with Defendant Williams (Kelley Aff., at 13); Williams told Kelley that they could not recommend to Jones a white candidate for the position of Deputy Director of Recreation because Jones would not accept a white candidate (Pl. SMF, at 110); Stogner "probably" discussed the transfers with Williams, but does not recall a specific conversation, before drafting the order reorganizing the Parks Department (Stogner Dep., at 35-37); Williams was copied on Drew's memorandum that resulted in Bryant's demotion (Drew Mem., attached to Ex. to Pl. SMF as Ex. 17); Williams was aware that Bryant was the only supervisor moved out of the department's office in Decatur; Bryant complained to Williams about Drew's racial discrimination (Bryant Aff., at ¶ 19); After Drew was hired, Jones and Williams

would bypass Kelley and go directly to Drew with issues involving the Parks

Department (II Pl. SMF, at 42); Williams is Drew's supervisor, has direct

supervisory authority over the Parks Department, and was in charge of reorganizing

the department pursuant to Jones's February 12, 2002 order.

Plaintiffs' evidence is sufficient for a reasonable jury to find that Williams, as

Assistant County Administrator with direct supervisory authority over Drew and the

Parks Department, was aware of the specific actions Drew directed at Bryant and

Drake, supported Jones's plan to increase black personnel and to decrease white

personnel, and that he did not prevent Drew from discriminating against Bryant and

Drake.  Williams also would have had direct supervisory authority over Kelley

when she was Director of the Parks Department, and Plaintiffs also submit

evidence, though it is contradicted by Defendants, that when Kelley worked in the

Greenspace group, Williams was in charge of the development portion of the

program.  (Kelley Aff., at ¶ 24.)  Taking the facts in the light most favorable to

Plaintiffs, the Court cannot conclude as a matter of law that there was not a causal

connection between Williams and the alleged hostile work environment

experienced by Kelley, Drake and Bryant, and Williams's motion for summary

judgment on Kelley, Bryant and Drake's hostile work environment claim is denied.

*Stogner's Involvement in the Hostile Work Environment Claim*s

Defendant Stogner argues that Plaintiffs cannot show that he personally participated in creating the hostile work environment alleged by Kelley, Bryant and Drake or that there is a causal connection between his actions and the violation alleged.  Bryant and Drake refer to two facts as evidence of Stogner's involvement in their hostile work environment claim.  First, that Stogner told Drake that Jones had made "too many political commitments" to consider Drake for Director of the Parks Department, and second, that Drake would be transferred to the Parks Department to "prop up Drew."  (Pl. SMF, at 163, 165.)  These statements alone are insufficient to show that Stogner directly participated in the alleged harassment suffered by Bryant and Drake.

Taking the facts in the light most favorable to Kelley, she refers to the following acts by Stogner as contributing to her hostile work environment:  Stogner told Kelley that Jones wanted to showcase black parks and black employees; Stogner consistently disregarded her ideas regarding implementation of the Greenspace program and kept her from participating in a meaningful way; Stogner told Kelley that she did not know how to relate to "powerful black men;" Stogner told Kelley she could move her office to Arabia Mountain and allowed her to buy

supplies and prepare to move there, then told her at the last minute that she could not in order to frustrate her.

The record evidence is that Stogner is Jones's Executive Assistant, and that Defendant Williams, who is an Assistant County Administrator with direct supervisory authority over the Parks and Recreation Department, reports to Stogner. Although Stogner's exact relationship or authority over Williams is unclear, that Williams reports to Stogner, indicates that Stogner has some degree of formal or practical supervisory authority over Williams and the Parks Department. While the connection is weak, the record evidence is sufficient to indicate that Stogner is in a supervisory position over Williams, Drew, and the Parks Department generally, and that he was on notice, and in fact supported, the discriminatory acts and failed to prevent them. After Kelley was transferred to the Greenspace group, she reported to Stogner through Tina Arbes, and Kelley interacted with Stogner in her job with the Greenspace group. The record is further that Stogner was aware of a plan to decrease white managers and increase black managers in the county. The Court cannot conclude as a matter of law that there is a legally insufficient causal connection between Stogner and the hostile work environment alleged by Kelley,

Bryant and Drake.  Stogner's motion for summary judgment on the hostile work environment claims is therefore denied.

*Stone's Involvement in Bryant and Drake's Hostile Work Environment*

Stone also argues that Kelley, Bryant and Drake have not put forth evidence that Stone personally participated in creating or maintaining an alleged racially hostile work environment for Bryant or Drake, or had a causal connection with it sufficient to hold him liable for the violation alleged.  First, in her deposition, Kelley stated that she is not asserting a hostile work environment claim against Stone, therefore no hostile work environment claim may be asserted against him.[29] (Kelley Dep., at 25.)

_____

[29] This does not stop Plaintiffs from making the same general, blanket argument in their Response to Stone's motion for summary judgment that they use for all Defendants that Stone should be held liable for Kelley's alleged hostile work environment.  Plaintiffs challenge Stone's motion for summary judgment claim without even responding to Stone's argument on this issue.  Plaintiffs simply reiterate their general argument that each defendant participated in all the claims asserted by Plaintiffs, including Kelley's hostile work environment claim.  Stone's argument that Plaintiffs failed to properly oppose summary judgment pursuant to L.R. 56.1 is well-taken.  (Reply to Pl. Resp. to Stone MSJ, at 2.)  Plaintiffs' often undisciplined and inexact briefing has frustrated the consideration of the motions before the Court.  The Court encourages Plaintiffs to aspire to a higher standard for their work product.

Plaintiffs offer minimal evidence of Defendant Stone's involvement in creating the hostile work environments alleged by Bryant and Drake.  Regarding Stone's actions towards Bryant, Lowe testified that Stone told him specifically not to have Drake and Bryant publicly visible in the Parks Department.  (Lowe Aff., at ¶ 13.)  Plaintiffs also assert that Stone contributed to Bryant's hostile work environment because the Department of Human Resources, of which he was the director, approved and processed Billups' transfer from Deputy Director of Strategic Management and Development, which Billups shared with Lowe, to Deputy Director of Recreation Services.  (II Pl. SMF, at ¶ 65.)  In so doing, Plaintiffs claim that Stone allowed Billups to assume the title of the position that Bryant was supposed to be performing.  (Id.)  Plaintiffs also allege that Stone took nine months to complete Bryant's EEO Complaint against Drew, and that Stone never informed Bryant the investigation was complete or apprised him of his findings.  Plaintiffs assert that Stone "allowed and approved" Drew's hiring as a deputy director at a higher salary than Bryant, even though the evidence is that Stogner told Kelley to offer Drew a higher salary.  (Id.; Ex. J, at 61.)  Essentially, Plaintiffs claim that because Stone was aware of and contributed to the overall scheme to discriminate against white employees, actions by other Defendants can

67

be attributed to him, even when there is no evidence linking him to the action.  (II Pl. SMF, at 83.)  The Court disagrees.  There is simply an insufficient link between Stone and the alleged hostile work environment suffered by Bryant and Drake, and the evidence does not show Stone personally participated in the acts alleged by Plaintiffs.

There also is no evidence that Stone was Kelley, Bryant or Drake's supervisor or that he had responsibility for their work assignments or work environment sufficient to impose supervisory liability on him.[30]  (Def. SMF, at ¶ 114.)  Based on the undisputed material facts alleged with respect to Stone, the Court finds as a matter of law that Stone is entitled to summary judgment on Kelley, Bryant and Drake's hostile work environment claim.

### 5.     Plaintiff Kelley's Claim for Constructive Discharge

"[C]onstructive discharge occurs for the purpose of employment discrimination when the employer, rather than directly discharging the employee, creates an intolerable work atmosphere that forces the employee to quit

───────────────

[30]  Although Plaintiffs do offer evidence that Stone was aware of Jones's agenda, and Lowe testified that Drew told him that Stone was helping the plan be executed, this evidence alone is insufficient to establish a causal connection between Stone and the hostile work environment claims asserted by Plaintiffs.

involuntarily." Johnson v. Woodruff, 28 F. Supp. 2d 1248, 1250 (M.D. Fla. 1998) (citing Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81 (2nd Cir. 1996)). A plaintiff "must show the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1363 (11th Cir. 1994); see also Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996); Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997). "[F]or a constructive discharge claim to present a jury issue and thereby survive summary judgment, the plaintiff must produce substantial evidence that conditions were intolerable." Akins v. Fulton County, 420 F.3d 1293, 1302 (11th Cir. 2005). A prima facie case of constructive discharge is established if one may reasonably infer discrimination from the un-rebutted facts. Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1559 (11th Cir. 1988).

"An employer may defend against [a constructive discharge claim] by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of [discrimination], and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Pa. State Police v. Suders, 542 U.S. 129, 134 (2004). This

defense is unavailable, however, "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Id.  Kelley has put forth evidence of a humiliating demotion in this case, therefore Defendants may not assert this defense.

