# Exhibit G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **KRISTY BRYANT YULE,** as Temporary Administrator of the Estate of **MICHAEL BRYANT, JOHN DRAKE, BECKY KELLEY, AND HERB LOWE,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **CIVIL ACTION NO.** |
| **v.** | ) ) ) | **1:04-CV-2462-WSD** |
| **VERNON JONES, MARILYN BOYD DREW, MORRIS WILLIAMS, AND RICHARD STOGNER, in their individual capacities, and DEKALB COUNTY,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

### PLAINTIFFS' MOTION FOR SANCTIONS FOR LITIGATION MISCONDUCT

COME NOW Plaintiffs Kristy Bryant Yule, as Temporary Administrator of the Estate of Michael Bryant, John Drake, Becky Kelley, and Herb Lowe and file this Motion for Sanctions for Litigation Misconduct, showing the Court as follows:

### I.   INTRODUCTION

From the outset of this case and continuing into trial, Defendants have engaged in conduct that can fairly be described as "abuse of the judicial process." Plaintiffs contend that two of the Defendants, DeKalb County ("DeKalb") and Marilyn Boyd

Drew ("Drew"), have engaged in conduct so egregious that no lesser sanction than striking their answers and defenses will suffice. Specifically, DeKalb and Drew engaged in the following sanctionable conduct:

1. After the first day of trial, two letters allegedly counseling Joe Stone and Morris Williams in May 2006 for their role in the racially-charged telephone conversation concerning Fire Department promotions were produced for the first time to rebut Plaintiffs' counsels' opening remarks. No one representing DeKalb can explain where the documents came from or where they have been for the past four years.

2. It was revealed at trial that DeKalb's Human Resources Department has been selectively maintaining Plaintiffs' personnel files. No one representing the DeKalb can explain why Bryant's written response to a reprimand letter was not included in Bryant's personnel file.

3. DeKalb witness and former DeKalb County attorney William Linkous received a notice to appear for jury duty on the same day he knew this trial was to begin. No one from the Defense notified Plaintiffs or the Court, who discovered Linkous's presence in the venire only after he had spent several hours with the jury.

4. Drew telephoned DeKalb employee Kelvin Walton during trial to put him on notice of testimony concerning him from Plaintiff Drake. Drew lied under oath when asked about her conversation with Walton.

5. Drew testified that she did not prepare performance evaluations for Plaintiffs Bryant and Drake because they did not submit performance plans. She admitted, however, that at some point after this lawsuit was filed, she found Bryant and Drake's performance plans under her credenza.

6. Drew testified that she did not write two reprimand letters sent to Plaintiff Bryant (and placed in his personnel file) immediately after he joined this lawsuit, but refused to identify the actual author of those letters. No one from DeKalb could identify the author of the letters.

7. DeKalb continues to hide the ball regarding the racial composition of its managerial staff from 2001 to 2005, despite a Court order requiring DeKalb to produce data showing such composition.

8. DeKalb sought to mislead the jury by eliciting false testimony from Defendant Stogner that DeKalb eliminated five positions from the Parks and Recreation Department in the 2004 budget (as opposed to only the position of Plaintiff Lowe). As Stogner was forced to admit on cross, the

four positions other than Lowe's position were not actually eliminated but were reclassified under a different department.

9.   DeKalb sought to mislead the jury by eliciting false testimony from Stogner that Executive Order 1-5 put Plaintiff Kelley in charge of the County's $135 million Greenspace program. Defendants' witness Tina Arbes testified unequivocally that she (Arbes) was in charge of the Greenspace program, that Kelley had no control over any of the $135 million in the program, and that Kelley had limited supervisory authority over only two or three employees in the acquisition division of the Greenspace program.

10.   DeKalb has stonewalled Plaintiffs for six years through discovery disputes and "farcical"[1] appellate arguments, purposefully delaying Plaintiffs' day in court and needlessly driving up the cost of litigation in this case.

Nearly six years after Plaintiffs filed this lawsuit, DeKalb and Drew continue to engage in abusive tactics to thwart the orderly administration of justice and the dignity of this tribunal. Defendants DeKalb and Drew have committed fraud upon the Court, hampered the enforcement of the Court's Orders, raised frivolous arguments, and delayed and disrupted this litigation. The Court should find that such conduct

---

[1] Bryant v. Jones, 575 F.3d 1281, 1300 (11th Cir. 2009).

constitutes bad faith and exercise its inherent power to strike DeKalb's and Drew's answers and defenses.