Taking the facts in the light most favorable to Plaintiffs, Kelley offers the following evidence to support her constructive discharge claim:  Defendant Jones angrily confronted her on several occasions, and on one occasion, Jones yelled and screamed at her and approached her in a physically threatening manner.  (Pl. SMF, at ¶ 102.)  Jones told Kelley not to speak to the press as Parks Department Director or speak with members of the Board of Commissioners, though her previous job duties included these tasks.  (Pl. SMF, at ¶¶ 103-104.)  Stogner told Kelly that she didn't understand the geopolitical issues of DeKalb County and that she could not relate to powerful black men.  (Pl. SMF, at ¶ 105.)  Stogner also told Kelley that Jones wanted to showcase black parks and black employees, implying that Jones did not want white employees, including her, to represent the Parks Department. (Id. at ¶ 116.)

The evidence is further that after Jones was elected, Kelley's hiring authority was drastically reduced.  Specifically, Kelley was not permitted to make hiring decisions or to conduct applicant interviews on her own.  Williams was required to interview candidates with Kelley.  Williams told Kelley that a white candidate could not be recommended for the position of Deputy Director of Recreation because Jones would not accept it.  (Pl. SMF, at 110.)  After Drew was hired to fill the Deputy Director position, Jones and Williams isolated Kelley by bypassing her in the decision-making process and by communicating directly with Drew.  (Pl. SMF, at ¶ 114.)  Kelley was demoted from her position as Director of the Parks Department and reassigned to the Greenspace group where she was to work in a group.  She was denied an official title and was not given supervisory authority, (id. at ¶ 121), and she was ordered to report to Tina Arbes, rather than directly to Stogner as she had done before.  (Id. at ¶ 122.)  Kelley's proposals for the Greenspace bond program were repeatedly rebuffed by Stogner and her supervisor, Tina Arbes, even though she was the only person in the group who had bond issuance experience, and she was prevented from making contributions to the group.  Kelley was designated to be moved from her former Director's office into a small, windowless office that used to be a storage area.  (Pl. SMF, at ¶ 131.)

71

Stogner intentionally induced Plaintiff to spend needless time and money moving offices, then withdrew approval for her to do so.  Kelley's transfer to the Greenspace group was considered by her to be personally and professionally humiliating, and it was uniformity perceived as a demotion.  (Id. at ¶ 127, 129, 132.)

Kelley submits evidence that when she finally left her employment with DeKalb County, she had no meaningful job responsibilities and her duties had been reduced to spending most of her time "coloring maps."  (Id. at 133.)  Kelley testified that she was "taken from a position of great stature and prominence and placed into a highly subordinate role where [she] moved from personally managing a $10 to 20 million bond budget to having no financial oversight, from [having responsibility for over 600 positions] to having quasi oversight over three people."  (Kelley Dep., at 121.)  Kelley claims these circumstances and this treatment of her constitute her constructive discharge.

Defendants rely on a variety of cases to support their contention that Kelley had not suffered a constructive discharge.  These cases are distinguishable.  In Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 978 (11th Cir. 2003), the plaintiff asserted a constructive discharge claim based on a withdrawn reprimand; statements

72

of supervisors that plaintiff would be fired due to his race that were not supposed to

be revealed to the plaintiff; offensive cartoons that were not condoned by his

supervisor; a job offer to transfer to another managerial role after plaintiff

complained of discrimination; and a claim of unequal pay.  Under these conditions,

the Eleventh Circuit held that plaintiff's work situation was not so intolerable that

the plaintiff was forced to quit involuntarily; therefore the constructive discharge

claim failed.  Here, Kelley claims significant adverse effects, none of which were

withdrawn or undone.

In Tatroe v. Cobb County, the plaintiff sued her employer and supervisors

under § 1983 for retaliation against her for exercising her First Amendment rights.

No. 1:04-CV-1074-WSD, 2006 U.S. Dist. LEXIS 66462 (N.D. Ga. Mar. 7, 2006).

This Court found that no constructive discharge had occurred, because "Plaintiff did

not offer evidence that she was stripped of her work duties or benefits, subjected to

humiliating or unfairly physically challenging work conditions."  Id. at *27.  In

Tatroe, the plaintiff's allegations essentially consisted of a claim that her job

performance was closely scrutinized and that this scrutiny led to several written

reprimands and other unfair personnel actions which did not change her job title or

responsibilities.  This Court held that, "Plaintiff's subjective frustration with what

she perceived as an inability to advance within the Bureau is not sufficient to demonstrate that her working conditions were so intolerable that a reasonable person would feel compelled to resign rather than continue employment." Id. at * 27-28.  In contrast, Kelley asserts that she was indeed stripped of her work duties, suffered a demotion and reduction in prestige of her position, and was almost made to work in what appears to be at least an inferior, and at most degrading, office space.

The facts here more closely resemble in quality the treatment of the plaintiff in Poole, where Plaintiff's constructive discharge claim survived summary judgment.  In Poole, the plaintiff asserted a claim of constructive discharge against the defendant country club and its general manager, for whom she worked as an executive secretary.  She asserted that her job duties and responsibilities were reduced to virtually nothing and she was relieved of all existing responsibilities, although her pay and benefits were not affected.  Poole, 129 F.3d at 552.  In Poole, the defendant manager gradually removed the plaintiff's job duties and assigned them to his wife.  Later, the manager refused to submit plaintiff's worker's compensation claim to the defendant's insurance carrier and also made remarks about the plaintiff's age.  Eventually, the plaintiff was not allowed to use her desk

74

or computer and was assigned to the business office to stuff envelopes.  The

defendant eventually told the plaintiff that she was being relieved of all her

responsibilities and transferred her to the business office, although her pay and

benefits would be maintained at the levels that were then in place.  Plaintiff alleged

that her coworkers were instructed by the defendant manager not to speak to her,

that once in the business office she was given only a chair with no desk, and that,

because she had no place to store her belongings, they were placed next to her chair

in boxes.  The Plaintiff resigned.  The Eleventh Circuit held that the plaintiff had

submitted sufficient evidence for her constructive discharge claim to go to a jury.

Id.

Although Kelley's evidence relating to her claim for constructive discharge is

not as compelling as that of the plaintiff in Poole, viewing the evidence in the light

most favorable to Kelley, the Court finds she has demonstrated a genuine issue of

material fact as to whether Kelley was constructively discharged.  See Wardwell v.

Sch. Bd. of Palm Beach County, Fla., 786 F.2d 1554, 1557 (11th Cir. 1986) (stating

that a discriminatory refusal to promote would be relevant to the issue of whether

plaintiff was constructively discharged).  That is, the Court is satisfied that

Plaintiff's evidence is sufficient to create a jury question as to whether a reasonable

person would find the working conditions at issue so intolerable that Plaintiff was compelled to resign.  Summary judgment on Kelley's constructive discharge claim is not appropriate.

Individual Defendant Culpability

Several of the Defendants, including Williams and Drew, argue that they were not involved in the acts surrounding Kelley's alleged constructive discharge.[31]

*Defendants Williams's Involvement in the Constructive Discharge*

Williams argues that he was not the decisionmaker regarding Kelley's constructive discharge and that he therefore is not liable.  The Court has already held that Plaintiffs' evidence is sufficient for a reasonable jury to find that Williams, as Assistant County Administrator with direct supervisory authority over Drew and the Parks Department, was aware of the pervasive hostile work environment that was being instituted, and that he was complicit in the discriminatory scheme to remove white managers from DeKalb County.  Plaintiffs have therefore offered sufficient evidence that there is a causal connection between Williams and Kelley's constructive discharge resulting from the discriminatory

---

[31]  Additionally, because Kelley testified that she did not assert a hostile work environment claim against Stone, the Court finds that Stone is entitled to summary judgment on Kelley's constructive discharge claim.

actions and hostile work environment.  Williams's motion for summary judgment on Kelley's constructive discharge claim is therefore denied.[32]

*Drew's Involvement in the Constructive Discharge*

Drew argues there is an insufficient causal connection for her to be held liable for Kelley's constructive discharge claim.  The evidence of Drew's involvement in Kelley's constructive discharge claim consists of an incident where Drew attempted, after becoming Director, to have Kelley removed from her office and placed into a much smaller office that formerly was used as a storage area.  Plaintiffs' evidence indicates that the decision to transfer Kelley to the Greenspace program was not made by Drew, but was made before Drew became Director of the Parks Department.  After Kelley was transferred to the Greenspace program, she reported, through Tina Arbes, to Defendant Stogner and was officially within the

---

[32]   Williams also appears to argue that Kelley's constructive discharge claim is barred because no acts contributing to the discharge occurred after August 24, 2002.  (Williams MSJ, at 20.)  This Court finds that the statute of limitations for a constructive discharge claim is measured from the date the employee gives notice of his intent to resign.  See Scott, 232 F. Supp. 2d at 1295 (holding that although the Eleventh Circuit has not addressed the issue, the majority of other courts have held that the EEOC's 180-day filing period for a claim of constructive discharge is measured from the date the employee gives notice of his intent to resign, not the last day of employment."); see also Brewer v. Alabama, 111 F. Supp. 2d 1197, 1205 (M.D. Ala. 2000).  Williams's motion for summary judgment on Kelley's constructive discharge claim is therefore denied.

office of the CEO.  The evidence, therefore, is that Drew did not have supervisory authority over Kelley and was not otherwise sufficiently connected to the acts Kelley alleges contribute to her constructive discharge to hold Drew liable for acts complained of by Kelley.  Accordingly, Drew's motion for summary judgment on Kelley's constructive discharge claim is granted.[33]

> 6.    Plaintiff Lowe's Retaliation and First Amendment Claim

> *Administrative Hearing Bar*

Defendants argue that Plaintiff Lowe is bound by the hearing officer's conclusion upon his appeal of his job abolishment that his position was abolished as part of a reduction in force, and thus Lowe is barred from litigating whether his position was eliminated in retaliation for his objection to the discriminatory practices he alleges.  Plaintiffs argue that the Court is not bound by the agency's decision because the issue before the Court was not addressed by the hearing officer.  The Court agrees.