## II.   ARGUMENT AND CITATION TO AUTHORITY

The Court has the inherent power and discretion to strike a defendant's answer and enter a default judgment against that defendant in order to "protect the orderly administration of justice and to preserve the dignity of the tribunal." In re: Amtrak "Sunset Limited" Train Crash In Bayou Canot, Alabama On September 22, 1993, 136 F. Supp. 2d 1251, 1264 (S.D. Ala. 2001) (citing Kleiner v. First Nat. Bank of Atlanta, 751 F.2d 1193, 1209 (11th Cir. 1985)). The striking of an answer and entry of default judgment against a defendant is a drastic remedy that should be reserved to penalize egregious conduct. See In re Amtrak, 136 F. Supp. 2d at 1265. In order to exercise its inherent power to strike a defendant's answer, the court must find by clear and convincing evidence that the abusive behavior occurred and that a lesser sanction would not sufficiently punish or deter the abusive conduct. Quantum Communications Corp. v. Star Broad., Inc., 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007).

"The key to unlocking a court's inherent power is a finding of bad faith." Eagle Hosp. Physicians, LLC, 561 F.3d 1298, 1306 (11th Cir. 2009). "Bad faith exists when the court finds that a fraud has been practiced upon it, or 'that the very temple of

justice has been defiled,' or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." Quantum Communications Corp., 473 F. Supp. 2d at 1268-69 (citations omitted).

## A.   DeKalb and Drew Tainted Defendants' Document Production

Late in the evening on March 22, 2010, in response to opening remarks from Plaintiffs' counsel that DeKalb County had failed to take any action against Joe Stone and Morris Williams for their role in the recorded conversation regarding promotions in the fire department, DeKalb County's attorneys produced, for the first time, two counseling letters allegedly given to Stone and Williams in May 2006.

Although the letters purport on their face to be documents maintained in Stone's and William's personnel files since 2006, those two documents were not produced until after the first day of trial. To date, no one from the County has explained where the two documents were actually being kept (if anywhere) or why they had not been produced.

DeKalb attempted to defend its failure to produce the documents by arguing in Court, and later by brief, that Plaintiffs had not requested the letters in discovery. DeKalb's argument is patently false. In Plaintiffs' Second Requests for Production of Documents, Request No. 3, Plaintiffs' specifically requested Stone's and Williams'

- 6 -

personnel files, including any disciplinary action taken against them. See Plfs.' Resp.

to Defs.' Req. for Limiting Instruction Regarding the Letters of Counseling (Plfs.' Ex.

279 and 280), Docket No. 450, at Ex. A, Req. No. 3.  Incredibly, despite the fact that

the letters materialized only after DeKalb County realized they would be useful to

refute Plaintiffs' opening argument, the County has moved the Court to prevent

Plaintiffs from inquiring or arguing about the letters' mysterious appearance in front

of the jury because of the potential for "prejudice" to their defense.

    Moreover, assuming that the counseling letters were in fact created on May 30,

2006, the facts that (1) they were created three weeks after Stone and Williams were

deposed concerning the tape (months after the County became aware of the tape); (2)

they were not maintained in Stone and Williams' personnel files, as indicated on the

face of the letters; and (3) they were not produced until it became apparent they would

bolster DeKalb's defense (as opposed to being used as an admission of wrongdoing)

indicate that DeKalb likely created those letters to use as trial exhibits in this

litigation.  Williams, Stone, and Stogner testified that the counseling did not occur

until after the depositions because DeKalb County's attorneys were investigating

whether the tape was legitimate.  This explanation for DeKalb's delay in creating the

letters, which is the only explanation offered by DeKalb, strains credulity given that

Williams and Stone admit that they recognize their voices on the tape and that the tape accurately reflects the portion of their conversation caught on the tape.

Similarly, the County has engaged in improper conduct with regard to a written response to one of two reprimand letters Bryant received from Drew shortly after he joined this lawsuit. Drew admitted that she did not write the reprimand letters, but merely contributed to them. Although DeKalb has been asked repeatedly by Plaintiffs counsel to identify who actually wrote the letters, neither Drew nor DeKalb have revealed the author's identity.

Moreover, DeKalb admits that Bryant's response to the reprimand was not kept in Bryant's personnel file, despite a request that a copy be placed there. At the direction of the Court, the current County Attorney investigated why the letter never found its way into Bryant's personnel file. According to her, a previous County Attorney, Linkous, said that he intended for the letter to be placed in Bryant's file and sent a copy to the Human Resources Department for that purpose, albeit without express instruction from him to place it in Bryant's file. Neither the current nor the former county attorney could explain why Human Resources, which was and is under the control of Joe Stone, did not put the letter in Bryant's file.