Travers v. Jones, 323 F.3d 1294 (11th Cir. 2003), applies.  In Travers, the plaintiff, a firefighter, had a verbal encounter with the Defendant Jones while

---

[33]  Drew also argues that Kelley's constructive discharge claim is time-barred.  The Court has ruled that this claim is not time barred, therefore Drew's motion for summary judgment on this ground is denied.

plaintiff and a group of firefighters were picketing outside DeKalb County administration building.  <u>Travers</u>, 323 F.3d at 1295.  The DeKalb County fire chief suspended the plaintiff without pay for insubordination and unbecoming conduct. <u>Id.</u>

The <u>Travers</u> plaintiff appealed his suspension to a merit system hearing officer as allowed by the Code of DeKalb County.  The hearing officer found that the facts surrounding the verbal exchange did not indicate any non-job-related factor or any errors of fact that would reverse the plaintiff's suspension.  <u>Id.</u> at 1296.  The plaintiff then filed a complaint in the district court for the Northern District of Georgia, alleging that he was disciplined in retaliation for engaging in protected union activity and that his First Amendment rights were violated.  The district court denied qualified immunity on the basis that there were issues of fact concerning the reasons that the plaintiff was disciplined.  On appeal to the Eleventh Circuit, the defendants argued that the district court was bound by the hearing officer's earlier determination that plaintiff's rights were not violated.

In deciding whether the district court was bound by the hearing officer's findings of fact, the Eleventh Circuit held:

> [t]hose findings are binding upon the court in a case such
> as this one if the employee received a *full and fair*

79

> *opportunity to present his case* in the administrative
> hearing.  When a state agency, acting in a judicial
> capacity, resolves *disputed issues of fact properly before*
> *it* that the parties have had an adequate opportunity to
> litigate, federal courts must give the agency's fact finding
> the same preclusive effect to which it would be entitled in
> the State's court.

Id. (emphasis added).  The Eleventh Circuit concluded in Travers that the Plaintiff

had received a full and fair opportunity to present his case on the factual dispute

that ultimately was at issue in the district court, and because these fact disputes

were resolved by the hearing officer, the district court was bound by the resolution

reached at the administrative hearing.  Id. at 1297.

Travers is distinguishable from the case here.  The officer who presided over

Plaintiff Lowe's hearing did not have the authority to hear evidence or make

findings about the cause of Lowe's termination.  He determined only that the

dismissal was the result of Lowe's position being abolished.  The officer made a

very narrow finding:

> The undersigned finds, in the instant case, that, in fact,
> the DeKalb County Board of Commissioners voted not to
> appropriate funding for the position of Deputy Director,
> Strategic Management Development, Park[s] and
> Recreation Department.

Decision of Hearing Officer, attached to Vol. II Ex. in Support of Def. MSJ as Ex. 26.)  The issue before this Court is not identical to the issue resolved by the hearing officer in Lowe's appeal of his job elimination.  Here, Plaintiff Lowe alleges a series of discriminatory acts which ultimately resulted in him being maneuvered into a position which Defendants intended to abolish, resulting in Plaintiff Lowe's termination of employment.

Defendants next argue that Lowe's retaliatory discrimination claim is barred because "[c]ollateral estoppel bars not only the relitigation of issues actually litigated and decided by a prior action, it also precludes issues that necessarily had to be decided in order for the previous judgment to have been rendered."  Meagher v. Quick, 264 Ga. App. 639, 645 (2003).  Defendants claim that to conclude that Lowe's position was in fact abolished due to reduction in force, the Hearing Officer necessarily rejected other bases for Lowe's termination.

Defendants' argument is unconvincing.  First, Defendants misconstrue the Hearing Officer's findings.  The Hearing Officer simply found that "in fact, the DeKalb County Board of Commissioners voted not to appropriate funding for the position."  He did not find that the underlying reason for abolishing the position was a reduction in force, rather than retaliation, and he did not consider whether

81

Plaintiff Lowe wrongfully was maneuvered into a position which was then intentionally abolished.  The issue before this Court is different from whether the Board of Commissioners voted not to fund Lowe's job.  It is whether Defendants recommended the abolishment of Lowe's job with an impermissible retaliatory motive.  Plaintiff Lowe's retaliation claim is not resolved or precluded by the hearing officer's determination.[34]

### *Legislative Immunity Bar*

Jones argues that he is entitled to legislative immunity as to Lowe's retaliatory discharge and First Amendment claims.  (Jones MSJ, at 37.)  Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity."  Bogan v. Scott-Harris, 523 U.S. 44, 55 (1998).  "Legislative immunity provides protection from suit to government officials when they take actions that are an integral part of the deliberative and communicative processes by which legislators participate in proceedings with respect to the consideration and passage or rejection of proposed legislation."  Smith v. Lomax, 45 F.3d 402, 405

---

[34]  Plaintiffs present reasonably convincing evidence that Plaintiff Lowe did not receive a full and fair opportunity at the hearing to litigate his case as required by Travers.  Plaintiff Lowe testified that Defendant Stone told him that there was no use in appealing his case.

(11th Cir. 1995) (quoting <u>Gravel v. United States</u>, 408 U.S. 606, 625 (1972)).  "Only those acts which are 'necessary to preserve the integrity of the legislative process' are protected."  <u>Id.</u> (citing <u>Yeldell v. Cooper Green Hosp., Inc.</u>, 956 F.2d 1056, 1062 (11th Cir.1992)).  The question, therefore, is "whether the defendant in the instant case [was] engaging in legislative activity."  <u>Id.</u> (citing <u>Espanola Way Corp. v. Meyerson</u>, 690 F.2d 827, 829 (11th Cir.1982)).

Typically, legislators' employment decisions are deemed administrative acts. <u>Id.</u> (citing <u>Yeldell</u> and holding that voting on the appointment of a board clerk is not the sort of broad "legislative" activity typically associated with absolute immunity). "A legislative act involves policymaking rather than mere administrative application of existing policies." <u>Id.</u> at 406 (citing <u>Minton v. St. Bernard Parish Sch. Bd.</u>, 803 F.2d 129, 135 (5th Cir.1986)).  "If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative.  Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature." <u>Id.</u> Relying on <u>Bogan</u>, Jones argues that introducing the budget proposal is a legislative act.  Plaintiffs argue that <u>Bogan</u> does not apply because <u>Bogan</u> involved the introduction of a budget and the adoption of a related ordinance, not the mere

submission of a budget proposal.  Plaintiffs argue, therefore, that Jones is not entitled to legislative immunity.

In <u>Bogan</u>, the plaintiff, a city agency administrator, received a complaint that an employee had made racial and ethnic slurs.  <u>Bogan</u>, 523 U.S. at 47.  The administrator prepared termination charges against the employee, who pressed her case with several state and local officials, including the vice president of the city council.  The council held a hearing on the charges and ultimately accepted a settlement proposal which provided for the employee to be suspended without pay for 60 days.[35]  While the charges against the discriminating employee were pending, the defendant, mayor of the city of which Plaintiff was the city agency head, prepared his budget proposal for the fiscal year.  He proposed freezing the salaries of all municipal employees, eliminating 135 city positions, and called specifically for the elimination of a department in which the plaintiff was the sole employee. The City Council Ordinance Committee, which was chaired by a defendant, approved an ordinance eliminating the plaintiff's department.  The city council adopted the ordinance and the defendant mayor signed it into law.  <u>Id.</u>

---

[35] The mayor of the city subsequently reduced the punishment.