DeKalb's handling of the counseling letters to Stone and Williams, and the selective maintenance of Bryant's personnel file, both of which were the responsibility

- 8 -

of Joe Stone in the Human Resources Department, raises serious questions about the veracity of DeKalb's personnel records and its production of documents in this case. Similarly, Drew testified at trial that Bryant and Drake did not get performance evaluations because they did not submit performance plans. On cross examination, she admitted that she found their performance plans under her credenza at some point after this lawsuit was filed. Drew claims she has no idea how those plans got under her credenza. As these incidents show, the unexplained appearance and disappearance of vital personnel documents at DeKalb's convenience has been one of the hallmarks of this case from the beginning.

**B.    DeKalb's Attempt To Frustrate The Court's Order Regarding Racial Composition Data**

DeKalb County has similarly tried to hide the ball with regard to the data showing the racial composition of DeKalb's managerial employees (the "data" or the "PeopleSoft data"). After being ordered by the Court to produce data showing the racial composition of DeKalb County's managerial employees from 2001 to 2005, DeKalb began a contentious negotiation with Plaintiffs to narrow the scope of what the County would actually produce. Ultimately, the County produced data that it represented was accurate and responsive to Plaintiffs' requests, as modified by the County through that negotiation.

At trial, DeKalb put Faye McCommon on the stand to testify that the data DeKalb County produced is flawed because Plaintiffs did not request the data in precisely the right way. Specifically, McCommon testified that Plaintiffs requested that the data exclude employees under the supervision and control of "constitutional officers," a term she claimed to be unfamiliar with and which DeKalb apparently felt no obligation to explain to her. Realizing that McCommon included several employees under the control of constitutional officers in the data, despite being asked not to, Plaintiffs had to send Requests to Admit to DeKalb to clarify who within the data worked for a constitutional officer and who worked under the control of the CEO. Despite having made Plaintiffs fight hammer and tong for the racial composition data, DeKalb is seeking to use McCommon's testimony to discredit the very data it produced in response to the Court's order.

There is no dispute that DeKalb County has exclusive control of the PeopleSoft data and that it can obtain in a couple of hours the racial composition data Plaintiffs have been seeking for years. In fact, Stone testified that such reports have been run for him and then subsequently shredded. Through McCommon's testimony, the County is seeking to prevent Plaintiffs and the Jury from learning the true racial composition of managerial employees under Jones's control from 2001 to 2005—

information the Court has ruled Plaintiffs were entitled to obtain and the Jury is entitled to hear.

## C.     **Knowingly False Statements Constituting Fraud On The Court**

Knowingly false or misleading statements made to the Court constitute fraud on the Court sufficient to justify the imposition of sanctions, including the striking of pleadings. See In re: Amtrak "Sunset Limited", 136 F. Supp. 2d at 1266, 1269-70; Young v. Office of the U.S. Senate Sergeant at Arms, 217 F.R.D. 61, 71 (D.D.C. 2003) ("Lying cannot be condoned in any formal proceeding.... Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.").

After the depositions on Monday, March 29, 2010, it is indisputable that either Drew or DeKalb's current Director of Purchasing and Contracting, Kelvin Walton, or both, have perjured themselves with regard to a violation of the Court's order of sequestration in this case. Walton testified as follows:

*Q.     Okay.  Last week when Ms. Drew called you, what did ya'll talk about?*

*A.     She just mentioned that John Drake mentioned my name about a position or something.*

*Q.     Okay, she said that John Drake had mentioned your name about a position.  Where did he mention your name; at trial in litigation?*

*A.     Yes.*

- 11 -

Deposition of Kelvin Walton ("Walton Dep.") at p. 6, lns. 4-13. The trial record will show that John Drake mentioned Walton's name during his testimony on the afternoon on Thursday, March 25, 2010.

Drew's testimony regarding her conversation with Walton contradicts Walton's testimony that Drew called him to put him on notice about Drake's testimony at trial. Specifically, Drew testified as follows:

> *Q.    It's true, is it not, that you had a conversation with Kelvin Walton late last week regarding this litigation?*
>
> *A.    I talked with Kelvin Walton on Monday evening. ...*

Deposition of Marilyn Boyd Drew ("Drew Dep.") at p. 4, lns. 12-15.

> *Q.    He called you Monday evening, March the 22nd?*
>
> *A.    March 22nd.*

Drew Dep. at p. 5, lns. 1-2.