The plaintiff administrator subsequently brought § 1983 claims against the city, the mayor, and the city council member (who chaired the committee which passed the ordinance eliminating Plaintiff's department), alleging that the elimination of her department was calculated to terminate her and that the elimination was racially motivated and in retaliation against the plaintiff for exercising her First Amendment rights.  The Supreme Court held that "[Mayor] Bogan's introduction of a budget and signing into law an ordinance . . . were formally legislative, even though he was an executive official.  We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions; [the mayor's] actions were legislative because they were integral steps in the legislative process."  Id. at 55.  The Court noted: "Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'"  Id. at 53.  The Court held that the "motive or intent" of the defendant is irrelevant in determining whether absolute immunity applies.  Id. at 54.

The facts here are similar to those in Bogan.  Jones approved of and submitted the 2004 budget recommendation to the DeKalb County Board of Commissioners.  On January 27, 2004, the Board voted to adopt the 2004 budget.

The Court finds that Jones's submission of the 2004 budget to the Board of Commissioners was legislative in nature, and Jones is entitled to legislative immunity for this activity.  Jones's motion for summary judgment on Plaintiff Lowe's termination claims therefore is granted.

Defendant Stogner argues that he also is entitled to absolute legislative immunity.  (Stogner MSJ, at 37.)  Stogner argues he is entitled to legislative immunity under Bogan because drafting the budget also is a legislative function. (Id.)  He argues further that presenting a budget to a legislative body is a legislative act, even if performed by an executive official.  The argument is unconvincing. Stogner is an unelected employee who serves as an Executive Assistant to a county chief executive officer.  The Supreme Court has held that the "doctrine [of legislative immunity] is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves." Dombrowski v. Eastland, 387 U.S. 82, 84 (1967).  Stogner is not an officer or employee of a legislative body–he is an executive assistant of someone who is serving in an executive position.  Stogner's activities included providing input into the decision to eliminate Lowe's position and the drafting of the budget proposal which reflected the elimination.  He did not decide the final budget to be submitted,

did not introduce the final version of the budget for approval by the Board, nor did he take any other act that could be deemed legislative.  Stogner is not entitled to legislative immunity, and Stogner's motion for summary judgment on this grounds is denied.

### *Lowe's Racial Retaliation Claim*

Having considered the affirmative defenses to Lowe's retaliation claim, the Court next considers Defendants' argument that Lowe has not shown sufficient disputed facts that the elimination of Lowe's position constituted wrongful retaliation.[36]  Defendants argue specifically that Lowe's claim for retaliation fails because even if Lowe could establish a prima facie case of retaliation, he cannot rebut Defendants' legitimate, non-discriminatory reasons for recommending abolishing Lowe's position.[37]

─────────────────────

[36]  The Court has found that to the extent Lowe asserts a claim for discriminatory transfer, this claim fails because Lowe requested to be moved from the Parks Department.  Likewise, the Court also found that any claim for retaliation based on failure to provide a performance review fails because Plaintiffs did not adequately respond to Defendants argument and offer sufficient evidence from which to show such a violation occurred.

[37]  To established a prima facie case of retaliation, Plaintiff must demonstrate that: 1) he engaged in statutorily protected activity; 2) he suffered an adverse employment action; and 3) a causal relation between the two.  Raney v. Vinson Guard Serv., 120 F.3d 1192, 1196 (11th Cir. 1997).

Defendants do not contest, for purposes of their summary judgment motions, that Lowe has asserted a prima facie case of retaliation.[38]  Thus, assuming a prima facie case has been shown, the burden of production shifts to the Defendant to rebut the inference of discriminatory retaliation by articulating a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973).  Defendants offered evidence that Stogner drafted the budget abolishing Lowe's position after discussing the issue with Drew and Ann Kimbrough, Jones's assistant, and that Drew and Kimbrough advised him that Lowe's position was not needed, and the duties performed in the position were being performed by other employees.  (Def. SMF, at ¶ 143.)  This is a legitimate, non-discriminatory reason for Defendants' adverse employment actions, therefore the Plaintiffs must show that Defendants' reason for termination was a mere pretext for discrimination.

"To survive summary judgment, the plaintiff must . . . present concrete evidence in the form of specific facts which show that the defendant's proffered

---

[38]  In his Reply brief, Jones appears to argue for the first time that Lowe's claim for retaliatory termination fails because he cannot show the necessary sufficient causal connection.  "Defendants, however, may not make new arguments in the reply brief."  Adams v. Cobb Cty. Sch. Dist., No. 1:03-cv-2464-RLV-ECS, 2006 LEXIS 63767, at *28 (N.D. Ga. July 6, 2006).

reason is mere pretext.  Mere conclusory allegations and assertions will not suffice."
Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  To establish
pretext, "the district court must evaluate whether the plaintiff has demonstrated such
weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a reasonable factfinder
could find them unworthy of credence."  Jackson v. Ala. State Tenure Comm'n, 405
F.3d 1276, 1289 (11th Cir. 2005) (quoting Combs v. Plantation Patterns, 106 F.3d
1519, 1538 (11th Cir.1997)).

A complicated assignment process suggests this pretext.  Lowe originally was
hired as Deputy Director of Strategic Management and Development for the Parks
Department.  Shortly after he was hired and thereafter, Lowe was told that there was
a plan to discriminate against white managers, that there are ways to get rid of
employees without firing them, and that he should "dig up dirt" on white managers.
Lowe stated he informed Stone, Drew, Jones and Williams separately that he would
not participate in a scheme to discriminate against white managers in the
department, and when he resisted he was admonished for not being a team player.

Being in the middle of conduct he did not condone, Lowe demanded to be
reassigned so that he no longer worked for the Department.  His demand was met

when in May 2003, he was moved into Jones' executive office. Lowe kept his Deputy Director position and job responsibilities, although he also was asked to work on special projects. After moving Lowe to the sixth floor closer to him,[39] Jones again told Lowe that if he wanted to continue working for DeKalb County, he would have to be a team player. Two months later, on July 23, 2003, Marvin Billups, a black male, was hired and given the job of Deputy Director of Strategic Management and Development–the same title as Lowe. His position was time-limited until December 2003. Billups's duties were those that had been performed by Lowe.

Before December, Billups's title was changed to Deputy Director of Recreation. His duties, however, did not change. After Billups's title was changed to Deputy Director of Recreation, Lowe was left as the only person with the title of Deputy Director of Strategic Management and Development. That position was then abolished when Jones submitted the 2004 budget, and with that action, Lowe was terminated. Lowe argues these actions were taken by Defendants to eliminate his position in retaliation for opposing Defendants' discriminatory practices and was a subterfuge to disguise his retaliatory discharge. Defendants deny this claim,

---

[39] This move, a reasonable person may conclude, was to enable senior officials to help keep close tabs on someone who was not a team player.

argue this was a legitimate reorganization of duties, and specifically deny any statements attributed to them to the effect that Lowe was enlisted to assist in an effort to eliminate white managers.  There is a clear and important dispute of material facts regarding whether the events surrounding the elimination of Lowe's position constitute actionable discrimination, and summary judgment on this retaliation claim is denied.[40]

<u>*Lowe's First Amendment § 1983 Retaliation Claim*</u>

To sustain a claim of retaliation for protected speech, a public employee must prove each of the following: (1) his speech was on a matter of public concern; (2) his interest in engaging in the speech outweighs the county's interest in prohibiting the speech; and (3) his speech played a substantial part in the county's decision to transfer him or abolish his position.  <u>Anderson v. Burke Cty.</u>, 239 F.3d 1216, 1219

---

[40] Drew makes the same arguments regarding Lowe's claim for retaliation based on his transfer to the sixth floor and failure to receive performance reviews. (Drew MSJ, at 35.)  The Court already held that both these claims fail.  Defendants also argue, citing <u>Little v. United Tech.</u>, 103 F.3d 956 (11th Cir. Jan 22, 1997), that Lowe may not assert a claim for retaliation under § 1981 because he does not allege he was discriminated against because of his race.  The Eleventh Circuit, however, decided in <u>Jackson v. Motel 6 Multipurpose, Inc.</u>, that such a claim may be asserted, and Defendants drop this argument in their Reply briefs.  130 F.3d 999, 1007 (11th Cir. Dec. 10, 1997) ("The . . . plaintiffs' claim for retaliation may, however, proceed under section 1981(b).").

(11th Cir. 2001).  "A public employee's speech is generally not protected if it is made not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest."  <u>Berry v. Coleman</u>, 172 Fed. Appx. 929, 931 (11th Cir. 2006).

To assert a claim for First Amendment retaliation, a plaintiff must show his speech may be fairly characterized as constituting speech on a matter of public concern.  <u>See</u> <u>Morgan v. Ford</u>, 6 F.3d 750, 754 (11th Cir. 1993).  The "public concern" element is a question of law to be determined by the court.  <u>Deremo v. Watkins</u>, 939 F.2d 908, 910 (11th Cir. 1991).  In making this determination, the court must consider the content of the speech, as well as its form and context.  <u>Connick v. Myers</u>, 461 U.S. 138, 147-48 (1983).