> *Q.    Other than the Monday conversation, did you have any other conversations with Mr. Walton this week?*
>
> *A.    I have not.*
>
> *Q.    It's true, is it not, that you called him after Mr. Drake's testimony?*
>
> *A.    No, I did not.*
>
> *Q.    I understand that you did call him with regard to Mr. Drake's testimony and told Mr. Walton that his name came up during Mr. Drake's testimony. That did not occur?*
>
> *A.    I did not talk to Mr. Walton after Mr. Drake's testimony. I did not talk to Mr. Walton after Monday.*

- 12 -

Drew Dep. at p. 8, ln. 20 through p. 9, ln. 6.

> *Q.    Are you positive that you had no conversations with Mr. Walton about Mr. Drake's testimony?*
>
> *A.    I'm positive.*

Drew Dep. at p. 10, lns. 3-6.

When Walton was asked why he understood Drew called him to tell him

that John Drake had mentioned his name at trial, Walton responded:

> *Q.    Why do you think she wanted you to know?*
>
> ...
>
> *A.    Oh, okay.  I guess just letting me know just in case if I was called in [to court].*

Walton Dep. at p. 11, lns. 6, 13-14 (bracketed matter added).

If Walton is to be believed, Drew called him during trial to put him on notice

that his name had come up during Drake's testimony on Thursday, March 25 and to

let him know the nature of Drake's testimony concerning him.  If Drew is telling the

truth, she did not call Walton after Drake's testimony.  Accordingly, there is clear and

convincing evidence that one of the two perjured themselves as to Drew's attempt to

tip off a potential county witness about testimony at trial.

Walton's and Drew's testimony concerning their call differed in other

significant ways.  Drew testified that she and Walton discussed Joe Stone and George

Smith during their telephone conversation last week.  <u>See</u> Drew Dep. p. 12, lns. 9-25.

Walton denied talking about Stone or Smith. <u>See</u> Walton Dep. p. 7, ln. 15-20. Both

Drew and Walton denied talking about Defendant Jones. <u>See</u> Drew Dep. at p. 14, lns.

17-21; Walton Dep. p. 8, lns. 7-11. To the extent the Court finds that either Drew or

Walton perjured themselves involving an issue as serious as violation of the Court's

sequestration order, Drew's and/or the County's answer and defenses should be

struck. <u>See Young</u>, 217 F.R.D. at 67-68 (dismissing complaint due to witness

tampering).

Additionally, DeKalb has knowingly elicited false and/or misleading testimony

at trial on at least two occasions so far. First, Stogner testified with an intent to

mislead when, on direct examination, he stated that DeKalb County eliminated five

jobs from the Parks and Recreation Department in the 2004 budget, not one, as alleged

by Plaintiff Lowe. On cross examination, Stogner admitted that the other four

positions he testified were "eliminated" in the 2004 budget were not actually

eliminated, but were simply reclassified into a new department. As Stogner was

forced to concede, the only person in the Parks Department to have their job

eliminated by the 2004 "reduction in force" was Lowe.

Similarly, DeKalb argued in opening statements that Kelley was put in charge

of a $135 million Greenspace program when she was transferred out of her job as

Director of Parks and Recreation. That "theory" was sought to be proved through

Stogner, who testified that he put Kelley in charge of the $135 million Greenspace program when he prepared Executive Order 1-5. Defense witness Tina Arbes, Kelley's supervisor in the Greenspace program, testified unequivocally on Friday, March 26, 2010, that Kelley had no control over any of the County's $135 million in bond funds. According to Arbes's testimony, Kelley's role in the Greenspace program could, at best, be described as recommending certain properties for acquisition using selection criteria given to her by Arbes. Arbes also testified that Kelley had some limited supervisory role over two or three employees in one component (the acquisition component) of the Greenspace program. Arbes's testimony, which corroborates Kelley's testimony, exposes DeKalb's false claim that it put Kelley in charge of the $135 million Greenspace program.

DeKalb's attempt to elicit false testimony and to mislead the Jury on these issues, which are central to Kelley's and Lowe's claims, is sanctionable misconduct. Id.; Young, 217 F.R.D. at 71.

### D. Other Evidence of Bad Faith

DeKalb also engaged in questionable conduct early on the first day of trial. DeKalb County witness William Linkous received a notice to appear in the venire on the same day he knew this trial was to begin, and no one from the County notified the Plaintiffs or the Court of the situation. Linkous's presence in the jury pool was only

- 15 -

discovered by Plaintiffs upon reading the juror questionnaires, after Linkous had spent

the better part of the morning with the jurors. Remarkably, Defendant Jones's counsel

then sought to take further advantage of the situation by referring to Linkous's race as

evidence of non-discrimination in opening arguments.