With respect to complaints by public employees concerning alleged invidious discrimination in the workplace, the Eleventh Circuit has declined to adopt *per se* rules regarding what is and is not speech on a matter of public concern, instead requiring district courts to examine the particular speech at issue.  <u>See</u> <u>Morgan</u>, 6 F.3d at 755 (holding public employee's complaints about alleged sexual harassment and filing of a charge of discrimination with the Georgia Office of Fair Employment Practices did not constitute speech which could be fairly characterized

92

as speech on a matter of public concern); <u>Belyeu v. Coosa County Bd. of Ed.</u>, 998

F.2d 925, 928 (11th Cir. 1993) (affirming district court's holding that public

employee's speech at a school board meeting concerning the school's treatment of

Black History Month implicated public concerns).

The Supreme Court recently explained, in <u>Garcetti v. Ceballos</u>, the policy

considerations behind the "public concern" requirement:

> The Court's employee-speech jurisprudence protects, of
> course, the constitutional rights of public employees.  Yet
> the First Amendment interests at stake extend beyond the
> individual speaker.  The Court has acknowledged the
> importance of promoting the public's interest in receiving
> the well-informed views of government employees
> engaging in civic discussion.  <u>Pickering</u> again provides
> an instructive example.  The Court characterized its
> holding as rejecting the attempt of school administrators
> to "limi[t] teachers' opportunities to contribute to public
> debate."  It also noted that teachers are "the members of a
> community most likely to have informed and definite
> opinions" about school expenditures.  The Court's
> approach acknowledged the necessity for informed,
> vibrant dialogue in a democratic society.  It suggested, in
> addition, that widespread costs may arise when dialogue
> is repressed.  The Court's more recent cases have
> expressed similar concerns.  The Court's decisions, then,
> have sought both to promote the individual and societal
> interests that are served when employees speak as
> citizens on matters of public concern and to respect the
> needs of government employers attempting to perform
> their important public functions.  Underlying our cases
> has been the premise that while the First Amendment

> invests public employees with certain rights, it does not
> empower them to "constitutionalize the employee
> grievance."

Garcetti v. Ceballos, 126 S.Ct. 1951, at 1957-58 (2006) (citations and quotations

omitted).

Lowe claims his discharge for opposing racial discrimination violated his

First Amendment rights, and the discharge is actionable under § 1983.  To

determine whether Lowe was speaking on a matter of public concern -- and thus

engaging in protected speech -- the Court considers the "content, form, and context

of a given statement, as revealed by the whole record."  Kendall v. Cobb County, 14

F. Supp. 2d 1342, 1348 (N.D. Ga. 1998) (citing Connick, 461 U.S. at 146-48).  This

evaluation shows that Lowe's speech was not protected.  The content of the speech

reflects that Lowe was not speaking as a citizen.[41]

_____

[41]  Lowe testified that he told Defendants (except for Stogner): "Look, it's
fine if that's your agenda; I just don't want to be a part of it; I just don't."  (Lowe
Dep., at 397.)  Lowe's comment reflects only his refusal to participate in their
agenda to discriminate, not any disapproval of Defendants' actions or concern for
preventing the discrimination.  He also testified that he told three acquaintances of
the discrimination, but provided no detail regarding those discussions.  (Lowe
Dep., at 192.)  Lowe mentioned a memo to Stogner discussing unethical practices,
but he admitted that it was not in regard to the alleged discrimination.

The context of Lowe's speech also supports the conclusion that it did not concern a public matter.  Although racial discrimination is an issue in which the public has an interest, unlike the plaintiff in <u>Kendall</u>, Lowe did not speak with co-workers in any detail about his concern, he did not report the alleged discriminatory conduct to his superiors, and he did not warn any white managers, specifically the other plaintiffs in this case, that he was concerned about the existence of discrimination.  That is, his speech was not "public," and although a "public employee does not forfeit his protection against governmental abridgment of freedom of speech if he decides to express views privately rather than publicly," the evidence does not demonstrate that Lowe made this statement as a citizen airing public concerns, and the statement did not have this effect.

In fact, Lowe only made his statements in response to comments regarding, or solicitations from Defendants inviting him to join in, discriminatory conduct or to support their agenda to eliminate white managers.  These comments were made in private conversations, Lowe made no attempt to air his comments publicly out of a sense of concern for the public harm, and he did not attempt to dissuade Defendants from their plan.  <u>See</u> <u>Berry</u>, 172 Fed. Appx. at 932 (holding that a memo written by employee within context of his employment, provided only to his

supervisor, where employee did not take affirmative steps to communicate to the public and where the employee was attempting to ensure his conduct was legal, were of a personal, not public, concern).[42]  Lowe's comments, therefore, do not constitute speech on a matter of public concern, and summary judgment on Plaintiff Lowe's First Amendment claim is granted.

*Individual Defendants' Involvement in Alleged Retaliation*

Defendant Stone argues that he was not involved in the conduct resulting in Lowe's termination.  In response, Plaintiffs offer the following evidence: Defendants Jones, Stone, Williams and Drew each were involved in the conduct to discriminate and asked him to help implement the plan.  (II Pl. SMF, at ¶ 125.) Lowe claims that Stone stated that he wanted to have a "darker administration" to reflect "the new DeKalb County."  (Id. at ¶ 126.)  Lowe also testified that he told Stone, Jones, Williams and Drew that he would not participate in the scheme.  (Id. at ¶ 129.)  Plaintiffs claim that Stone was involved "in some capacity" in Lowe's

---

[42]  The interests protected by the First Amendment discussed by the Supreme Court in Garcetti are not furthered here.  The First Amendment protects the public's interest in receiving the well-informed views of government employees engaging in civic discussion and allowing well-informed public employees to participate in public debate.  Plaintiff Lowe's comment only to Defendants does not serve these goals.

move to the sixth floor because human resources generated the personnel action and requisition forms that allowed Billups to double-fill Lowe's position.  (II Pl. SMF, at ¶ 136.)  Plaintiffs claim that Stone, Drew and Williams were involved in the decision to abolish Lowe's job, although Stogner's testimony was that Stogner abolished the position based on input from only Drew and Ms. Kimbrough.  (See II Pl. SMF, at ¶ 150; Stogner Dep., at 113.)  Plaintiffs claim that Stone, as Director of Human Resources, "would have had to have decided where to transfer Mr. Billups before the position could be eliminated.  Human Resources supplied the paperwork for the transfer . . . ."  (II Pl. SMF, at ¶ 150.)

Plaintiffs' evidence is simply not sufficient to show Stone's involvement in the abolishment of Lowe's position.  Plaintiffs rely on weak inferences that Stone was involved with these decisions solely because he was Director of Human Resources.  Stogner testified that he made the decision with the input of Drew and Kimbrough–not Stone.  Plaintiffs do not offer evidence to refute this or to connect

Stone with the decisions.[43]  Stone's motion for summary judgment on Lowe's

retaliatory termination claim is granted.[44]

Williams argues that he was not the decisionmaker regarding Lowe's

termination, and therefore he cannot be held liable for the action.  (Williams MSJ,

at 16.)  The evidence of Williams's involvement with Lowe's termination consists

of the following facts:  Lowe testified that Williams had spoken to him about the

retaliatory scheme, that Lowe told Williams that he would not be involved with the

discriminatory scheme, and Williams told him he was not being a "team player."

(II Pl. SMF, at ¶ 129.) Williams was responsible for the reorganization of the Parks

Department pursuant to Jones's February 2002 order, therefore he would have had

---

[43]  Stone also argues that the tape recording of a conversation between Stone
and Williams discussing promotions for Battalion Chief in the Fire Department do
not bear on any issue in this case.  (Stone MSJ, at 17.)  While it is not necessary to
decide what role, if any, the tape might play in the further litigation of this matter,
the Court does not believe that the recording is evidence of any direct involvement
by Stone in the employment decisions in this case sufficient to hold Stone liable
for Plaintiffs' claims.

[44]  Stogner also argues that Lowe has not put forth evidence that Stogner
participated in the decision to assign him to the CEO's office, and therefore argues
Lowe's claim for retaliatory transfer fails as against him.  (Stogner MSJ, at 20.)
The Court has concluded that Lowe's transfer to the sixth floor is not an actionable
adverse action.

to have had input into the decision or approved the abolishment of the position.  (II Pl. SMF, at 150.)