Taken as a whole, there is clear and convincing evidence that the County's and

Drew's conduct in this litigation has crossed the line between zealous defense and

abusive litigation. Accordingly, the Court's use of its inherent power to strike their

answers and defenses is warranted.

### E.    Lesser Sanctions Will Not Suffice

DeKalb's and Drew's attempt to delay and disrupt the judicial process,

including during the trial of this case, is egregious conduct warranting the most severe

sanction—striking their answers and defenses. The unexplained appearance of

documents, DeKalb's apparently one-sided maintenance of its personnel files, and the

County's manipulation of the PeopleSoft data has tainted DeKalb's discovery

production. Plaintiffs can only wonder what other responsive data has been withheld,

misplaced, or shredded by the County's Human Resources Department, which at all

times relevant to this litigation has been under the control of Joe Stone. Similarly,

Drew's refusal to cooperate in discovery, her questionable participation in the creation

of reprimand letters to Bryant after this litigation was filed, and, most egregiously, her

willful violation of the Court's sequestration order and perjury to cover up that violation constitute fraud on the Court and justify the striking of her answer and defenses as well.

Through delay and obfuscation, DeKalb, Drew, and the other Defendants have already denied Mike Byrant his day in court. Now, through the conduct described herein, they are attempting to corrupt this judicial process to preclude the remaining Plaintiffs from a fair trial on the facts. The Court should give the most severe sanction against the County in this case "to act as a deterrent" to other governmental entities and officers who would use the public's resources to cover-up misconduct. See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc., 561 F.3d 1298, 1306 (11th Cir. 2009) (affirming the striking of defendant's answer as a deterrent to other litigants who might otherwise view the defendant's conduct as an invitation to abuse the judicial process). Lesser sanctions of fines or contempt rulings would be ineffective in restoring the integrity of this process, which has been compromised by DeKalb's and Drew's conduct. See Eagle Hosp. Physicians, LLC, 561 F.3d at 1306-07; Forsberg v. Pefanis, 261 F.R.D. 694, 702 (N.D. Ga. 2009); In re: Amtrak "Sunset Limited", 136 F. Supp. 2d at 1268-69; Quantum Communications Corp., 473 F. Supp. 2d at 1277-78; Young, 217 F.R.D. at 70-71.

### III.   **<u>CONCLUSION</u>**

For these reasons, Plaintiffs respectfully request that the Court strike Defendant

DeKalb County's answer and defenses and enter default judgment against the County

and in favor of Plaintiffs Kelley, Bryant, and Drake on all claims against the County.


(Signature on the following page)

Respectfully submitted this 30th day of March 2010.

/s/ **Christopher S. Anulewicz**
Michael J. Bowers
Georgia Bar No. 071650
Christopher S. Anulewicz
Georgia Bar No. 020914
James L. Hollis
Georgia Bar No. 930998
K. Alex Khoury
Georgia Bar No. 416978
mbowers@balch.com
canulewicz@balch.com
jhollis@balch.com
akhoury@balch.com
BALCH & BINGHAM LLP
30 Ivan Allen Jr. Blvd., NW
Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
Facsimile:  (404) 261-3656


J. Tom Morgan
Georgia Bar No. 522675
160 Clairemont Avenue
Suite 500
J. Tom Morgan Law
P.O. Box 1324
Decatur, Georgia  30031
Telephone: 404-687-1002
jtom@jtommorganlaw.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF COUNSEL REGARDING FONT SIZE**

Counsel certifies that the foregoing has been prepared using Times New Roman

font size 14 in accordance with Local Rules 5.1(B)(3) and 7.1(D).

This 30th day of March, 2010.

**/s/Christopher S. Anulewicz**
Christopher S. Anulewicz
Georgia Bar No. 020914

- 20 -

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2010, I sent by electronic mail the foregoing

to the following attorneys of record:

Kerri Anne Gildow
kgildow@rh-law.com

Sharon P. Morgan
morgan@elarbeethompson.com

Robert B. Remar
RRemar@rh-law.com

Brent L. Wilson
bwilson@etsw.com

Dwight Lowell Thomas
dlowellthomas@hotmail.com

**/s/ Christopher S. Anulewicz**
Christopher S. Anulewicz
Georgia Bar No. 020914

- 21 -