First, Lowe's testimony indicates that Williams did not take part in the decision to transfer Lowe to the sixth floor.  (Lowe Dep., at 394.)  Second, Stogner testified that he made the decision to abolish Lowe's position with input from Drew–not Williams.  Third, Williams testified that he did not know that Lowe's position had not been funded until after the budget was finalized and sent to the Board.  (Williams Aff., attached to Decl. in Support of Def. MSJ as Ex. C, at ¶ 12.)  Although evidence exists that Williams was aware of and did generally participate in the alleged scheme to rid white managers from DeKalb County and did nothing to prevent such discrimination, the evidence does not show that Williams was similarly aware of any retaliatory acts taken against Lowe.  Though Williams had supervisory authority over the Parks Department, there is insufficient evidence that he was on notice of a widespread practice of retaliation, and he apparently was not consulted by Stogner, who drafted the budget.  The evidence appears to indicate that this decision was made at a level higher than Williams.  There is insufficient evidence of Williams' involvement in the alleged retaliatory termination of Lowe,

and the Court finds that Williams's motion for summary judgment as to Lowe's retaliatory discharge claim should be granted.

Drew also argues that there is not sufficient evidence to hold her liable for Lowe's claim of retaliation.  Considering the facts in the light most favorable to Plaintiffs, Plaintiffs present the following evidence of Drew's involvement in the alleged retaliation:  Drew interviewed and hired Billups as Deputy Director of Strategic Management and Development, thereby double-filling Lowe's position. (Pl. SMF, at ¶ 83.)  Stogner testified he based his decision to abolish Lowe's position on information gained after discussing the matter and receiving input from Drew.[45]  (Stogner Dep., at 111.)  There is also significant evidence of Drew's involvement in implementing the plan to eliminate white managers.  Plaintiffs'

---

[45]  Drew argues that Plaintiffs have not produced evidence that she had the power to eliminate Lowe's position and that Lowe merely speculates that Drew's input with Stogner makes her liable.  (Reply to Pl. Resp. to Drew MSJ, at 4-5.) Stogner, however, clearly testified that he made the decision to abolish Lowe's job based on input from Drew, and that he was told by Drew that Lowe was not needed in the Parks Department.  (Stogner Dep., 111-113.)  "[A] discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge."  Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999).  Stogner's testimony indicates that his decision to abolish Lowe's position was made in reliance on Drew's input, and Plaintiffs submit sufficient evidence at this stage to show that Drew's input was a direct cause of Lowe's termination.

evidence is sufficient to create a genuine issue of material fact as to whether Drew

was involved in the elimination of Lowe's position, and Drew's motion for

summary judgment on this claim is denied.

 7. Qualified Immunity

 Defendants next argue they are entitled to summary judgment on all

Plaintiff's claims against them because they are entitled to qualified immunity.

"Qualified immunity offers complete protection for government officials sued in

their individual capacities if their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."

Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003) (citations and quotations

omitted).  The process for analyzing a defense of qualified immunity is well

established:

> To be eligible for qualified immunity, the official must first establish
> that he was performing a "discretionary function" at the time the
> alleged violation of federal law occurred.  Once the official has
> established that he was engaged in a discretionary function, the
> plaintiff bears the burden of demonstrating that the official is not
> entitled to qualified immunity.  In order to demonstrate that the official
> is not entitled to qualified immunity, the plaintiff must show two
> things:  (1) that the defendant has committed a constitutional violation
> and (2) that the constitutional right the defendant violated was "clearly
> established" at the time he did it.

Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004).

"A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is apparent." Cooper v. Dillon, 403 F.3d 1208, 1220 (11th Cir. 2005). This standard does not require that the specific conduct in question was previously found to be unlawful; the state of the law need only give an official "fair warning" that his conduct is unlawful. Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)). Qualified immunity therefore "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." Id. "[T]he relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1503 (11th Cir.1990).

It is undisputed that Defendants were performing discretionary functions in making the various employment decisions complained of by Plaintiffs.[46] Plaintiffs,

---

[46] An official performs a discretionary function when his acts "but for the alleged constitutional infirmity, would have fallen with his legitimate job description," and the acts were done "through means that were within his power to utilize." Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004). It is clear that Defendants' alleged acts were discretionary because they included making

then, have the burden of showing Defendants are not entitled to qualified immunity.

Plaintiffs have presented sufficient evidence to show that the discriminatory acts

complained of here would constitute violation of Plaintiffs' constitutional rights.

"The relevant, dispositive inquiry in determining whether a right is clearly

established is whether it would be clear to a reasonable official that his conduct was

unlawful in the situation he confronted." Hyath, 2006 U.S. Dist. LEXIS, at * 49.

"[T]his question boils down to whether the state of the law, at the time of the

incident, gave "fair warning" to the official that his conduct was unlawful." Id. at *

49-50 (noting that the Eleventh Circuit identified three ways to show fair warning:

1) a federal statute that is so specific as to clearly prohibit the conduct, 2) case law

categorically prohibiting the conduct, and 3) a case prohibiting the described

conduct, involving facts that are not fairly distinguishable from the facts in

plaintiff's case).

It is "patently obvious" that intentional, race-based discrimination in public

employment is prohibited.[47] Smith, 45 F.3d at 407 ("We need not engage in a

———————————————

various employment decisions.

[47] Several defendants also argue that they are entitled to qualified immunity
on Lowe's retaliation claim because at the time of the alleged discrimination, the
law did not clearly establish that their activities violated § 1981. This argument is

lengthy discussion of the patently obvious illegality of racial discrimination in public employment, . . . [i]t can hardly be argued that in 1989, when the events leading up to this lawsuit [took] place intentional race discrimination in the workplace did not violate the Fourteenth Amendment."). "Whether harassment is sufficiently severe and pervasive to violate the Equal Protection Clause can only be determined after examining the specific facts of the situation." Id. at * 50.

Plaintiffs have put forth sufficient evidence that the hostile work environment and constructive discharge alleged by Bryant, Drake, and Kelley and the retaliation alleged by Lowe violated rights which were clearly established during the relevant time periods. At the time of the alleged violations, it was clearly established that race-based employment decisions are unlawful. The Eleventh Circuit recently affirmed a district court's denial of qualified immunity in a similar racial discrimination case, holding that "the district court observed correctly that the right

---

specious. The question is not whether Defendants had fair notice that his conduct violated § 1981–the particular statute through which Plaintiffs bring their claims in this instance. The relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law. In 2003, Title VII made it facially clear that retaliation for opposing discriminatory employment practices was illegal. 42 U.S.C.S. § 2000e-3. It is irrelevant that Plaintiffs chose to bring their claims under § 1983 for a violation of § 1981 rather than under Title VII. A reasonable official should have known that the alleged retaliation was unlawful at the time.

to be free from racial discrimination in the public workplace was a clearly

established constitutional right of which a reasonable official would have known."

McMillan, 2006 U.S. App. LEXIS at *6-7; see also  Alexander v. Fulton County,

Ga., 207 F.3d 1303, 1321 (11th Cir. 2000) (denying qualified immunity and holding

that a reasonable jury could find the defendant sheriff intentionally made race-based

employment decisions with respect to discipline, promotions, transfers,

reclassifications, promotional examinations, restorations of rank, and appointments

to unclassified positions in violation of Plaintiffs' clearly established rights); Mosley

v. MeriStar Management Co., LLC, 137 Fed. Appx. 248, 252 (11th Cir. 2005)

("Title VII [and] § 1981 . . . provide for causes of action for hostile work

environment discrimination based on race.").  It was also clearly established, as

demonstrated by the facts in Poole, that subjecting Plaintiffs to the specific actions

alleged here was severe and pervasive racial harassment and is also unlawful, as is

retaliating against employees for opposing racial discrimination.  Poole, 129 F.3d at

552; Jackson, 130 F.3d at 1007 (holding, where plaintiff employees alleged they

were required to discriminate against minority patrons and were retaliated against

for failing to do so, "[t]he . . . plaintiffs' claim for retaliation may . . .  proceed under

section 1981(b)").

Defendants also argue that they were motivated, at least in part, by lawful motives, and thus they are still entitled to assert qualified immunity.  "That [Defendants] acted, in part, with discriminatory motive does not defeat entitlement to qualified immunity. . . . at least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage."  McMillan v. DeKalb County, 2006 U.S. App. LEXIS 27535, at *4 (11th Cir. Nov. 6, 2006) (per curiam) (citing Foy v. Holston, 94 F.3d 1528, 1534-35 (11th Cir. 1996)).

The Eleventh Circuit in McMillan held that "[i]n cases involving mixed motives, a public official is not immunized from liability for an otherwise objectively valid act if the complained of act was undertaken *only* based on improper motive."  Id. at *5 (citing Crawford-El v. Britton, 523 U.S. 574 (1997) and Foy, 94 F.3d at 1535 n.9 (11th Cir. 1996)).  "When improper motive is part of the underlying constitutional tort, a defendant is entitled to qualified immunity only when, among other things, the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."  Id. at *6 (citing Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1296 (11th Cir. 2000)).

106

Plaintiffs have offered evidence that Defendants' actions of altering Drake, Kelley, and Bryant's positions or responsibilities, abolishing Lowe's job, and harassing Bryant, Drake and Kelley by removing their job responsibilities, withholding information and resources, and treating them differently from black managers were done with the sole purpose of instituting Jones's agenda to increase the number of black managers and eliminate white managers.  Plaintiffs offer evidence that Drake, Bryant and Kelley were in fact targeted by Defendants to be removed from the Parks Department, and Defendants' managerial decisions were made with that sole intention in mind.  Plaintiffs also offer evidence that when Lowe refused to participate in their plan, Defendants decided that he needed to be eliminated from the department.  Defendants have offered their own evidence that these decisions were made due to true staffing needs of the department and that many actions complained of by Plaintiffs were simply the Defendants' valid management choices and styles which Plaintiffs did not like.  Although there is a genuine dispute, Plaintiffs' evidence is sufficient to show that Defendants' decisions were motivated solely by the intent to discriminate and were not based on any lawful motives.  The Court finds that the evidence does not "indisputably establish that Defendants were motivated, at least in part, by lawful considerations."

Defendants "misapprehend the analytical framework applicable to qualified immunity in mixed motive cases." Id.  Qualified immunity should be denied here because the evidence does not establish that the actions complained of by Plaintiffs indisputably was motivated *at least in part* by the reasons offered by Defendants for their employment decisions.  The evidence here is that Defendants should have known that discrimination against Plaintiffs based on their race and retaliation against Lowe was unlawful and clearly established under the law, and the evidence does not indisputably show that Defendants were partially motivated by lawful considerations.  The Court does not believe the law allows a public official defendant to engage in calculated racial discrimination costumed in a racially neutral garb of administrative actions so it can masquerade as a qualified immunity defense.  The Court finds the Defendants in this case have not, and cannot, "indisputably establish" they were motivated even in part by lawful considerations.  In fact, Plaintiffs have presented sufficient evidence that it was unlawful conduct in which the Defendants engaged in here.  Defendants are therefore not entitled to assert qualified immunity as to any of Plaintiffs' claims.

8. <u>Discriminatory Custom or Practice to Establish Official Capacity</u>

There is no respondeat superior liability under § 1983. <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1307 (2001). "When suing local officials in their official capacities[48] under § 1983, the plaintiff has the burden to show that a deprivation of constitutional rights occurred as a result of an official government policy or custom." <u>Cooper</u>, 403 F.3d at 1221; <u>see also</u> <u>Monell v. Dep't of Social Servs.</u>, 436 U.S. 658, 690 (1978). Each Defendant in this case, except for Jones, argues that all of Plaintiffs' claims against them in their official capacity are barred under <u>Monell</u>. Jones only challenges Lowe's retaliation claim against him in his official capacity.

A local government body is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose

---

[48] "[A] suit against a governmental officer 'in his official capacity' is the same as a suit against the entity of which the officer is an agent." <u>McMillian v. Monroe County</u>, 520 U.S. 781, 785 n.2 (1997). "The Eleventh Circuit has held that when an officer is sued in his or her official capacity, the suit is simply another way of pleading an action against the city that the offer represents. Consequently, it would be redundant to allow [Plaintiffs] to sue both the [county] and the officers in their official capacity." <u>Hyath v. City of Decatur</u>, 2006 U.S. Dist. LEXIS 21184, at * 36 (N.D. Ga. Mar. 28, 2006) (citing <u>Busby v. City of Orlando</u>, 931 F.2d 764, 776 (11th Cir. 1991)).

edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."
Monell, 436 U.S. at 694.  "A policy is a decision that is officially adopted by the
municipality, or created by an official of such rank that he or she could be said to be
acting on behalf of the municipality.  A custom is a practice that is so settled and
permanent that it takes on the force of law." Cooper, 403 F.3d at 1221 (quotation
and citations omitted).  "[Section] 1983 liability may be imposed on a municipality
based on governmental custom even though such a custom has not received formal
approval through the body's official decisionmaking channels. . . . [T]o prove §
1983 liability against a municipality based on custom, a plaintiff must establish a
widespread practice that, although not authorized by written law or express
municipal policy, is so permanent and well settled as to constitute a custom or usage
with the force of law." Griffin, 261 F.3d at 1308 (citations and quotations omitted).

　　 "In other words, a long-standing and widespread practice is deemed
authorized by the policy-making officials because they must have known about it
but failed to stop it." Brown v. City of Ft. Lauderdale, 923 F.2d 1474, 1481 (11th
Cir. 1991).  "This threshold identification of a custom or policy ensures that a
municipality is held liable only for those deprivations resulting from the decisions
of its duly constituted legislative body or those officials whose acts may fairly be

said to be those of the municipality."  McDowell v. Brown, 392 F.3d 1283, 1290

(11th Cir. 2004).  "State and local positive law determine whether a particular

official has final policymaker authority for § 1983 purposes." Cooper, 403 F.3d at

1221.

　　　"[M]unicipal liability under § 1983 attaches where–and only where–a

deliberate choice to follow a course of action is made from among various

alternatives by the official or officials responsible for establishing final policy with

respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S.

469, 483 (1986); see also Church v. City of Huntsville, 30 F.3d 1332, 1342 (11th

Cir. 1994) ("Only those municipal officers who have final policymaking authority

may by their actions subject the government to § 1983 liability."); Brown, 923 F.2d

at 1481 (stating that once the policymakers have been identified, it is for the jury to

decide whether *their* decisions have caused the deprivation of rights at issue by . . .

acquiescence in a long-standing practice or custom which constitutes the standard

operating procedure of the local government entity) .

　　　"There are three ways to show a governmental policy or custom: 1) an

express policy; 2) a widespread practice that is so permanent and well-settled as to

constitute a custom; or 3) the act or decision of a municipal official with final

111

policy-making authority."  Hyath v. City of Decatur, 2006 U.S. Dist. LEXIS 21184,

at * 29-30 (N.D. Ga. 2006).

In Church v. City of Huntsville, the Eleventh Circuit explained:  "[M]unicipal

liability may be based upon (1) an action taken or policy made by an official

responsible for making final policy in that area of the city's business; or (2) a

practice or custom that is so pervasive, as to be the functional equivalent of a policy

adopted by the final policymaker."  Church, 30 F.3d at 1342.  To establish the

existence of a practice or custom under the second prong, "it is generally necessary

to show a persistent and wide-spread practice.  Moreover, actual or constructive

knowledge of such customs must be attributed to the governing body of the

municipality."  Id. at 1345; see also Hale v. Tallapoosa County, 50 F.3d 1579, 1583

(11th Cir. 1995) (holding that to prevail against the County through a defendant

sheriff in his official capacity, plaintiff must show a practice or custom that is so

pervasive, as to be the functional equivalent of a policy adopted by the final

policymaker, and because the defendant sheriff was the County official responsible

for making final policy for the jail, the County would be liable if the sheriff's

actions or policies amounted to deliberate indifference to a substantial risk of

serious harm which resulted in the plaintiff's injury); Depew v. City of St. Marys,

787 F.2d 1496, 1499 (11th Cir. 1986) (upholding a verdict against a city on the basis of five incidents of excessive force, because the mayor and city council members were aware of prior incidents and therefore the city had implicitly ratified a custom or policy permitting excessive force).

*Defendant Jones*

Defendant Jones argues for summary judgment only on Lowe's § 1983 claim for retaliation against Jones in his official capacity.  (Jones MSJ, at 40.)  Jones argues that Lowe's position was merit protected and that Lowe exercised his right to administratively appeal the elimination of his position.  He argues that final policymaking authority does not vest where an official's decisions are subject to meaningful administrative review.  Plaintiffs argue that they have shown that a custom of discriminating against white managers existed because the county tacitly, or expressly, authorized the discrimination or displayed a deliberate indifference to it.  Relying on Hale, Plaintiffs also argue that the custom of discrimination is "the functional equivalent of a policy adopted by the final policymaker," and it does not matter if the official who displayed indifference to the discrimination is not a final policymaker.  (Pl. Resp. to Jones MSJ, at 30.)  The Court disagrees.

"A municipality's failure to correct the constitutionally offensive actions of [a] department may rise to the level of a custom or policy if the municipality tacitly authorizes these actions or displays deliberate indifference towards the . . . misconduct." Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987).  In Hale, the plaintiff, a former inmate in the Tallapossa County jail, filed suit against a jailer and a sheriff in their individual capacities, and against Tallapoosa County through the sheriff in his official capacity, after being beaten by fellow inmates while being held in the jail.  Hale, 50 F.3d at 1583.  The complaint alleged in part that an excessive risk of inmate-on-inmate violence existed at the jail, that the defendants were deliberately indifferent to this risk, and that this deliberate indifference caused his beating.  The Eleventh Circuit held that "to prevail against the County through [the sheriff] in his official capacity, [the plaintiff] was required to prove that the deprivation resulted from (1) an action taken or policy made by an official responsible for making final policy in that area of the County's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Id. at 1582.  Citing Church, it further reasoned that "[b]ecause Sheriff Smith was the County official responsible for making final policy for the jail, the County would be liable if Smith's actions or policies

114

amounted to deliberate indifference to a substantial risk of serious harm which resulted in [the plaintiff's] injury."  Id.

Contrary to Plaintiffs' argument, Hale did not hold that the final policymaker analysis is inapplicable, because the court based its decision on the fact that the defendant was indeed the final policymaker.  Even under the "practice or custom" prong, the actual or constructive knowledge of the widespread discrimination must be attributed to either the governing body of the municipality or an official with final policymaking authority.

Final policymaking authority does not vest where an official's decisions are subject to meaningful administrative review.  Quinn v. Monroe Cty., 330 F.3d 1320, 1325 (11th Cir. 2003).  Here, Lowe was entitled to appeal the elimination of his position pursuant to the DeKalb County Code, and he did so.  A hearing was conducted on the matter, and the elimination of Lowe's position was affirmed by the hearing officer.  Jones therefore did not have final policymaking authority over the abolishment of Lowe's position, and DeKalb County cannot be liable for Lowe's retaliation claim against Jones in his official capacity.  See McMillan v. DeKalb County, No. 1:04-cv-3039, at 20 (N.D. Ga. 2005) (Martin, J.) (finding that the defendant county could not be held liable for plaintiff's termination under

§ 1983).  Summary judgment on Lowe's retaliation claim against Jones in his official capacity is granted.  Drake, Bryant and Kelley's claim for hostile work environment and Kelley's claim for constructive discharge against Jones in his official capacity remain.

*Defendant Drew*

Drew argues that all of Plaintiffs' § 1983 claims against her in her official capacity are barred because Plaintiffs cannot show that Drew is an official with final policymaking authority.  (Drew MSJ, at 45.)  First, the Court has held that because the abolishment of Lowe's position was subject to administrative review, the county cannot be held liable for the decision to abolish Lowe's job.  Therefore, Lowe's claim for retaliation against Drew in her official capacity is barred.  The remaining claims asserted against Drew in her official capacity are Drake, Bryant and Kelley's hostile work environment claim and Kelley's constructive discharge claim.

First, it is undisputed that there is no express policy of discrimination within the county.  Plaintiffs, however, have put forth sufficient evidence that there was a "widespread practice . . . that is so permanent and well settled as to constitute a custom or usage with the force of law."  <u>Griffin</u>, 261 F.3d at 1308.  The Eleventh

116

Circuit has further defined a custom to include "deeply imbedded traditional ways of carrying out policy." <u>Hyath</u>, 2006 U.S. Dist. LEXIS, at * 32 (citing <u>Fundiller v. Cooper City</u>, 777 F.2d 1436, 1442 (11th Cir. 1985)).  The evidence is that Jones began implementing his agenda to eliminate white managers as soon as he took office and that many high-ranking officials within DeKalb County, including Stogner, Jones's Executive Assistant, Stone, the Director of Human Resources, Williams, an Assistant County Administrator, and Drew, the Director of the Parks Department, were actively participating and furthering the agenda.  Plaintiffs have also submitted other evidence that Jones implemented his plans in other departments within the county, such as the fire and police departments.  Plaintiffs have submitted evidence that Defendant Jones stated that a goal of the administration was to hire employees that look like the population of DeKalb County, that Drew admitted that Defendant Jones had implemented racially motivated employment directives, and that Defendant Drew told Plaintiff Lowe to "dig up dirt" on white employees in the Department.  Plaintiffs offer evidence that Jones, Stone, and Drew each told Lowe that a plan was in place to discriminate against white DeKalb County managers.  Lowe testified that Jones told him the

white people in the Department needed to removed, and the whole department needed to be reorganized.

This evidence is sufficient for a reasonable jury to find that there was a widespread practice that is so permanent and well-settled as to constitute a custom, and that this practice was implemented and encouraged by Jones as CEO of DeKalb County.[49]  See Brown, 923 F.2d at 1481 (finding plaintiff had sufficiently alleged facts to show a custom of racial discrimination in the police department when plaintiff alleged a series of discriminatory practices over 5 years in which the police chief's acquiesced and even knew of the actions).  Furthermore, there is no evidence in the record that these hostile work environment and constructive discharge claims are subject to meaningful administrative review.[50]

---

[49]  Jones does not challenge Plaintiffs' contentions that he was a policymaker within DeKalb County regarding the employment actions experienced by Bryant, Kelley and Drake, or that Plaintiffs' evidence, though capable of being challenged at trial, does not show a custom or policy, approved of by Jones, of creating the hostile work environments and constructive discharge suffered by Plaintiffs Kelley, Drake, and Bryant.

[50]  The DeKalb County Code disciplinary action appeal process does not provide for a method to brings claims for discrimination based upon a hostile work environment or constructive discharge; it only provides for appeals from a disciplinary action such as suspension, demotion with a reduction in pay, or dismissal.  (DeKalb County Code §§ 20-192, 20-194.)

Although there is no evidence in the record that Drew had final policymaking authority sufficient to make the county liable for her acts in discriminating against Bryant, Drake, and Kelley, because the evidence indicates the actions taken by Drew were pursuant to a custom or practice instituted and approved of by Jones, her actions can be attributed to the county for purposes of § 1983.[51]  Drew's motion for summary judgment on Bryant and Drake's hostile work environment claims against her in her official capacity is denied.[52]  Drew's motion for summary judgment on Lowe's retaliation claim against her in her official capacity is granted.

*Defendants Stogner, Williams and Stone*

Defendants Stogner, Williams and Stone each make the same arguments as Drew that all Plaintiffs' claims against them in their official capacity are barred because Plaintiffs have not shown that the acts were a result of an official

---

[51]  This is an unusual case because Plaintiffs have presented evidence that Jones actually established a policy, though unwritten and not public, of discriminating against white managerial employees.  Plaintiffs have presented sufficient evidence for a jury to find that Jones's policy was supported and implemented by Defendants, who are management-level employees throughout the tenure of Jones's administration.

[52]  The Court has granted summary judgment in favor of Drew on Kelley's constructive discharge claim against her.

119

government policy or custom, or that they were a final policymaker with respect to any of the acts or decisions Plaintiffs complain of.  (Stogner MSJ, at 45; Stone MSJ, at 43; Williams MSJ, at 43.)  Lowe's claim for retaliation against Williams, Stogner and Stone in their official capacity is barred because the abolishment of Lowe's position was subject to administrative review.  Plaintiffs have put forth sufficient evidence that discrimination against white managers was a widespread practice that is so permanent and well-settled as to constitute a custom or usage with the force of law.  Stogner, Williams, and Stone's actions taken pursuant to that custom can therefore subject the county to liability, even though there is no evidence that they had final policymaking authority themselves.  Stogner, Williams, and Stone's motions for summary judgment on Bryant, Drake, and Kelley's hostile work environment claims and Kelley's constructive discharge claim against them in their official capacity are denied.  Stogner, Williams, and Stone's motions for summary judgment on Lowe's retaliation claim against them in their official capacity are granted.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Stogner's Motion for Summary Judgment [256] be **GRANTED** in part and **DENIED** in part.  Defendant Stone's Motion for Summary Judgment [257] is **GRANTED**.  Defendant Jones's Motion for Summary Judgment [259] is **GRANTED** in part and **DENIED** in part.  Defendant Williams's Motion for Summary Judgement [263] is **GRANTED** in part and **DENIED** in part.  Defendant Drew's Motion for Summary Judgment [262] is **GRANTED** in part and **DENIED** in part.  Defendants' Joint Motion to Supplement Exhibit [282] is **GRANTED**.

Specifically, summary judgment is granted as to all Defendants on Kelley's discriminatory transfer claim, Bryant's discriminatory transfer claim, Drake's failure to promote and discriminatory transfer claims, and Lowe's § 1983 first amendment claim.  Summary judgment is granted to all Defendants on Plaintiffs' conspiracy claim.  Summary judgment is granted to Stone on Bryant and Drake's hostile work environment claim.  Summary judgment is granted to Drew and Stone on Kelley's hostile work environment claim and constructive discharge claim.  Summary judgment is granted to Jones, Stone, and Williams on Lowe's retaliatory

termination claim, and summary judgment is granted to all defendants on Lowe's retaliatory termination claims against them in their official capacities.

Summary judgment on Bryant and Drake's hostile work environment claim is denied as to Williams, Jones, Stogner, and Drew.  Summary judgment on Kelley's hostile work environment claim and constructive discharge claim is denied as to Williams, Jones, and Stogner.  Summary judgment on Lowe's retaliatory termination claim is denied as to Drew and Stogner.  Summary judgment on Bryant and Drake's hostile work environment claims against Williams, Jones, Stogner, and Drew in their official capacities is denied.  Summary judgment on Kelley's hostile work environment claim and constructive discharge claim against Williams, Jones, and Stogner in their official capacities is denied.  Defendant Stone is dismissed from this action.

**SO ORDERED** this 21st day of November, 2006.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

122