```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3   MICHAEL BRYANT, et al.          )
                                     )
 4                  Plaintiffs,      )    CIVIL ACTION FILE
                                     )    NO. 1:04-CV-2462-WSD
 5   v.                              )
                                     )    ATLANTA, GEORGIA
 6   VERNON JONES, et al.            )
                                     )
 7                  Defendants.      )
     _____)

 8

 9                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE WILLIAM S. DUFFEY, JR.,
10             UNITED STATES DISTRICT JUDGE, AND A JURY

11                           VOLUME 1
                      Monday, March 22, 2010
12


13
     APPEARANCES OF COUNSEL:
14
     For the Plaintiffs:         BALCH & BINGHAM LLP
15                               (By:  Michael J. Bowers
                                       James L. Hollis
16                                     John Thomas Morgan, III
                                       Christopher S. Anulewicz
17                                     K. Alex Khoury)

18   For Defendant Drew, Stogner, ROGERS & HARDIN
     Williams and DeKalb County:  (By:  Robert B. Remar
19                                       Kerri Anne Gildow)

20   For Defendant Jones:        ELARBEE THOMPSON SAPP & WILSON
                                 (By:  Brent L. Wilson
21                                     Sharon P. Morgan)

22                               Dwight Lowell Thomas

23
           Proceedings recorded by mechanical stenography
24          and computer-aided transcript produced by
                  NICHOLAS A. MARRONE, RMR, CRR
25                       (404) 215-1486
```

1                              I N D E X

2                                                      Page

3          Voir Dire                                  15
           Jury Selection                             109
4          Preliminary Instructions                   117
           Opening by Mr. Bowers                      129
5          Opening by Mr. Remar                       139
           Opening by Mr. Wilson                      155

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Monday Morning Session

 2                      March 22, 2010

 3                        9:06 a.m.

 4                       -- -- --

 5              P R O C E E D I N G S

 6                       -- -- --

 7         (In open court without prospective jurors present:)

 8         THE COURT:   Good morning, everybody.

 9              As is often the case, I tried very hard to put into

10    place a process to make sure that whatever needs to be

11    decided is decided before the trial.   Sometimes I am not

12    successful with the lawyers following the process, and that's

13    the case here, because after the time for filing motions

14    in limine, the defendants have chosen to file a motion out of

15    time.

16              It purports to be based upon some ruling I made at

17    the pretrial conference.   I think that that is somewhat of a

18    ruse to file the motion based upon what I ruled at the

19    pretrial conference.

20              But in the interest and expecting this not to

21    happen again and in the interest of the case going forward,

22    let me consider what this untimely motion presents and see if

23    we can't get this further issue behind us.

24              Part of it is behind you.   It looks to me like if

25    you had talked to each other, it would have been behind
```

1    you.  Part of it is behind you.

2          This motion specifically I'm referring to is the

3    motion that was filed by defendants.  The defendants filed a

4    motion *in limine* to restrict the testimony or documentary

5    evidence from Mr. Moody, which we discussed at the pretrial

6    conference last week.  We discussed specifically the very

7    issues that are the subject of this motion.

8          But apparently the defendants, either because

9    they forgot to argue it or somehow were confused about

10   what I said, had some concern about whether the plaintiffs

11   were going to introduce evidence of contacts by

12   Reverend Wiley Jackson with Mr. Moody concerning his grand

13   jury testimony and claims that he was an emissary on behalf

14   of Mr. Jones to admonish and maybe indirectly intimate to

15   Mr. Moody that he ought to be careful about what he says

16   before the grand jury, and to state that it was his idea as

17   to the security detail as opposed to Mr. Jones' control who

18   was on the security detail.

19         My understanding now is that the plaintiffs indeed

20   don't intend to introduce that evidence and that that's not

21   really an issue.

22         Is that correct, Mr. Bowers?

23         MR. ANULEWICZ:  That's correct, Judge.

24         THE COURT:  So to the extent that the defendants

25   saw fit to file a motion on a matter that is ultimately

1  unnecessary, that motion is moot and, therefore, it was one

2  that was not necessary to present to the Court.

3           I did rule and I have consistently said that to the

4  extent that there was any contact with Mr. Moody about him

5  not following what he perceived and understood to be the plan

6  of DeKalb County that the white police officer managers that

7  he hired should be discharged based upon their race, any

8  evidence that relates to that is admissible.

9           Now are there any questions about my ruling on

10 Mr. Moody's testimony?

11           MR. THOMAS:  Yes, there is, Your Honor.

12           THE COURT:  Pardon me?

13           MR. THOMAS:  Yes, there is.

14           THE COURT:  There are questions about the ruling?

15           MR. THOMAS:  That's correct, Your Honor.  I will

16 address the question.

17           May I approach the podium?

18           THE COURT:  You may.

19           And any reason why we didn't take these up last

20 week?

21           MR. THOMAS:  I don't know, Your Honor, except

22 that maybe I didn't fully understanding the Court's ruling

23 during the pretrial conference insomuch as we didn't have a

24 written order to study the Court's comments or the Court's

25 rulings.

1            But it appears from the plaintiffs' motion that

2      they intend to offer hearsay evidence.  And of course, as the

3      Court has already ruled that, that was not clear to me in

4      terms of the Court's ruling.

5            The hearsay testimony -- and of course, they

6      made it plain that the hearsay testimony that they are

7      going --

8            THE COURT:  Which hearsay testimony are you

9      speaking about?

10           MR. THOMAS:  The hearsay testimony from former

11     Chief Moody that Wiley Jackson told me to go to

12     Richard Stogner, and certain things that Wiley Jackson told

13     him about falling on the sword.

14           Now, the plaintiffs have indicated in their motion

15     that they believe all of that is relevant in terms of the

16     circumstances surrounding why he retired or why he was forced

17     to retire.

18           I didn't think that hearsay --

19           THE COURT:  Have you read this response?

20           MR. THOMAS:  I read the response yesterday, and

21     I talked with plaintiffs' counsel this morning.  And

22     plaintiffs' counsel this morning still insisted that that was

23     what they wanted, to get that testimony out.

24           I spoke with plaintiffs' counsel this morning.  We

25     came to an agreement about the grand jury, to the use word

1    "official inquiry" if that subject came up.  We came to an

2    agreement on that this morning.

3              We did not come to an agreement as to whether or

4    not what Wiley Jackson told him was admissible under

5    Rule 807.  And that's why we brought that to the Court's

6    attention.

7              And I did speak to plaintiffs' counsel this morning

8    about it.

9              THE COURT:  It might be admissible under another

10   rule.

11             MR. THOMAS:  It may be, but if the Court rules

12   it's admissible on another rule, I did not see another

13   exception that that testimony would be admissible under.

14   Because Wiley Jackson is available.  He's an available

15   witness.

16             THE COURT:  Of course, 807 only comes into play if

17   it is hearsay.

18             MR. THOMAS:  Right.

19             THE COURT:  There is a rule that says that

20   certain things are not hearsay, especially those statements

21   made by somebody who is an agent or a servant of the party.

22   And it could be that they are traveling under that

23   assumption.

24             MR. THOMAS:  Your Honor, but I don't think that was

25   the theory, that an agent of the government made a

1    statement -- or an agent of the county government made a

2    statement to Mr. Moody.  That was not the theory.

3          The theory was simply that someone came to

4    him.  And of course even throughout the testimony --

5          THE COURT:  Why not give me a proffer as to what

6    you think is going to be elicited so I have some context

7    rather than this rhetoric that I'm hearing?

8          MR. THOMAS:  Right.  The proffer I believe that

9    will be admitted is that Wiley Jackson came to Mr. Moody, and

10   Mr. Moody will testify that at no time did Wiley Jackson say

11   that Vernon Jones sent him to him.  That Wiley Jackson just

12   simply came there and said, I think Vernon Jones wants your

13   resignation, I think you should fall on the sword for him in

14   respect to that official inquiry reconcerning the security

15   detail.

16         Now, those are statements that Wiley Jackson

17   stated.  And Mr. Jackson is available.

18         THE COURT:  All right.  Is that the statement that

19   the plaintiffs intend to introduce?

20         MR. ANULEWICZ:  No, Judge.

21         THE COURT:  All right.

22         MR. ANULEWICZ:  The statement that we intend to

23   introduce is that Wiley --

24         THE COURT:  Well, first of all, I'm going to rule

25   on that.  Since that's a statement that's not intended to be

```
 1   introduced --
 2            MR. ANULEWICZ:  Not that exact statement.
 3            THE COURT:  -- there is no issue.
 4            MR. THOMAS:  I understand.
 5            THE COURT:  And therefore with respect to that
 6   proffer, your request for relief is moot.
 7            Next?
 8            MR. ANULEWICZ:  The statement that we do intend to
 9   introduce and where I disagree with Mr. Thomas is that
10   Wiley Jackson did come to Chief Moody and he said,
11   Vernon Jones has told me to tell you to submit your
12   resignation.
13            And in that instance that's where I disagree.  And
14   I think that it explains both the course of conduct of
15   Chief Moody and, as Your Honor pointed out, it shows that
16   Mr. -- Reverend Jackson was an agent of Vernon Jones in
17   coming to Chief Moody.  And that's why Chief Moody submitted
18   his resignation.
19            And one of the things that Wiley Jackson also told
20   Chief Moody is that, Prior to filing your resignation,
21   Mr. Jones wants you to fire two white assistant police chiefs
22   that Mr. Moody had promoted.  That is what we intend to
23   introduce.
24            THE COURT:  Those are two totally different
25   statements.
```

1          MR. THOMAS:  That's correct.

2          Never does Wiley Jackson -- never does Chief Moody

3    say that Wiley Jackson told him that Vernon Jones said --

4    said Vernon Jones asked for my resignation.  That's the

5    difference in terms of semantics.

6          THE COURT:  That's not what he just said is the

7    proffer.  You need to listen carefully to what the proffer is

8    because that's what I'm ruling on.

9          MR. THOMAS:  I understand.

10         THE COURT:  The proffer is that Mr. Wiley Jackson

11   came and said that Mr. Jones told him to tell him that he

12   needed to resign and that he needed to fire the two white

13   people that he had hired.

14         That's totally different than what you claim was

15   going to be the testimony.

16         MR. THOMAS:  I understand, Your Honor.  And I don't

17   have an issue about the testimony that he understood that he

18   was to fire someone.  That's not what I'm talking about.

19         I'm talking simply about the statements about the

20   resignation, going into the resignation of Chief Moody.  And

21   I think that's why we filed our motion, that that whole area

22   was --

23         THE COURT:  I'm going to deny that motion.

24         If in fact he, after communication that his job was

25   at risk because he refused to comply with what he understood

1    were the instructions from the chief executive officer and

2    therefore chose to resign, he's not going to claim that he's

3    constructively discharged, but I think it does explain what

4    he felt about the instructions that he was given.

5             I think that that explains the plan that's been

6    alleged in this case, and I'm overruling that objection.

7             MR. THOMAS:  Thank you, Your Honor.

8             THE COURT:  Now, the next is there is a motion

9    *in limine* that the plaintiffs have filed about a document

10   which I assume has been a document that probably has been in

11   the case for a long time.  It's a legal document that relates

12   to the policies I guess of the county.  It's with

13   DeKalb County's code.

14            And while I haven't fully studied it, it

15   apparently is some limitation on the county's liability for

16   acts that are found against -- or liability that's found

17   against individuals who are agents or managers in the

18   county and what they are or are not obligated to compensate

19   or what limits they have on the liability of findings against

20   people in the county against whom verdicts and judgments are

21   entered.

22            But I will hear what the problem is with this

23   document and what exactly the plaintiffs' concern with it

24   is.

25            MR. ANULEWICZ:  Judge, Mr. Hollis will argue that.

1          MR. HOLLIS:  Good morning, Your Honor.

2          The problem with the document is that it sets forth
3     what purports to be a legal standard for county liability,
4     and the Court is going to instruct the jury on that.

5          It also sets forth monetary limitations on what the
6     county is going to pay.  It states that no sum will be paid
7     for punitive or exemplary damages.

8          And we think that's highly prejudicial and
9     confusing to the jury.  The verdict form -- the Court is
10    going to instruct the jury on what obligations the county has
11    to pay and what claims are against them.

12         We are not exactly sure what purpose -- for what
13    purpose they intend to admit this, but we feel like
14    submitting evidence of insurance coverage or the lack of
15    insurance coverage or monetary caps on liability is just
16    highly prejudicial and it's irrelevant.

17         THE COURT:  Do you intend to introduce this,
18    Mr. Remar?

19         MR. REMAR:  Your Honor, we first received this
20    motion at about 7:15 last evening, and this exhibit --

21         THE COURT:  Well, look, everybody has some
22    responsibility for not doing their jobs on time, so let's
23    leave that aside.

24         MR. REMAR:  Well, I was just pointing out to the
25    Court that we have not had the opportunity to thoroughly

1    research the issue.

2             But I will say to the Court --

3             THE COURT:  Well, you must have -- if you intend to

4    introduce it, you must have your theory of admissibility.

5             MR. REMAR:  We certainly do, Your Honor.  And that

6    theory is that for punitive damages, the jury can consider

7    the financial circumstances of the defendants, and the fact

8    that the county will not indemnify them or cover them for any

9    punitive damages is directly relevant to the jury's

10   consideration of their financial circumstances.

11            The jury needs to know that if they award punitive

12   damages, it is paid 100 percent out of the defendants'

13   pockets, and therefore we believe it is admissible.

14            And it is not liability insurance as set forth in

15   Rule 411.

16            THE COURT:  I'm not sure about that.  I am going to

17   think about that some more.

18            I will give you till the end of the day to file

19   a brief in response to the motion.  But I'm not sure that

20   I totally accept that argument and that there isn't a

21   better way, rather than have this introduced, that there

22   isn't a better way to make sure that the jury understands

23   what the rules are as it relates to the responsibility of the

24   various and sundry parties in the event of an adverse

25   verdict.

1              MR. REMAR:  Thank you, Your Honor.  We will do our

2    best to have something for you.

3              THE COURT:  All right.  Anything else?

4              All right.  Then we will be in recess until the

5    jury questionnaires are completed.

6              MR. REMAR:  Thank you, Your Honor.

7              (A recess is taken at 9:19 a.m.)

8                         --  --  --

9              (In open court without prospective jurors present

10   at 11:54 a.m.:)

11             THE COURT:  All right.  Is there anything we need

12   to discuss before I give you the process for the rest of the

13   day?

14             I guess not.

15             I've gone through almost all the jury

16   questionnaires.  I don't think we are going to have any

17   problem getting a jury with the first half of the group.

18             So what I thought we would do is I'm going to bring

19   them in and go over my preliminary instructions and my

20   qualifying questions, and that way I can get that

21   information, you can get that information.

22             And then after that, we will send them to lunch,

23   because it would be about time for them to do that.  So they

24   will be at lunch sometime between quarter after and 12:30.  I

25   will ask them to come back in a little more than an hour.

1          I would ask you to come back about ten minutes
2    before they are to come back, and I will hear from you who it
3    is that we need to have follow-up on.
4          And so when they come back, I will instruct them to
5    go over to Judge Cooper's courtroom and sit in there until
6    they are called if we need to have follow-up with them.
7          And then as soon as we get the twenty that we need,
8    we will do jury selection, seat the jury, and then go right
9    into the case.
10          Does that make sense to everybody?
11          All right.  I thought it was interesting that the
12    first juror was the county attorney, so he has had his
13    experience as a public servant of responding to the call to
14    serve in federal court, and I assume that he will probably be
15    recused or excused for cause.
16          But we can take that up later.  I wouldn't want him
17    to miss out on lunch.
18          All right.  Let's bring the jurors in, please.
19          (The prospective jurors enter the courtroom.)
20          THE COURT:  Please be seated.
21          All right.  Good morning, ladies and gentlemen.  I
22    know that some of you not too long ago went to your mailboxes
23    expecting to get junk mail, and within that junk mail is a
24    piece of mail that some of you might have had the first
25    reaction to is it being also a piece of junk.  And that's

1    your letter to be here today.

2            I want to give you some perspective on that letter,

3    because I revisited that perspective myself within the past

4    few months because I also got a letter to serve as a juror in

5    a case.

6            I think sometimes we lose perspective on why you

7    are here.

8            I know and you know that this is always something

9    that is an interruption in your life.  For some of you it's

10   more of an interruption today than it would be at other times

11   because of the economy.

12           But I don't think there is any more solemn a

13   responsibility that we have as citizens than to serve as a

14   juror in a case.  And I want to explain to you why I have

15   that view, because I have spent a lot of my life in public

16   service.

17           But it was brought home to me a number of years ago

18   when I took some people from our government and visited and

19   put on a program in the Republic of the Philippines.  It was

20   for members of their government, members of their court

21   system, and members of their justice system.

22           We spent a lot of time preparing and designing the

23   program, and it was over a week long period that we made a

24   number of presentations, beginning with flying over, arriving

25   there on a Sunday, and beginning on Monday morning at 8:00,

1    and going every day till about 6:00 for five days, and we

2    flew home on Saturday.

3            And I must admit that I thought that we did a great

4    job of thinking about what it is that we might be able to

5    pass along to them about the way that we conduct our court

6    systems and the way that we perform our specific jobs, and

7    spent a lot of time making sure that we covered the things

8    that we thought were very important at least to us, thinking

9    that in turn it would be important to them.

10           On the Wednesday morning of the week that we were

11   there, it occurred to me that it probably made sense, now

12   that they had a chance to go through what we were going to

13   present, that we had left to present, and also to reflect on

14   what we had presented.  And I'm talking about of a group of

15   about twenty Philippine officials.

16           And on that Wednesday morning, thinking that when I

17   asked this question I would get more adulation than I would a

18   question, I thought is there anything that we have not

19   covered or anything that we will not cover that you would

20   like for us to cover, thinking the response would be, no,

21   this was a great program, everything that we have seen we

22   have enjoyed and everything we are about to see we look

23   forward to.

24           And I would say two-thirds of the people raised

25   their hands, which caught me a bit aback.  And it was clear

1   that they talked about something missing, and that if

2   I hadn't brought it up, they were going to bring it up.

3          Because the most senior official raised his hand

4   and very respectfully said, There is something that we would

5   like for you to cover that is not on the agenda, and it is

6   very important to us.

7          And I said, Well, what is that?

8          He said, We want you to talk about the American

9   jury system.  He said, Because you see, and as you probably

10  realize from having spent almost two days with us, that we

11  don't allow citizens to participate in the process.  If it's

12  a civil case or a criminal case, it's decided by judges.  The

13  judges are appointed by the government.  We trust only the

14  judges with decisions about guilt or innocence in criminal

15  cases and about who prevails in a civil case.

16         And he took a pause and he said, How can you trust

17  members of your community with the weighty issues of guilt or

18  innocence or who should prevail in a civil case?  He said, We

19  just do not understand that.

20         And I think for the first time in a long time

21  I thought about that myself there that morning.

22         And I said, you know, We have lived under the

23  American jury system ever since our founding fathers

24  established us as a republic, and we have fundamental to our

25  democracy an underlying principle that citizen participation

1   is essential to a free society, and that citizen

2   participation, even in the most weighty matters involving

3   people, in a criminal case their very liberty and in a civil

4   case often their property, sometimes their reputations, that

5   we are going to entrust that to the conscience of the

6   community according to the law that we have established in

7   our country.

8           And I think reflecting on that conversation I had

9   with them that day and thinking more deeply about it after

10  I left, it is what distinguishes our country from virtually

11  every other democracy in the world.

12          You know, we have had a steady flow of officials,

13  judges and executive branch officials from Japan, because

14  Japan now understands the merit of the American jury system

15  and is about to enact and for the first time in their history

16  to entrust to their citizens the weighty decisions that are

17  required of jurors in trials.

18          And the people from Japan who have been here and

19  have talked to us have said, We only do this because we have

20  talked to you and we understand from you, judges and lawyers

21  and citizens alike -- because they have met them all -- that

22  we believe that a democracy requires it.

23          And soon, if they haven't already, you will see in

24  Japan American-style jury trials, because they have a

25  different view of what a free culture and a free society

1    requires.

2            That works only when you participate.  And it works

3    in this environment, where some people represent parties and

4    other people represent other parties and I preside over all

5    of that, making sure that the people who sit in that box who

6    are the jurors in the case, the citizens who give up their

7    time to perform the weighty responsibility and the solemn

8    duty to be jurors, that it's my responsibility to make sure

9    that they hear only what the law allows them to hear.

10           And when it's all over, we are all done, my job is

11   done, the lawyers' job is done, the parties' job is done, the

12   witnesses' job is done, we literally entrust to you the

13   decision in the case.

14           And I spend a long time with every single jury that

15   has ever appeared in this courtroom, and often -- at least an

16   hour, often longer than that, and they all leave saying it

17   has restored in them the understanding of what our courts do

18   and the understanding of the importance of citizens'

19   participation in this process.

20           That is why you are here, because we have made a

21   decision which we have never changed over the over 225 years

22   that we have been established as a democracy, that this is

23   who we are and this is how we conduct our affairs and this is

24   how we invite citizens in the process.

25           Do I feel strongly about this?  I think you

1    understand that I do.

2              And there is nothing more important to me from the

3    moment that you are here to make sure that the system and the

4    integrity of it is preserved, and that you, as the citizen

5    participants, that your time is honored, that your

6    responsibility is honored, and that we allow you to do the

7    important work that we have called you to do.

8              Now, there are a lot of you, and somebody is

9    probably looking around saying we all can't sit as jurors

10   because, among other things, there aren't enough chairs in

11   the jury box.

12             That's because we are about to go through a process

13   by which we take a larger group of people to select those

14   that are best suited to try this particular case.

15             You will hear a little more about the case.

16   I think by going through the questionnaire you probably have

17   a little sense of what the case is.  I will give you a better

18   description, not a full description, but enough to let you

19   know generally what the case is about.

20             And then we will go through a process by which we

21   select from a larger group that smaller group of people that

22   will serve as the jurors in the case.

23             We know nothing about you other than what we have

24   seen in our quick review of your questionnaires.  That's the

25   way the process always starts.  We don't send out letters to

1   people to say, well, we have decided in this case you would

2   be a good juror, we have decided in this case you would be a

3   good juror.

4           The beauty of the system is that we take a

5   cross-section of the community, because it works best when we

6   have a cross-section evaluating members of the community that

7   have either engaged in wrongdoing or in a case like this

8   where there are civil claims that have been asserted.

9           So we now have to decide from amongst you who are

10  the best people to sit on this jury.

11          Some of my friends when they get called for jury

12  duty say, Well, I never get selected, I always get struck, or

13  whatever term they use.

14          And I tell them, I say, The reason why you are

15  there is because we need people to strike.  We can't decide

16  who the best of a group is unless we have people from whom to

17  choose.  And we do that choosing through this process by

18  which people are eliminated from the pool so that we get down

19  to that group that's best able to try the case.

20          And that's the process, which I know you have heard

21  this -- saw the titillating jury presentation that they show

22  you upstairs, which hopefully if I have some say in it

23  we will make it more interesting than it is right now.

24          But there is a term that's used in that DVD that

25  I am going to remind you at the end of this why, as hard

1    as I try to take all of the legal jargon out of this

2    process, but sometimes there are words that are just the

3    right words.

4           And at the end of this I will explain to you why I

5    continue to use the word that we use -- the two words that we

6    use for this process, because we are dedicated -- and I have

7    talked to the lawyers already about the need to be efficient

8    in the use of your time, that you ought to be here, and when

9    you are here you ought to be doing your function, which is to

10   hear evidence so you can prepare to deliberate, that I'm not

11   going to subject you to all of this process because I think

12   it would be inefficient to do so.

13          So we will get the information we need from

14   you, and then we will use that information to go through

15   the process to determine which of you will serve as the

16   jurors.

17          And to the extent that we don't need you physically

18   here to do that, I will make sure that you get that time as

19   your time and that we won't inconvenience you by simply

20   having you sit around in a process where your active

21   participation isn't needed.

22          But I think you are entitled to know how the

23   process works, and so I'm going to tell you that right now.

24          We begin -- in this case there are three parts of

25   the process.

1          One of the parts you are done with, because you

2     have completed a questionnaire.  So that's the first part of

3     the process in which you have participated.

4          We are about to go into the second part of the

5     process, and that will be questions that I need to ask of you

6     to make sure that I have the information I need to make some

7     legal rulings.

8          And the third part of the process will be for

9     some of you we will need to follow up on some of your

10    answers that you gave in the questionnaire -- not all of you,

11    just some -- so we make sure we understand what you are

12    saying.

13         The part we are about to go through now are what I

14    would characterize as qualifying questions, or questions that

15    I need to ask to get information from you to see whether or

16    not some of you are legally disqualified from serving.

17         An example of that would be a case, you know,

18    some time ago where -- it was a civil case.  As I said, we

19    don't know who is going to be sent down from upstairs to be

20    the panel from which we select the jury.  And one of the

21    panel members came in and saw sitting at the table their

22    brother.

23         That said something about the relationship between

24    those two siblings that one didn't know that the other was

25    going to have a piece of litigation in a federal court.  We

1    found that out.

2           The law says that we ought not put a family member,

3    an immediate family member, in a position of having to

4    evaluate or judge the conduct or the position of another

5    family member.  And so we got that information by going

6    through this process.

7           And there is a legal disqualification of that

8    person from sitting in that case, and that person was one of

9    the people from the larger group that ultimately did not

10   serve on the jury.

11          So there are certain legal things, certain legal

12   reasons why people can't serve.  Some of those are given to

13   us in the information that you have provided in the

14   questionnaires, but some of them now will be in the questions

15   that I ask.

16          After we determine which people are legally

17   disqualified from being part of the group, then there is a

18   way in which the parties, through what we call -- the fancy

19   word is peremptory challenges.  The word you would best

20   understand and that I best understand are discretionary

21   challenges.

22          The parties then have a right to exercise some

23   challenges to get down to those people, or another way of

24   putting it is to exclude the people that they think are not

25   the right people to hear the case.  That's their discretion

based upon their view of what the case is like and who their

clients are.

         And once we exercise the legal challenges and the

discretionary challenges, we will have left those people that

will be the jurors.  And so from this broader group of you,

we will have selected a smaller group who will actually hear

this case.

         So that's the process.  And we call it voir dire,

because I cannot think of a better, more direct translation

shorter than voir dire, which in French means to speak the

truth.  And we are asking you in your questionnaires and in

the questions that I put to you as well as whatever follow-up

questions we might have is that we need for you to speak the

truth to us now so that we can do our job and I can do my job

of selecting those people that will be the jurors in this

case.

         And because we ask you to do that, we begin with

administering to you an oath.

         Jessica, would you please do that?

         (The oath is given by the Clerk.)

         THE COURT:  While I don't think it will be the

case, if during this part of the questioning I ever ask a

question that you are uncomfortable answering -- and like

I say, I don't think there will be any of those --

uncomfortable answering in this big room with all of these

 1    people present, just raise your hand and let me know, and we

 2    can do that in a more private setting.

 3           But these are pretty general questions, and I don't

 4    think you will have a problem with them.

 5           I told you one of the things we need to do is to

 6    see whether or not you have a relationship with either the

 7    defendants in the case, the plaintiffs in the case, or the

 8    lawyers representing them.  So we begin with that.

 9           First I'm going to ask Mr. Bowers, Mr. Anulewicz,

10    Mr. Hollis and Mr. Khoury to please stand.

11           These are lawyers who represent the plaintiffs.  Do

12    any of you know any of these gentlemen?

13           All right.  And you are Mr. Linkous?

14           PROSPECTIVE JUROR NO. 1 LINKOUS:  Yes, Your Honor.

15           THE COURT:  Amd I assume you know a number of

16    them?

17           PROSPECTIVE JUROR NO. 1 LINKOUS:  I know

18    Mr. Bowers, Mr. Anulewicz, and I know Mr. Khoury.

19           THE COURT:  All right.  Thank you.  You may be

20    seated.

21           They are with a law firm called Balch &

22    Bingham.  Do any of you know any employees of, or have any of

23    you or your immediate families worked for or been represented

24    by the law firm of Balch & Bingham?

25           All right.  Apparently not.

1          Mr. Morgan, if you would please stand?

2          Does anybody know Mr. Morgan?

3          All right.  Mr. Linkous.

4          Mr. Morgan is with the law firm of J. Tom Morgan

5     L.L.C.  Are any of you employees of or do any of you know

6     any employees of or have any of you or your immediate

7     families worked for or been represented by the law firm of

8     J. Tom Morgan L.L.C?

9          All right.  Apparently not.

10          Mr. Remar and Ms. Gildow, would you please rise?

11          This is Mr. Remar and Ms. Gildow.  They represent

12     three -- four of the defendants in this case:  Ms. Drew,

13     Mr. Williams, Mr. Stogner and DeKalb County.

14          Do any of you know Mr. Remar or Mr. Gildow?

15          All right.  Mr. Linkous, you know both of them?

16          PROSPECTIVE JUROR NO. 1 LINKOUS:  Yes, Your Honor.

17          THE COURT:  All right.  In the back on the right,

18     if you could please stand up and tell me who you are?

19          PROSPECTIVE JUROR NO. 15 ALLEN:  David Allen.

20          THE COURT:  Mr. Allen, who do you know and how do

21     you know them?

22          PROSPECTIVE JUROR NO. 15 ALLEN:  Mr. Remar.  He was

23     an attorney who represented AIG in a lawsuit against Batco

24     Seal.

25          THE COURT:  And were you involved in the lawsuit?

```
 1              PROSPECTIVE JUROR NO. 15 ALLEN:  Yes, at a
 2   deposition.
 3              THE COURT:  Pardon me?
 4              PROSPECTIVE JUROR NO. 15 ALLEN:  I was in a
 5   deposition.
 6              THE COURT:  And were you being defended by
 7   Mr. Remar?
 8              PROSPECTIVE JUROR NO. 15 ALLEN:  I was being
 9   defended by Mr. Remar.
10              THE COURT:  Because you were with what company at
11   the time?
12              PROSPECTIVE JUROR NO. 15 ALLEN:  AIG.
13              THE COURT:  Would your representation by him in
14   that case involving AIG affect your ability to be a fair and
15   impartial juror in this case if you are selected?
16              PROSPECTIVE JUROR NO. 15 ALLEN:  I don't think so.
17              THE COURT:  All right.  Thank you.
18              Yes, sir, if you will stand and give me your name,
19   please?
20              PROSPECTIVE JUROR NO. 29 GARRETT:  Bowman Garrett.
21   I know Mr. Remar tangentially.  My sister used to work for
22   him.
23              THE COURT:  At his law firm?
24              PROSPECTIVE JUROR NO. 29 GARRETT:  Yes.
25              THE COURT:  How would you define tangentially?
```

1          PROSPECTIVE JUROR NO. 29 GARRETT:  Well, I mean, I

2    have met him, and my sister practiced law with him.  She's an

3    attorney.

4          THE COURT:  Was she was a lawyer at the firm?

5          PROSPECITVE JUROR NO. 29 GARRETT:  Yes.

6          THE COURT:  Was she a partner or an associate?

7          PROSPECTIVE JUROR NO. 29 GARRETT:  She was an

8    associate.

9          THE COURT:  And was the contact that you had -- I

10   mean, how many times did you meet him and in what kind of

11   setting was it?

12         PROSPECTIVE JUROR NO. 29 GARRETT:  Just a couple

13   times socially.  I have no real connection with him, but I do

14   know him.

15         THE COURT:  Would that affect your ability to be a

16   fair and impartial juror in this case?

17         PROSPECTIVE JUROR NO. 29 GARRETT:  No.

18         THE COURT:  Thank you.

19         Anybody else?

20         All right.  Thank you.  You may be seated.

21         They are, by the way, with the law firm of

22   Rogers & Hardin L.L.P.  Do any you have know any employees of

23   or has any member of or have you or any members of your

24   immediate family worked for or been represented by the law

25   firm of Rogers & Hardin other than we have already

1    discussed?

2            All right.  Apparently not.

3            Mr. Wilson and Ms. Morgan?

4            Mr. Wilson and Ms. Morgan represent Mr. Jones in

5    this case.  Do either of you know Mr. Wilson or Ms. Morgan?

6            All right.

7            PROSPECTIVE JUROR NO. 1 LINKOUS:  I know

8    Mr. Wilson.

9            THE COURT:  All right.  And you don't know -- not

10   Ms. Morgan?

11           PROSPECTIVE JUROR NO. 1 LINKOUS:  I don't believe

12   so.

13           THE COURT:  All right.  Anybody else?

14           All right.  You may be seated.

15           They work at a law firm called Elarbee Thompson

16   Sapp & Wilson L.L.P.  Do any of you know any employees of or

17   have any of you or your immediate families worked for our

18   been represented by the law firm of Elarbee Thompson

19   Sapp & Wilson?

20           Apparently not.

21           Mr. Thomas, if you would please stand?

22           Mr. Thomas also represents Mr. Jones.  Does anybody

23   know Mr. Thomas?

24           PROSPECTIVE JUROR NO. 1 LINKOUS:  I know

25   Mr. Thomas.

1          THE COURT:  All right.  I would ask him if he knows
2   me but I'm afraid he would say no, he doesn't.
3          All right.  Nobody else?
4          Mr. Thomas works for the law firm of
5   Dwight L. Thomas, P.C.  Do any of you know any employees of
6   or have any of you or your immediate families worked for or
7   been represented by the law firm of Dwight L. Thomas, P.C.?
8          All right.  Apparently not.
9          Thank you, Mr. Thomas.
10          Do either of you know two women, one by the name of
11   Lisa Chang or Laura Johnson?
12          PROSPECTIVE JUROR NO. 1 LINKOUS:  Yes.
13          THE COURT:  Just so that everybody -- Mr. Linkous
14   is the county attorney for DeKalb County.
15          MR. REMAR:  Former, Your Honor.
16          THE COURT:  I'm sorry, former.  So that's why he
17   knows everybody.
18          Nobody else knows Lisa Chang or Laura Johnson; is
19   that correct?
20          All right.  Do any of you know Michael Bryant,
21   Kristy Bryant Yule, John Drake, Becky Kelley or Herbert Lowe?
22          Before I have them -- are they here?
23          MR. J. THOMAS MORGAN:  Yes, Your Honor.  There
24   wasn't room.  They are outside.
25          MR. BOWERS:  They are outside, Your Honor.  We

```
1    didn't have room for them.

2            THE COURT:  I know we are a little crowded.

3            MR. BOWERS:  Do you want me to get them?

4            THE COURT:  Yes, I would like to -- before you

5    do, you will see that I said Michael Bryant and

6    Kristy Bryant Yule.  Michael Bryant recently died.  He is

7    now represented -- his estate is now represented by

8    Kristy Bryant Yule, so she is now the plaintiff in the case

9    representing his interest.

10           But I think, if we could, I'm going to have them

11   just step in the back door.  If you would please look at them

12   to see if any of you know either Kristy Bryant Yule,

13   John Drake, Becky Kelley or Herbert Lowe.

14           Would you do that, please?

15           (The plaintiffs enter.)

16           THE COURT:  All right.  We just had Ms. Yule,

17   Mr. Drake, Ms. Kelley and Mr. Lowe come in.  Do any of you

18   know any of them?

19           PROSPECTIVE JUROR NO. 1 LINKOUS:  Yes, sir.

20           THE COURT:  And who of the group do you know?

21           PROSPECTIVE JUROR NO. 1 LINKOUS:  I know Mr. Drake,

22   and I knew Mr. Bryant before he died.

23           THE COURT:  I'm sorry?

24           PROSPECTIVE JUROR NO. 1 LINKOUS:  I knew Mr. Bryant

25   before he died, Your Honor.
```

1          THE COURT:  All right.  Thank you.

2          All right.  I'm going to have Mr. Jones, Ms. Drew,

3    Mr. Williams and Mr. Stogner stand, please.  They are the

4    defendants in the case.

5          Do any of you know any of them?

6          Yes, sir?  Remind me of your name again, please?

7          PROSPECTIVE JUROR NO. 29 GARRETT:  Bowman Garrett.

8          THE COURT:  Mr. Garrett, who do you know?

9          PROSPECTIVE JUROR NO. 29 GARRETT:  I know

10   Mr. Jones.

11         THE COURT:  And how do you know him?

12         PROSPECTIVE JUROR NO. 29 GARRETT:  Had business

13   dealings while he was still in his political environment.

14         THE COURT:  What kind of business did you have?

15         PROSPECTIVE JUROR NO. 29 GARRETT:  I was handling a

16   project for a contractor for DeKalb County Schools, and

17   Mr. Jones got involved with it.

18         THE COURT:  All right.  Was it a construction

19   project?

20         PROSPECTIVE JUROR NO. 29 GARRETT:  Yes, sir.

21         THE COURT:  All right.  Thank you.

22         Mr. Linkous, I assume that you know them all?

23         PROSPECTIVE JUROR NO. 1 LINKOUS:  Yes, sir.

24         THE COURT:  All right.  Thank you.  You may be

25   seated.

```
1            I am going to go over a list of people who may be

2      witnesses in the case.  If you will listen carefully, after

3      each name that I call, if you know this person or any of

4      these people, just raise your hand and let me know that.

5            First is Eddie Moody.  Does anybody know

6      Eddie Moody?

7            All right.  Mr. Linkous.

8            Mike Amato?  Does anybody know Mr. Amato?

9            Mr. Linkous, you can raise your hand when you don't

10     know somebody.

11           David Foster?   Apparently not.

12           Joe Stone?   Apparently not.

13           Walter Murray?   Apparently not.

14           Tina Arbes, A-r-b-e-s?  Ms. Arbes?

15           So you don't know Ms. Arbes?

16           PROSPECTIVE JUROR NO. 1 LINKOUS:  I do, yes,

17     Your Honor.

18           THE COURT:  You are going to raise your hand if you

19     don't know somebody.

20           PROSPECTIVE JUROR NO. 1 LINKOUS:  Oh, okay.

21           THE COURT:  Marvin Billups?   Apparently not.

22           Kelly Conn, C-o-n-n?

23           You don't know Ms. Conn?

24           PROSPECTIVE JUROR NO. 1 LINKOUS:  No, Your Honor.

25           THE COURT:  Devetrice Conyers?  All right,
```

1    Mr. Linkous doesn't know her.

2              Gary Dalton?

3              Carl Hoffman?

4              All right.  You don't know Mr. Hoffman?

5              PROSPECTIVE JUROR NO. 1 LINKOUS:  No, Your Honor.

6              THE COURT:  Pamela Holmes?

7              PROSPECTIVE JUROR NO. 1 LINKOUS:  No.

8              THE COURT:  All right.

9              Susan Hood?

10             Ann Kimbrough?

11             Curtis LeBlanc?

12             Faye McCommon, M-c-C-o-m-m-o-n?  Apparently not.

13             Patricia Moore?   Apparently not.

14             Al Sheppard?  Apparently not.

15             Patricia Simon?   Apparently not.

16             And Emma Turner?  Some may know her as Emma Moss

17   Turner or Emma Moss.  Does anyone know her?  Apparently

18   not.

19             Jason Warner?  Apparently not.

20             Paul Wright?   Apparently not.

21             Tom Black?   No responses.

22             Robert Burgess?

23             David Fisher?

24             Maria Mullins?

25             R. P. Flemister?

1          Jacqueline Dixon?

2          William Linkous?

3          Liane Levetan?

4          Hank Johnson?

5          And Steve Warner?

6          PROSPECTIVE JUROR NO. 1 LINKOUS:  I don't know him.

7          THE COURT:  You don't know him, all right.

8          Looking around, do any of you know each other?

9          All right.  Apparently not.

10         If you were selected to sit on this case, would

11    each of you be able to render a verdict solely on the

12    evidence presented in the trial that I admit and in the

13    context of the law that I give to you in my instructions,

14    disregarding any other idea, notion or belief that you might

15    have about the law or that you may have encountered in

16    reaching your verdict?

17         That is, if I give you the law and tell you you

18    must apply it, could you apply it and consider only the

19    evidence that is presented in the case?

20         Is there anybody that cannot do that?  All right.

21         PROSPECTIVE JUROR NO. 1 LINKOUS:  (Raises his

22    hand).

23         THE COURT:  Let me read you a description -- well,

24    before I do that, do any of you hold a belief, religious or

25    otherwise, that discourages jury service?

```
1              All right.  Apparently not.

2              Now, let me read you a brief summary of the

3    case.  This summary is to give you enough information to see

4    if any of you have heard anything about it.

5              The case involves alleged racial discrimination,

6    retaliation and harassment.

7              There are four plaintiffs, as I told you,

8    John Drake, Becky Kelley, Herbert Lowe, and the estate of

9    Michael Bryant.  As I told you before, Mr. Bryant died

10   recently, and his claims are being brought by his estate.

11             Plaintiffs Drake and Kelley are white, Mr. Bryant

12   was white, and plaintiff Lowe is black.  They all worked for

13   DeKalb County and were associated with its Department of

14   Parks and Recreation.

15             The plaintiffs allege that the defendants

16   Vernon Jones, Richard Stogner, Morris Williams and

17   Marilyn Drew engaged in racial discrimination, retaliation

18   and harassment in connection with Bryant's, Drake's, Kelley's

19   and Lowe's employment with the company.

20             Defendant Jones was the Chief Executive Officer of

21   the county.  Defendant Stogner was his Executive

22   Assistant.  Defendant Drew was the Director of the Parks and

23   Recreation Department for the county.  And defendant Williams

24   was the Assistant County Administrator.

25             Defendants Jones, Williams and Drew, as you know,
```

1    are black.  Defendant Stogner is white.

2           Plaintiffs allege that Bryant, Drake and Kelley

3    were transferred or reassigned to less prestigious positions

4    within the county as part of the defendants' alleged

5    discriminatory plan to replace white managers with managers

6    who are black.

7           Plaintiffs further allege that Bryant, Drake and

8    Kelley were subjected to a hostile work environment by the

9    defendants based upon their race.  Plaintiff Lowe alleges

10   that he was retaliated against for his response to this

11   alleged discrimination and harassment.

12          The defendants deny that they discriminated against

13   or harassed Bryant, Drake or Kelley based on their race.

14   They also deny that they retaliated against plaintiff Lowe

15   for his response to the alleged discrimination.

16          Defendants claim that their actions were all

17   legitimate business decisions.

18          Based upon that description that I have given you,

19   is there any of you who believes that you know anything about

20   the case or that you have heard about the case?

21          All right.  Let's begin on this side.

22          Mr. Linkous, I know you are familiar with it.

23          The first row on the left?

24          PROSPECTIVE JUROR NO. 6 REID:  Just what I read in

25   the paper about it, but I don't know a lot of details.  It's

1    been a while since I read something about it.

2              THE COURT:  All right.  Well, based upon whatever

3    you read, even if it was some time ago, whatever you had read

4    about the case, would that affect your ability to be a fair

5    and impartial juror in this action?

6              PROSPECTIVE JUROR NO. 6 REID:  No, sir.

7              THE COURT:  All right.  Next?

8              Yes, sir.  In the second row, I think it's a yellow

9    shirt?

10             PROSPECTIVE JUROR NO. 8 DURHAM:  I read an article.

11             THE COURT:  Your name, please?

12             PROSPECTIVE JUROR NO. 8 DURHAM:  Alec Durham.

13             THE COURT:  All right.

14             PROSPECTIVE JUROR NO. 8 DURHAM:  I read an article,

15   a short article, and it reflects what you just said.

16             THE COURT:  And whatever you read won't impact your

17   ability to be a fair and impartial juror in the case; is that

18   correct?

19             PROSPECTIVE JUROR NO. 8 DURHAM:  No, Your Honor.

20             THE COURT:  All right.  Thank you.

21             I think we had somebody else in the second row

22   there on the end.  Your name, please?

23             PROSPECTIVE JUROR NO. 12 McCORD:  James McCord.

24             THE COURT:  All right.  Mr. McCord, what do you

25   know?

                    PROSPECTIVE JUROR NO. 12 McCORD:  Just what I seen

on the newscast.  I passed it over, you know, didn't study it

or read anything on that.

                    THE COURT:  I couldn't hear you.

                    PROSPECTIVE JUROR NO. 12 McCORD:  I said I didn't

study it in depth or anything.  Just what I saw on the

newscast some months ago.

                    THE COURT:  Right.  And what you saw or heard some

months ago, would that affect your ability to be a fair and

impartial juror?

                    PROSPECTIVE JUROR NO. 12 McCORD:  No.  I didn't

follow it that closely.

                    THE COURT:  All right.  Anybody else on my

right-hand, your left-hand side of the room?

                    All right.  There in the back, I saw you, in blue?

                    PROSPECTIVE JUROR NO. 16 HINES:  Yes.  My name is

Rosalyn Hines.  Just what I read in the newspaper and seen on

television.  In fact, this morning there was a news story

that said that the jury would be seated today in this case.

                    THE COURT:  And now you have confirmed that.

                    Is what you have heard such that it would affect

your ability to be a fair and impartial juror?

                    PROSPECTIVE JUROR NO. 16 HINES:  I don't believe

so.

                    THE COURT:  All right.  Thank you.

1          On the left-hand side of the room, my left, your

2     right?  We have --

3          PROSPECTIVE JUROR NO. 32 HEDA:  Shyam Heda.  Same

4     thing, I heard it on the news.  That's it.

5          THE COURT:  Would that affect your ability to be a

6     fair and impartial juror?

7          PROSPECTIVE JUROR NO. 32 HEDA:  No, Your Honor.

8          THE COURT:  All right.  Thank you.

9          PROSPECTIVE JUROR NO. 29 GARRETT:  Bowman Garrett.

10    I read about it in the newspaper.  I follow DeKalb politics.

11         THE COURT:  And would that --

12         PROSPECTIVE JUROR NO. 29 GARRETT:  It has no

13    effect.

14         THE COURT:  It has no effect on your ability to be

15    a juror in this case?

16         PROSPECTIVE JUROR NO. 29 GARRETT:  That's correct.

17         THE COURT:  Anybody else?

18         Well, now that you know a little bit about the

19    case, based upon the description that I gave you and the

20    claims in this particular case and the parties involved in

21    the case, is there anyone, just because of the nature of the

22    case and the people involved, are there any of you that you

23    could not fairly and impartially evaluate the evidence that

24    I allowed to be admitted in the case?

25         Yes, sir.  Mr. Garrett, you would have a hard --

1   that would be a problem for you?

2           PROSPECTIVE JUROR NO. 29 GARRETT:  Yes, but I would

3   rather not say --

4           THE COURT:  We will follow up with you.  Thank

5   you.

6           And Mr. Linkous?

7           PROSPECTIVE JUROR NO. 1 LINKOUS:  Yes.

8           THE COURT:  We will follow up with you.

9           Anybody else?

10          All right.  Thank you.

11          From what I hope you can understand, this is a case

12  that's important to both parties.  It could be that this case

13  would last through next week.

14          Does that present any special problem to any of

15  you; that is, sitting through a case that might go through

16  next week?

17          All right.  Let's begin in the front.

18          PROSPECTIVE JUROR NO. 4 GOBLE:  My name is

19  Shelly Goble.  Just because it's my last year of college and

20  I can't afford to miss class or I won't graduate.  Other than

21  that, it's no problem at all.

22          THE COURT:  All right.  How many classes do you

23  have between now and the end of next week?

24          PROSPECTIVE JUROR NO. 4 GOBLE:  I only have one

25  class, but it's my senior exhibition class.  So I have my

```
 1   senior show coming up at the end of April, and I have a lot
 2   of stuff that I need to do for that.  And I can't really miss
 3   more than three classes or I won't be able to -- and
 4   I already missed one.
 5           THE COURT:  All right.  Thank you, Ms. Goble.
 6           PROSPECTIVE JUROR NO. 3 WILLIAMS:  My name is
 7   Lorna Williams.  I have a plane ticket out to southern
 8   California on the evening of the 1st, which is Thursday
 9   night.
10           THE COURT:  Next week or this week?
11           PROSPECTIVE JUROR NO. 3 WILLIAMS:  Next week.
12           THE COURT:  And tell me the nature of that trip?
13           PROSPECTIVE JUROR NO. 3 WILLIAMS:  It's to visit my
14   children and my granddaughter for Easter.
15           THE COURT:  What would happen if you left a day or
16   two late, could you do that?  Not that you -- I know you
17   don't want to do that.
18           PROSPECTIVE JUROR NO. 3 WILLIAMS:  I could.
19           THE COURT:  All right.  Thank you.
20           Anybody else on the right-hand side?  There in the
21   back, yes, sir?
22           PROSPECTIVE JUROR NO. 14 SEMASKY:  Yes,
23   Your Honor.  My name is Michael Semasky.  I also have an
24   airline ticket.  We were actually planning a spring break
25   trip to visit my wife's son in New York.  We are leaving out
```

1   on the 2nd, which is next Friday.

2            THE COURT:  All right.  Thank you, Mr. Semasky.

3            All right.  On the left-hand side, starting --

4            PROSPECTIVE JUROR NO. 23 SPENCER:  My name is

5   Cristy Spencer, and I have two young kids, and I'm their only

6   transportation to and from school.

7            THE COURT:  How old are your children?

8            PROSPECTIVE JUROR NO. 23 SPENCER:  I have an eight-

9   and a four-year-old.

10           THE COURT:  If we taught the eight-year-old to

11  drive quickly. . .

12           All right.  Thank you, very much.

13           PROSPECTIVE JUROR NO. 19 FRANKLIN:  Sonya

14  Franklin.  I have a series of medical testings that I have

15  rescheduled a couple of times that's supposed to take place

16  this week.

17           THE COURT:  This week?

18           PROSPECTIVE JUROR NO. 19 FRANKLIN:  Yes.

19           THE COURT:  Are these tests that your physician

20  wants you to take or are they elective?

21           PROSPECTIVE JUROR NO. 19 FRANKLIN:  No.  The

22  physician wants me to take them.

23           THE COURT:  Could you just tell me, if you are

24  comfortable doing that, what kind of physician he is?

25           PROSPECTIVE JUROR NO. 19 FRANKLIN:  It's a

1   gynecologist.

2          THE COURT:  Thank you, Ms. Franklin.

3          PROSPECTIVE JUROR NO. 28 ISABELL:  Jacqueline

4   Isabell.  I'm an attorney, a workers' comp/personal injury

5   attorney, and I have a trial that will go forward on the

6   1st.

7          THE COURT:  And who is that before?

8          PROSPECTIVE JUROR NO. 27:  It's in workers' comp.

9   Workers' comp.  I can't -- I don't know the judge's name,

10  Your Honor.

11         It possibly could be reset.

12         THE COURT:  All right.  Thank you.

13         Anybody else?  Yes, Mr. Garrett?

14         PROSPECTIVE JUROR NO. 29 GARRETT:  Bowman Garrett

15  again.  I rescheduled a business trip to Spain off of this

16  two-week calendar till next week, and there's substantial

17  money involved.  I really need to go on that trip.

18         THE COURT:  And is it to conclude a deal or

19  something that you are in negotiation about?

20         PROSPECTIVE JUROR NO. 29 GARRETT:  It's to conclude

21  a deal.

22         I'm a developer.  We have got a project sitting on

23  hold in the Bahamas, and a lot of millions of dollars are

24  riding on this.

25         THE COURT:  All right.

```
 1              PROSPECTIVE JUROR NO. 29 GARRETT:  They weren't
 2     happy when I rescheduled it from this time.
 3              THE COURT:  All right.  Thank you.
 4              Yes, sir?
 5              PROSPECTIVE JUROR NO. 30 RENSON:  My name is
 6     Bradford Renson.  I own my own business.  I'm the sole
 7     provider for my family.  My wife doesn't work, and I have
 8     three young kids.  Nobody works for me, so me being here
 9     today, I'm losing money.
10              I brought documentation here:  Last year's taxes,
11     my bills, my debt, to show that I can't afford to be here
12     today.
13              THE COURT:  And what kind of business do you have?
14              PROSPECTIVE JUROR NO. 30 RENSON:  A cabinet
15     company, doing woodwork.
16              THE COURT:  And is that for residential or
17     commercial?
18              PROSPECTIVE JUROR NO. 30 RENSON:  Residential.
19              THE COURT:  All right.  Anything else?
20              PROSPECTIVE JUROR NO. 30 RENSON:  I don't believe I
21     could give a fair trial only because I would want to get out
22     of here as soon as I could.
23              THE COURT:  All right.
24              Anybody else?
25              All right.  Just one follow-up question about the
```

1    responsibilities we all have.  Ultimately it's my

2    responsibility to tell you what the law will be, and you

3    can't second-guess that.  You can't consider the wisdom of

4    the law that I give you.  When I give you the law, you will

5    have to follow it, because that law I give you will be what

6    the law is that you must apply in this case.

7              Is there anybody that could not do that?

8              All right.  Apparently they all can.

9              All right.  Here is what we are going to do

10   now.  I'm going to release you to lunch, and then when you

11   are -- and I will give you an hour, which means that lunch

12   will be over for you at 1:40.

13             When you come back, there is a courtroom next to

14   this courtroom that Judge Cooper uses.  We have made

15   arrangements for you to either stay in that courtroom or you

16   can sit out on some of the few benches that we have in the

17   public areas.

18             But I need you back up on this floor in one of the

19   places where we can find you, because we are going to do the

20   follow-up questioning based upon your questionnaires.

21             So when you come back up, we will immediately be

22   ready to start bringing those people in.  Hopefully it won't

23   take long to do that.

24             The goal then would be after we do the follow-up,

25   we will determine who will be the jurors in the case.  And so

1    my aspiration would be the next time you all come in, we will

2    actually tell you who is going to sit on the jury and tell

3    you those of you that will be asked to go back upstairs

4    because you are not going to serve on this jury.

5         Now you know something about the case, you know

6    something about the nature of the case.  I know you are not

7    jurors yet, but you cannot discuss this kind of case, you

8    can't discuss the parties in the case, you can't discuss what

9    the claims in the case may or may not be.  It would be

10   improper for you to have a discussion about this case or its

11   kind.  It doesn't mean you can't talk to each other, but

12   select a subject outside this litigation.

13        So I am going to release you for an hour.  Please

14   be back either at one of the benches on our floor or in

15   Judge Cooper's courtroom after you have your lunch, and we

16   will see you then.

17             (In open court without prospective jurors present:)

18             THE COURT:  All right.  Is there anything we need

19   to discuss before we break for lunch?

20             MR. BOWERS:  Nothing from the plaintiffs,

21   Your Honor.

22             MR. REMAR:  Nothing from the defendants,

23   Your Honor.

24             THE COURT:  Would it be fair to ask you to be back

25   by 1:30 and then we can get an agenda for the people that we

1    need to follow up on?

2              MR. BOWERS:  Yes, Your Honor.

3              MR. REMAR:  Certainly.

4              THE COURT:  Then let's break, and I will see you

5    back at 1:30.

6              You know, there are an awful lot of jurors.  I

7    haven't seen enough of them, you haven't seen enough of them

8    yet, but be careful about interacting with them.

9              At some point I will tell them, the ones that are

10   actual jurors, if you are standoffish, it's because I told

11   them that I made you do that, so they can blame that on me

12   and not on you.  But at this point try not to interact with

13   them.

14             All right.  We will be in recess.

15             MR. BOWERS:  Your Honor, may we stay in here?

16             THE COURT:  You may.

17             (A recess is taken at 12:46 p.m.)

18                          --   --   --

19

20

21

22

23

24

25

```
 1                    Monday Afternoon Session

 2                       March 22, 2010

 3                         1:40 p.m.

 4                         -- -- --

 5           (In open court without prospective jurors present:)

 6           THE COURT:  The panel members are not

 7   present.  Let's go over who we need to do the follow-up on.

 8           We will start with the plaintiffs.

 9           MR. ANULEWICZ:  You want for cause, Judge?

10           THE COURT:  No, let's first find out who we want to

11   do follow-up with.

12           MR. ANULEWICZ:  Oh, I'm sorry, I didn't hear you.

13           THE COURT:  Let's start with just the first ten

14   panel members.  Does anyone want to follow up with any of the

15   first ten?  And if so, on what grounds?

16           MR. ANULEWICZ:  No, Judge.

17           THE COURT:  All right.  Defendants?

18           MR. REMAR:  We do, Your Honor.

19           First of all, we would note that we would request

20   that Jurors 3 and 4 with the plane tickets be released from

21   service.

22           THE COURT:  I'm not going to do that.

23           I mean, I had a specific discussion with

24   Ms. Williams.  She has a plane ticket.  I asked her if she

25   could delay it, and she said fine.  So that's not grounds for
```

```
1    cause.  And I think she actually wants to sit.

2            So I'm not going to release her.  I think this is a

3    solemn duty, and I think she wants to perform it.  And she

4    can make an adjustment, at least that's what she told me.

5            MR. REMAR:  Then, Your Honor, we would ask to

6    question her about the expense that she might incur in having

7    to change her plane ticket and whether that might present a

8    hardship to her.

9            THE COURT:  You don't want her, do you?

10           MR. REMAR:  Not necessarily.  But I think it is a

11   hardship for someone who has bought a plane ticket to have to

12   to pay to change it.

13           And then, Your Honor, also on Juror 4, we would

14   like to question --

15           THE COURT:  Don't you think if it was a hardship,

16   when I asked her if she could delay it a couple of days and

17   she said yes, she could, that she would have said that would

18   be a hardship?  Isn't that what she said?

19           MR. REMAR:  I don't recall Your Honor's exact

20   question, but I would think that we would be able to have the

21   ability to follow up with the juror just to make sure that it

22   would not be an undue hardship to her.

23           I think Your Honor asked her if she could delay it,

24   and she said she could.

25           THE COURT:  She smiled and said yes, she could.
```

1          If you want to put her through that, that's fine,

2     Mr. Remar.

3          Who else?

4          MR. REMAR:  No. 4 is the student, Your Honor, who

5     said she can't miss class.  And we would like to find out

6     what the circumstances are.

7          THE COURT:  I think her circumstances are that she

8     said she was taking one class.  If you look at her

9     questionnaire, she said that she's a senior, that she has

10    some profile presentation that she needs to make, and that

11    she thinks that she -- she would like to graduate, and she

12    wasn't sure if she took these two weeks off that she would

13    have enough time to do that.

14         Have you read the questionnaire?

15         MR. REMAR:  I did, absolutely.

16         THE COURT:  Isn't that what she said?

17         MR. REMAR:  I did read her questionnaire, yes,

18    sir.

19         THE COURT:  Isn't that what she said?   I think so.

20         MR. REMAR:  Yes, that is what she said,

21    Your Honor.

22         THE COURT:  You want to follow up with her on

23    that?

24         MR. REMAR:  Excuse me?

25         THE COURT:  You want to follow her up with that?

```
 1              MR. REMAR:  If Your Honor prefers not, let me go on
 2    to Juror No. 5.
 3              THE COURT:  No, Mr. Remar, I'm going to let you
 4    have what you want, but I think that we are bordering on
 5    things that are just delaying the trial.
 6              We need to get the case tried.  We have two weeks
 7    to do that.  By going into these things where we have
 8    information, we are going to make sure that the woman who
 9    wants to leave next Friday or a couple days after that won't
10    be able to do that because we will have spent a lot of time
11    on things that are not really necessary to the trial of this
12    civil case.
13              MR. REMAR:  I will assure the Court that we have no
14    intention of delaying and are as interested as Your Honor is
15    in moving this forward expeditiously.
16              THE COURT:  All right.  So who is the next person?
17              MR. REMAR:  Juror No. 5, Your Honor.  In
18    Question 46, he indicated concern about crime in
19    DeKalb County.  Lots of crime was his response.
20              THE COURT:  There is, isn't there?
21              MR. REMAR:  Excuse me?
22              THE COURT:  There is.
23              MR. REMAR:  I don't know if that's true compared to
24    other jurisdictions.
25              THE COURT:  Well, I used to be the United States
```

1     Attorney.  I can tell you that's true.

2             But if you want to follow up with him on that, we

3     can do that.

4             MR. REMAR:  And Juror No. 6, Your Honor, indicated

5     in Question 50 that he has an ill-informed opinion of

6     Vernon Jones as a bit of a political boss.

7             THE COURT:  Okay.  Who else?

8             MR. REMAR:  And Juror No. 9, Your Honor.  She has a

9     spouse who works for DeKalb County, and we would just like to

10    find out in what area he works.

11            MR. REMAR:  All right.  Let's -- where is our CSO?

12    Oh, there you are.  Pardon me.

13            Let's bring in Ms. Williams since Mr. Remar would

14    like to ask her about her ticket, Lorna Williams.

15            (Prospective Juror No. 3 Williams enters the

16    courtroom.)

17            THE COURT:  Hi, Ms. Williams.  How are you?

18            PROSPECTIVE JUROR NO. 3 WILLIAMS:  Fine.

19            THE COURT:  One of the lawyers wanted me to follow

20    up with you on a discussion we had earlier about this plan to

21    go on a plane trip.

22            PROSPECTIVE JUROR NO. 3 WILLIAMS:  Uh-huh.

23            THE COURT:  And you need to say yes or no because

24    Nick is trying to write things down verbatim, so if you would

25    help me with that, I would appreciate it.

```
1              And I asked you about your travel, whether you

2    could delay your departure a couple of days.  I think you

3    said you could?

4              PROSPECTIVE JUROR NO. 3 WILLIAMS:  Yeah, I guess I

5    could.

6              THE COURT:  And if you had to delay it, if we got

7    to the point where you had to spend a couple more days on

8    this case, would that affect your ability to be a fair and

9    impartial juror in this case?

10             PROSPECTIVE JUROR NO. 3 WILLIAMS:  No.

11             THE COURT:  I know you wouldn't want to do that,

12   but would that cause you to not fulfill your duties as a

13   juror?

14             PROSPECTIVE JUROR NO. 3 WILLIAMS:  No.

15             THE COURT:  All right.  Anything else, Mr. Remar,

16   you would like to ask?

17             MR. REMAR:  No, Your Honor.  Thank you.

18             MR. BOWERS:  No, Your Honor.

19             THE COURT:  Thank you very much.

20             (Ms. Williams leaves the courtroom.)

21             THE COURT:  Donald, could you have Shelly Goble

22   come in, please?

23             (Prospective Juror No. 4 Goble enters the

24   courtroom.)

25             THE COURT:  Hi, Ms. Goble, how are you?
```

1             PROSPECTIVE JUROR NO. 4 GOBLE:  Good, how are you?

2             THE COURT:  Good.

3             You are at Kennesaw State; is that right?

4             PROSPECTIVE JUROR NO. 4 GOBLE:  Yes.

5             THE COURT:  You told us and you actually told us

6     also in your questionnaire that you are a senior, that you

7     are in your last semester of college.  Is that right?

8             PROSPECTIVE JUROR NO. 4 GOBLE:  Yes, sir.

9             THE COURT:  What are you studying?

10            PROSPECTIVE JUROR NO. 5:  Fine art, I'm a painting

11    and drawing major.

12            THE COURT:  And you have one class left to

13    complete; is that right?

14            PROSPECTIVE JUROR NO. 4 GOBLE:  Yes, sir.

15            THE COURT:  And I think you said you had your

16    senior exhibition that's coming up soon?

17            PROSPECTIVE JUROR NO. 4 GOBLE:  Yes, sir.

18            THE COURT:  What is that?

19            PROSPECTIVE JUROR NO. 4 GOBLE:  It's a final

20    showing of the senior art majors.  They have like an art show

21    at the end of the semester where we basically display our

22    best work, and it's up for a couple weeks.

23            THE COURT:  And the end of the semester at Kennesaw

24    is when?

25            PROSPECTIVE JUROR NO. 4 GOBLE:  I believe

 1    graduation is the 12th, but I think the last day is the 3rd.

 2              THE COURT:  12th of May?

 3              PROSPECTIVE JUROR NO. 4 GOBLE:  Uh-huh.

 4              THE COURT:  And what do you have to do to get ready

 5    for the senior exhibition?

 6              PROSPECTIVE JUROR NO. 4 GOBLE:  I just have three

 7    paintings that I'm working on for my senior show, and I'm

 8    still working on it to get ready for it.

 9              THE COURT:  Working on them all at the same time?

10              PROSPECTIVE JUROR NO. 4 GOBLE:  Resumes'.  Yes,

11    sir.

12              THE COURT:  If this case goes through next week,

13    would it be possible for you to do what you need to do to

14    complete your paintings and do your resume' to graduate on

15    time?

16              PROSPECTIVE JUROR NO. 4 GOBLE:  It's possible, but

17    I also have a job and I work five days a week, so it's really

18    hard.

19              And the painting process is not something I can

20    just do overnight.  It's hours of work.

21              THE COURT:  And you work at a restaurant; correct?

22              PROSPECTIVE JUROR NO. 4 GOBLE:  Yes, sir.

23              THE COURT:  Would that -- the fact that you would

24    have these time constraints, would that affect -- if you were

25    selected, what impact would that have on your ability to

1    listen to the evidence and to decide the case based upon the

2    law that I give to you?

3              PROSPECTIVE JUROR NO. 4 GOBLE:  No impact at all.

4              THE COURT:  And, I mean, is it possible -- would

5    your professors understand -- they always want things sooner

6    than you can give them to them.

7              PROSPECTIVE JUROR NO. 4 GOBLE:  Right, I'm going to

8    ask tomorrow.  I will see her tomorrow at 5:00, so I will ask

9    her tomorrow.  I won't know until then.

10             THE COURT:  Now, if you were seated, you wouldn't

11   be -- you wouldn't make it to Kennesaw tomorrow by 5:00.

12             PROSPECTIVE JUROR NO. 4 GOBLE:  Correct, yes.

13             THE COURT:  So you would have to talk to them on

14   the telephone.

15             PROSPECTIVE JUROR NO. 4 GOBLE:  Correct, yes.

16             THE COURT:  I guess the bottom line is this.  You

17   know about the lawsuit and you know that it's going to last

18   through the end of next week.  I mean, everybody has -- this

19   interrupts everybody's life, to some degree it does some

20   people more than others.

21             You have explained to us the degree to which it

22   would interrupt your life.  Would it interrupt it in such --

23   to such an extent that it would affect your ability to be

24   able to sit on this jury and to decide the case?

25             PROSPECTIVE JUROR NO. 4 GOBLE:  No, it would not.

```
 1            But also I didn't mention, I am moving out of my

 2    house to a new apartment next Wednesday, and my roommates are

 3    moving in starting on Wednesday.  So we have to be out of our

 4    house by the 1st too.

 5            THE COURT:  Is that something she could do while

 6    you are down here doing this?

 7            PROSPECTIVE JUROR NO. 4 GOBLE:  Well, to be quite

 8    honest, my other roommate has full-time school, so I'm

 9    supposed to be helping her instead of the other way around.

10            THE COURT:  Anything from either of the parties?

11    Mr. Bowers, anything from you, any follow-up?

12            MR. BOWERS:  No, sir.

13            THE COURT:  Mr. Remar?

14            MR. REMAR:  No, Your Honor.

15            THE COURT:  Thank you very much, appreciate your

16    answers.

17            PROSPECTIVE JUROR NO. 4 GOBLE:  Thank you.

18            (Ms. Goble leaves the courtroom.)

19            THE COURT:  Next I believe is Juror 6, who is

20    Mr. Reid.

21            MR. REMAR:  I think we wanted to question 5.

22            THE COURT:  Well, they are going to get 6.  We will

23    do 5 next.

24            (Prospective Juror No. 6 Reid enters the

25    courtroom.)
```

```
 1              THE COURT:  Hi, Mr. Reid.

 2              PROSPECTIVE JUROR NO. 6 REID:  Hello.

 3              THE COURT:  Just one follow-up.  There is a

 4    question where we asked about all the people that are

 5    involved in this case and whether you had formed an opinion,

 6    it was Question 50.

 7              And you wrote:  I have an ill-informed opinion of

 8    Vernon Jones as a bit of a political boss for

 9    DeKalb County.

10              The first question is does ill-informed mean you

11    don't have a good opinion, or it could be you don't have an

12    opinion that's very --

13              PROSPECTIVE JUROR NO. 6 REID:  I just have a very

14    kind of cursory, it's not a well-informed opinion from years

15    ago, probably from listening to Neal Boortz a lot, which

16    I don't do very much now.  It was just a -- I heard a lot of

17    his name.

18              THE COURT:  Well, going back to what you heard in

19    the past, would what you heard and whatever opinion,

20    ill-informed as it might have been, would that affect your

21    ability to be a fair and impartial juror in this case?

22              PROSPECTIVE JUROR NO. 6 REID:  It could possibly.

23              THE COURT:  How so?

24              PROSPECTIVE JUROR NO. 6 REID:  Well, you know, I

25    have basically an unfavorable opinion, I think.  As I said,
```

1    it's from years past of, you know, when I was kind of more

2    involved in reading local news.  I can't really even put a

3    finger on what it would be.

4            It's just, as I said in there, it's just in the

5    back of my head.  I wish I could say it was more than that.

6            THE COURT:  Well, if you were selected as a juror,

7    you would have two responsibilities.  One is you could only

8    listen to the evidence that's in this case because that would

9    be evidence that I determined was admissible in the case.

10   And then you would have to follow the law that I give to

11   you.

12           Would this information that came to you through the

13   radio station you listen to, would that affect your ability

14   to consider the evidence presented at the trial and to reach

15   a just and fair decision based upon the law as it is given to

16   you?

17           PROSPECTIVE JUROR NO. 6 REID:  Actually no, I think

18   it would be fine.  It would be fine.

19           THE COURT:  Any follow-up for either of the

20   parties?

21           MR. BOWERS:  No, Your Honor.

22           MR. REMAR:  No, Your Honor.

23           THE COURT:  Thank you very much, Mr. Reid.

24           (Mr. Reid leaves the courtroom.)

25           THE COURT:  What did you want to follow up with

1    Juror 5 with?

2              MR. REMAR:  That was the one, Your Honor, on the

3    lots of crime in DeKalb County.

4              THE COURT:  All right.  Can you bring in Mr. Dault,

5    D-a-u-l-t?

6              MR. WILSON:  Your Honor, before Mr. Dault comes in,

7    we would like to follow up with him with respect to his being

8    a plaintiff in a number of lawsuits.

9              (Prospective Juror No. 5 Dault enters the

10   courtroom.)

11             THE COURT:  Hi, Mr. Dault.

12             PROSPECTIVE JUROR NO. 5 DAULT:  Hi.

13             THE COURT:  A couple of things that we wanted to

14   follow up with you on.  One is you made a notation about you

15   had an opinion about DeKalb County, and you said there was

16   lots of crime there?

17             PROSPECTIVE JUROR NO. 5 DAULT:  Yes.  You hear it

18   on TV quite a bit, quite often on the news.

19             THE COURT:  Now, you know the nature of this

20   case.  It's a dispute between two parties about claims of

21   discrimination.

22             PROSPECTIVE JUROR NO. 5 DAULT:  Right.

23             THE COURT:  Would the fact that you are aware that

24   there is crime in DeKalb County, might be a fair amount of

25   crime, would that impact your ability to fairly and

1    impartially evaluate the evidence that's presented in the

2    case and to apply the law as I give it to you in this kind of

3    case?

4            PROSPECTIVE JUROR NO. 5 DAULT:  I think I could.

5            THE COURT:  Well, do you think the fact that there

6    is crime in DeKalb County would somehow impact your ability

7    to impartially weigh the evidence and to apply the

8    instructions that I give to you in this civil case?

9            PROSPECTIVE JUROR NO. 5 DAULT:  I don't know for

10   sure.

11           THE COURT:  How might it?

12           PROSPECTIVE JUROR NO. 5 DAULT:  I have got a bad

13   taste.  I wouldn't want to live over there.  It seems like

14   there is too much corruption and the crime that's over

15   there.  And I only have that from the media.

16           THE COURT:  So you think even if you were

17   restrained to what I admitted and the law I give you, still

18   something might creep into your thinking that would affect

19   your ability to fairly and impartially evaluate the evidence

20   and apply the law?

21           PROSPECTIVE JUROR NO. 5 DAULT:  I don't think so.

22           THE COURT:  Well, you know, it's important to make

23   sure that we have people that can follow the instructions and

24   can give everybody a fair shot here.

25           PROSPECTIVE JUROR NO. 5 DAULT:  Right.

```
 1            THE COURT:  And a fair shot means, whether it's

 2    plaintiffs or the defendants, to be able to say I can sit

 3    back and I have heard things about DeKalb County before, but

 4    my job here is to fairly and impartially evaluate the

 5    evidence that's presented just here in this courtroom and,

 6    second, to apply the law that I give to you.

 7            And I need to know whether you can do that or

 8    whether you have some reservation about that?

 9            PROSPECTIVE JUROR NO. 5 DAULT:  I would try very

10    hard to do it, follow your instructions.

11            THE COURT:  Well, trying very hard is different

12    than being able to commit to me now that you can.

13            PROSPECTIVE JUROR NO. 5 DAULT:  It's hard for me to

14    give you that answer.  I'm trying to be open, I'm trying to

15    stay understanding.

16            THE COURT:  I understand.  I mean, standing there,

17    is there something in the back your mind saying, you know,

18    I'm not sure that I can do that because I know that there is

19    some crime and some problems in DeKalb?

20            PROSPECTIVE JUROR NO. 5 DAULT:  I think it's just

21    what I have heard from the news and the media.

22            THE COURT:  But --

23            PROSPECTIVE JUROR NO. 5 DAULT:  I don't know any of

24    the people that are involved in any of it.  I don't have any

25    grudge or anything with those people.
```

```
 1              THE COURT:  You mean the people that are here; is

 2    that right?

 3              PROSPECTIVE JUROR NO. 5 DAULT:  Or the people

 4    involved in the case.

 5              THE COURT:  Well, of course, those are the people

 6    that are here, those are the ones that would be involved in

 7    the lawsuit are the people that are just here today.  I guess

 8    I need to know --

 9              PROSPECTIVE JUROR NO. 5 DAULT:  I don't have any

10    grudges.  I don't know any of them.  I wouldn't have any

11    grudges on them, any thoughts.

12              THE COURT:  Any follow-up, Mr. Bowers?

13              PROSPECTIVE JUROR NO. 5 DAULT:  I'm sorry?

14              THE COURT:  I'm sorry, I'm asking Mr. Bowers if

15    they have follow-up.

16              MR. BOWERS:  No, Your Honor.

17              THE COURT:  Mr. Remar?

18              MR. REMAR:  May I, Your Honor?

19              Mr. Dault, my name is Robert Remar and I represent

20    these folks over here.

21              You mentioned you heard about corruption in the

22    county.  Could you tell me what that means, what you have

23    heard and how that might affect you?

24              PROSPECTIVE JUROR NO. 5 DAULT:  You hear the

25    different things that are on the TV -- I'm sure you have
```

1    heard the same thing -- that the local governments, the crime

2    that's there.  I can't pinpoint exactly what I have heard,

3    but I'm sure we have all heard the same thing.  We all watch

4    the same shows.

5         MR. REMAR:  Could you recall where you heard this?

6         PROSPECTIVE JUROR NO. 5 DAULT:  On what channel

7    TV?

8         MR. REMAR:  Yes.

9         PROSPECTIVE JUROR NO. 5 DAULT:  I watch the

10   Fox News, I watch the Channel 3 news.

11        MR. REMAR:  And you mentioned crimes.  Are there

12   any particular crime that --

13        PROSPECTIVE JUROR NO. 5 DAULT:  There seems to be a

14   lot of murders and stuff over there, that's what you hear,

15   robberies.

16        MR. REMAR:  Thank you, Mr. Dault.

17        MR. THOMAS:  May I follow-up, Your Honor?

18        THE COURT:  Yeah, go ahead.

19        MR. THOMAS:  Yes, sir.

20        Mr. Dault, I would like to know, how long have you

21   had the opinions that you have expressed about corruption and

22   crime?  How long have you had those opinions?

23        PROSPECTIVE JUROR NO. 5 DAULT:  Probably a couple

24   of years.

25        MR. THOMAS:  Are they pretty much fixed opinions?

```
 1            PROSPECTIVE JUROR NO. 5 DAULT:  No, I'm pretty

 2      open.  I'm a pretty open person.  But when you continuously

 3      keep hearing it on TV, you know, it just gives you kind of a

 4      bad taste in your mouth.

 5            MR. THOMAS:  So you have had that bad taste a long

 6      time?

 7            PROSPECTIVE JUROR NO. 5 DAULT:  Yeah, I would say a

 8      couple years.

 9            THE COURT:  Well, if I gave you an instruction that

10      you could not consider anything that you heard outside this

11      courtroom, including whatever you heard in the news about

12      crime or corruption or the like, could you then only consider

13      what goes on in the courtroom and the law that I give to

14      you?  Could you do that?

15            PROSPECTIVE JUROR NO. 5 DAULT:  Yeah.

16            THE COURT:  All right.  Anything else?

17            MR. BOWERS:  Nothing from us, Your Honor.

18            MR. REMAR:  No, Your Honor.

19            THE COURT:  Thank you very much.

20            MR. WILSON:  Your Honor?

21            THE COURT:  I'm sorry, they wanted to ask you about

22      your lawsuits.

23            PROSPECTIVE JUROR NO. 5 DAULT:  I was a contractor

24      in Florida, and I did quite a bit of work for municipalities,

25      and we weren't treated very well in Florida.  There was a lot
```

 1    of controversy.

 2            We were an underground contractor, we built the

 3    infrastructures, and there was some places that you could not

 4    possibly build some areas.

 5            And through discovery we were able to go through

 6    the public records and found out that there was notes in the

 7    local government stating that they were having the same

 8    problems that we had brought up that you can't construct this

 9    project.  So that's what I ran into.

10            And we did prevail on that when we did go to

11    court.  When we went to mediation or arbitration --

12            THE COURT:  All right.

13            PROSPECTIVE JUROR NO. 5 DAULT:  -- we did prevail

14    on that because of all the notes we found in the local

15    government.

16            THE COURT:  So that was -- what county in Florida

17    was that?

18            PROSPECTIVE JUROR NO. 5 DAULT:  St. Petersburg,

19    Florida.

20            THE COURT:  So you had to bring actions against

21    the --

22            PROSPECTIVE JUROR NO. 5 DAULT:  St. Petersburg.

23            What we did is we had our attorney draw them up the

24    different conflicts that we ran into with the different storm

25    sewer drains, there was a forced main that was in the way to

1    build a structure or put a sewer line in.

2           And throughout the discovery they found out that

3    there was notes to the engineer that worked for the county

4    that you cannot do that, you couldn't build it.  It was an

5    unbuildable project.

6           And it cost us a lot of money to fight that.

7           THE COURT:  Would those -- would that relationship

8    with the county in Florida impact your ability to be fair and

9    impartial in this case which also involves a government --

10          PROSPECTIVE JUROR NO. 5 DAULT:  Yeah, it probably

11   would be.  It probably would be.

12          THE COURT:  Anything else?

13          MR. WILSON:  Nothing, Your Honor.

14          THE COURT:  Thank you.

15          (Mr. Dault leaves the courtroom.)

16          THE COURT:  All right.  Who is next within this

17   first group of ten?  I forgot to take notes after this

18   person.

19          Anything for Juror No. 7?

20          MR. REMAR:  No, Your Honor.

21          THE COURT:  Juror No. 8?

22          MR. REMAR:  No, Your Honor.

23          MR. BOWERS:  No, Your Honor.

24          THE COURT:  9 or 10?

25          MR. REMAR:  9, Your Honor, there was the question

1     about the spouse who works for the county.

2              THE COURT:  Okay.  Can we ask Ms. Braithwaite to

3     come in, please.

4              (Prospective Juror No. 9 Braithwaite enters the

5     courtroom.)

6              THE COURT:  Hi, Ms. Braithwaite.  One question to

7     follow up with you.

8              You said that your husband Eric works for

9     DeKalb County?

10             PROSPECTIVE JUROR NO. 9 BRAITHWAITE:  Yes, sir.

11             THE COURT:  Where does he work and for whom does he

12    work?

13             PROSPECTIVE JUROR NO. 9 BRAITHWAITE:  He works for

14    the county landfill.  He works -- I'm not sure what his

15    boss's -- his first name is Roger.  He's an equipment

16    operator.

17             THE COURT:  The fact that your husband works for

18    DeKalb County, would that have any impact on your ability to

19    be a fair and impartial juror in this case, to fairly and

20    impartially evaluate the evidence and to apply the law as

21    I give it to you?

22             PROSPECTIVE JUROR NO. 9 BRAITHWAITE:  No, sir.

23             THE COURT:  Is there anything else to ask

24    Ms. Braithwaite?

25             MR. REMAR:  No, Your Honor.

```
 1                    MR. BOWERS:  No, Your Honor.

 2                    THE COURT:  Thank you very much.

 3                    (Ms. Braithwaite leaves the courtroom.)

 4                    THE COURT:  All right.  Those are the first ten

 5       panel members.  Are there any challenges for cause with

 6       respect to any of those ten?

 7                    MR. ANULEWICZ:  Not from plaintiffs except for

 8       No. 1.

 9                    THE COURT:  I mean, is there any --

10                    MR. REMAR:  No, Your Honor.

11                    THE COURT:  You disagree on a lot.  Do you --

12                    MR. WILSON:  We don't disagree with that,

13       Your Honor.

14                    MR. REMAR:  No.

15                    THE COURT:  He's challenged for cause, and that's

16       granted.

17                    All right.  Any other challenges for cause for

18       Jurors 2 through 10?

19                    MR. REMAR:  Yes, Your Honor.  We have two,

20       Juror No. 6 and Juror No. -- I'm sorry, Juror No. 5 first,

21       Juror No. 5, Mr. Dault, who clearly stated that his prior

22       dealings with county government would affect his ability to

23       be fair.

24                    THE COURT:  No, he said the exact opposite of

25       that.
```

1          MR. REMAR:  No, Your Honor, he did not.

2          MR. WILSON:  No, Your Honor.

3          MR. REMAR:  With all due respect.

4          MR. WILSON:  The last series of questions about his

5  dealings with municipalities --

6          THE COURT:  Let me take a look here.

7          I'm sorry, I misheard him.

8          Let's ask him to come back in, please.  Mr. Dault.

9          (Prospective Juror No. 5 Dault enters the

10  courtroom.)

11          THE COURT:  Mr. Dault, I was confused about

12  something.  I just want to make sure I understand what you

13  were telling me.

14          With these disputes that you had in Florida on this

15  underground work that you were doing for them, this is a

16  dispute with a municipality in Georgia.  Would those disputes

17  affect your ability to be a fair and impartial juror in this

18  case involving this Georgia county and the claims between the

19  parties, which are claims not related to construction

20  contracts but are claims related to -- are claims of

21  discrimination?

22          Would your experience in Florida impact your

23  ability to be fair and impartial in this case?

24          PROSPECTIVE JUROR NO. 5 DAULT:  I don't think so.

25          THE COURT:  Any follow-up?

1          MR. BOWERS:  None, Your Honor.

2          MR. REMAR:  I do, Your Honor.

3          Sorry, Mr. Dault.  The first time His Honor asked

4    you this question, I believe you said it would affect your

5    ability to be fair.

6          Just being completely honest with us, was the

7    experience you had in Florida with the county government,

8    would that affect your ability here today, would it still be

9    in your mind as you sat in the jury box?

10         PROSPECTIVE JUROR NO. 5 DAULT:  You know it's going

11   to be in my mind.

12         I mean, I'm trying to be open.  I would like to be

13   here, I would like to serve on the jury.  But, yes, it

14   probably will be in my mind.

15         MR. REMAR:  Thank you, sir.

16         PROSPECTIVE JUROR NO. 5 DAULT:  It's a hard -- it's

17   a hard question.  I don't know.  I'm not there yet.

18         MR. REMAR:  Thank you, sir.

19         THE COURT:  You are not where yet?

20         PROSPECTIVE JUROR NO. 5 DAULT:  Sitting in the jury

21   box.  I would like to keep an open mind with it.

22         THE COURT:  And we are trying to find out if it's

23   okay for you to be there.

24         Look, everybody comes here with some life

25   experience.

```
1            PROSPECTIVE JUROR NO. 5 DAULT:  Right.

2            THE COURT:  What we need to know now is, taking

3    that particular life experience and in your case a business

4    experience dealing with a county in another state, if you are

5    selected to sit in the jury box, would you be able to say,

6    I'm looking at the parties in this case, I'm only going to

7    hear the evidence and consider the evidence admitted in this

8    case, and I'm only going to listen to the law presented to me

9    in this case?

10            Could you fairly and impartially consider the

11   evidence and the law that I give to you in reaching a just

12   decision in this case?

13            PROSPECTIVE JUROR NO. 5 DAULT:  The answer I have

14   given you, I guess, I -- I would like to.  I would try to.

15            That cost hundreds of thousands of dollars down

16   there, and it's tough to get out of my mind.

17            THE COURT:  Mr. Bowers, did you have some

18   follow-up?

19            MR. BOWERS:  Yes, please.

20            My name is Mike Bowers and I represent those four

21   folks sitting over there.

22            And the question is when you take that oath, can

23   you put aside what happened in Florida and decide the case

24   based on the law the Judge gives and the evidence that is

25   presented in front of this jury?
```

1            If you can, the answer is yes; if you can't, the

2    answer is no.  What's your answer, sir?

3            PROSPECTIVE JUROR NO. 5 DAULT:  No.

4            THE COURT:  All right.  Thank you.

5            (Mr. Dault leaves the courtroom.)

6            THE COURT:  All right.  What's the plaintiff's

7    response to the challenge for cause of Juror No. 5?

8            MR. BOWERS:  This juror we just had?

9            THE COURT:  Yes.

10           MR. BOWERS:  We don't have a response, sir.

11   I think his answer answers the question, he said he couldn't

12   be fair.

13           THE COURT:  All right.  Then his challenge for

14   cause is granted.  That's Juror No. 5.

15           And who is next?

16           MR. REMAR:  Your Honor, Juror No. 6, Mr. Reid.  We

17   would move to strike Mr. Reid for cause.

18           Mr. Reid said that he has a basic negative opinion

19   and he's not sure he could be fair.

20           And while I know that in response to Your Honor's

21   questions he said, well, he thought he could decide it based

22   on the evidence, but the fact of the matter is I think he has

23   expressed a bias and an unsureness of whether he could be

24   fair.

25           And for that reason he should not be seated as a

1    juror.

2              THE COURT:  Well, it's my responsibility to

3    ascertain whether any juror can set aside their opinions

4    and render a verdict based upon the evidence presented

5    in court and -- or whether he has such fixed opinions that

6    he could not judge impartially the evidence that's

7    presented.

8              I find that he did state to me that he could set

9    aside his opinions, and that based upon the evidence

10   presented and based upon the information admitted into

11   evidence as well as my instructions, that he could

12   apply those, and therefore I'm denying the challenge for

13   cause.

14             Who is next?

15             MR. REMAR:  The next ten, Your Honor?

16             THE COURT:  So that's all for the first ten; is

17   that correct?

18             MR. REMAR:  Yes, that's the first ten, Your Honor.

19             THE COURT:  Okay, so that gives us eight.  We only

20   need four more for the main jury.

21             So let's go to the next group, which is Jurors 11

22   through 20.  And who would you like to follow up on?

23             MR. ANULEWICZ:  Judge, Juror No. 13 wrote a

24   response to one of the questions "I love DeKalb," and we just

25   wanted to ask her a little bit more about that.

1          And also she's got a 2:00 interview today, which

2     I guess she's missed.

3          THE COURT:  Yeah, I don't think that's going to

4     happen.

5          MR. ANULEWICZ:  So the "I love DeKalb" comment, we

6     want to follow up with her on that.

7          Then Jurors No. 16 and 18 in response to your

8     Question No. 67 seemed to put a heightened burden on these

9     types of cases, and we want to ask them about that.

10         THE COURT:  How about for the defendants?

11         MR. REMAR:  Your Honor, Juror No. 12 did not answer

12    Questions 44 to 48, and as to Question 10 where he stated he

13    was forced into early retirement, Question 54 where he

14    indicated he had harassment at his job, Question 58 where he

15    indicated he was forced into early retirement, and

16    Question 62 where he indicated that he had been discriminated

17    against in his last job.  We believe all of those should be

18    inquired into, Your Honor.

19         THE COURT:  Anything else?

20         MR. REMAR:  Yes, Your Honor.

21         THE COURT:  I'm not going to use questionnaires

22    with you guys anymore.  This was supposed to save time,

23    not --

24         MR. REMAR:  Are we up to 18, Your Honor.  That

25    would be our next one.

```
 1              THE COURT:  18 is already being called in.

 2              MR. REMAR:  I'm sorry, Your Honor?

 3              THE COURT:  18 is already being called up.  The

 4   plaintiffs want to follow up with 18.

 5              MR. REMAR:  Okay.

 6              Oh, I'm sorry, Your Honor, and Juror No. 14

 7   indicated that he had been a plaintiff in an Americans with

 8   Disabilities Act lawsuit.  That was Question 29.

 9              THE COURT:  All right.  Would you -- well, is there

10   any objection to Juror No. 18 -- Juror No. 11 being --

11              MR. ANULEWICZ:  No, Your Honor.

12              THE COURT:  This will tell how deep we have to

13   go.

14              Are there any challenges for cause for Juror

15   No. 11?

16              MR. REMAR:  No, Your Honor.

17              MR. WILSON:  No, Your Honor.

18              MR. BOWERS:  No, Your Honor.

19              THE COURT:  So that gives us nine.

20              How about Juror 14?  I'm sorry.  Well, no, we have

21   got something for everybody else I guess, except 15.  Any

22   objection to 15?

23              MR. REMAR:  No, Your Honor.

24              MR. ANULEWICZ:  No, Judge.

25              THE COURT:  How about 17?
```

1          MR. REMAR:  Your Honor, I apologize to the Court.

2   We want to ask just where she retired from.

3          MR. WILSON:  And there was also Question No. 41.

4   I think her father was a U.S. Marshal and she has some

5   disclosure about a Trigger Burke case.

6          And either I'm too young or from another

7   jurisdiction that I don't know anything about the

8   Trigger Burke case, and I would be interested in knowing what

9   that was about, Your Honor.

10          THE COURT:  Well, I know you might be interested in

11   knowing that, but how does that relate to her bias or

12   prejudice?

13          MR. WILSON:  She wrote it down, she thought it

14   affected --

15          THE COURT:  So you think that if anybody writes

16   something down, you could ask any questions you want about

17   that?

18          MR. WILSON:  No, but I think that --

19          THE COURT:  It has to be calculated to determine

20   whether or not they have bias or prejudice.

21          MR. WILSON:  She felt it would affect her in some

22   way, so I think we are at least entitled to know what it's

23   about.

24          THE COURT:  All right.  Let's call in -- maybe we

25   can get this done today -- Juror No. 13, whose name is

 1     Ms. Woods.

 2              (Prospective Juror No. 13 Woods enters the

 3     courtroom.)

 4              THE COURT:  Ms. Woods, there was an answer that you

 5     gave to one of the questions about your feelings about

 6     DeKalb County, and what you stated is that you loved

 7     DeKalb County.

 8              PROSPECTIVE JUROR NO. 13 WOODS:  Yes, sir.

 9              THE COURT:  That might indicate your feelings

10     about the county.  Of course what we are doing here is

11     trying to find people that can be fair and objective about

12     this particular case, which is an important case as I told

13     you.

14              Can you, considering what this case is about and

15     considering it's about a county who is a defendant in the

16     case that you love, can you be fair and impartial --

17              PROSPECTIVE JUROR NO. 13 WOODS:  Yes, sir.

18              THE COURT:  You need to let me finish my question.

19              PROSPECTIVE JUROR NO. 13 WOODS:  Oh, I'm sorry.

20              THE COURT:  The only evidence that you can consider

21     is the evidence that's presented in this case, and you have

22     to follow the law that I give you, even if you disagree with

23     it.

24              Can you fairly and impartially evaluate the

25     evidence and apply the law as I give it to you?

1          PROSPECTIVE JUROR NO. 13 WOODS:  Yes, sir.

2          THE COURT:  All right.  Anything else?

3          MR. BOWERS:  Not from us, Judge.

4          MR. REMAR:  No, Your Honor.

5          THE COURT:  All right.  Thank you.

6          (Ms. Woods leaves the courtroom.)

7          THE COURT:  Next is Mr. Semasky.

8          (Prospective Juror No. 14 Semasky enters the

9   courtroom.)

10          THE COURT:  Hi, Mr. Semansky.

11          PROSPECTIVE JUROR NO. 14 SEMASKY:  Hello.

12          THE COURT:  I wanted to follow up on one of the

13   questions that was asked of you.  It had to do with do you

14   believe that you were discriminated against or mistreated by

15   your employer?  If so, did you complain?  Basically what

16   happened.

17          You answered by saying that you were terminated due

18   to a disability, that you filed a complaint of discrimination

19   based upon I take it your termination because of your

20   disability.  You filed that with the Labor Department under

21   the Americans with Disabilities Act alleging a violation

22   under that act, and then you filed a lawsuit that was

23   settled.

24          Is that a fair summary of what you did?

25          PROSPECTIVE JUROR NO. 14 SEMASKY:  Yeah.  At the

1   time I didn't realize, but it was actually EEOC that I filed

2   it with.

3            THE COURT:  Okay.  In filing that action and

4   working through that process and now having had that

5   experience, would that affect your ability to be fair

6   and impartial in this case, and that means considering

7   the evidence that I allow to be presented in the trial and

8   then following the law as I give it to you?   Could you do

9   that?

10           PROSPECTIVE JUROR NO. 14 SEMASKY:  Yes.

11           THE COURT:  All right.  Any follow up for either of

12   the parties?

13           MR. BOWERS:  No, sir.

14           MR. REMAR:  Yes, if I might, Your Honor?

15           Mr. Semasky, who was your employer that you filed

16   your charge against?

17           PROSPECTIVE JUROR NO. 14 SEMASKY:  It was Gunner

18   Construction Company.

19           MR. REMAR:  And how long ago was that, sir?

20           PROSPECTIVE JUROR NO. 14 SEMASKY:  It's been four

21   years ago.

22           MR. REMAR:  Thank you.

23           THE COURT:  Thank you, Mr. Semasky.

24           (Mr. Semasky leaves the courtroom.)

25           THE COURT:  The next is Juror No. 16, Ms. Hines.

1            (Prospective Juror No. 16 Hines enters the

2    courtroom.)

3            THE COURT:  Hi, Ms. Hines.

4            PROSPECTIVE JUROR NO. 16 HINES:  Hello.

5            THE COURT:  I wanted to follow up on an answer

6    that you gave to a question.  The first was do you have an

7    opinion on whether a person of any race, including those

8    persons who are white, is entitled to or should assert a

9    claim for race discrimination, and then they asked for your

10   opinion.

11           PROSPECTIVE JUROR NO. 16 HINES:  Yes.

12           THE COURT:  And you said:  The case would have to

13   be pretty compelling for me to see racial discrimination

14   against whites.

15           Can you explain that?

16           PROSPECTIVE JUROR NO. 16 HINES:  I think the best

17   way that I could describe it would be, recognizing that there

18   has been a long-standing pattern of discrimination against

19   minorities and the efforts that have been made to correct

20   that, it stands to reason somewhat that there would be, for

21   lack of a better term, white backlash.

22           So I really would be looking for something pretty

23   compelling for me to see that there was actually

24   discrimination against whites.

25           THE COURT:  How do you define pretty compelling?

```
 1              PROSPECTIVE JUROR NO. 16 HINES:  It would have to

 2   be blatantly obvious to me.

 3              THE COURT:  Now, in this case we would present

 4   evidence, you would have to consider the evidence fairly and

 5   impartially, and you would have to apply the law as I give it

 6   to you.

 7              Based upon your -- what you have just told me,

 8   could you do that?

 9              PROSPECTIVE JUROR NO. 16 HINES:  I believe so.

10              THE COURT:  Because these are white plaintiffs

11   generally bringing claims against black defendants

12   generally.

13              PROSPECTIVE JUROR NO. 16 HINES:  Right.

14              THE COURT:  Would you be need to see a pretty

15   compelling case before you could find in favor of the

16   plaintiffs?

17              PROSPECTIVE JUROR NO. 16 HINES:  Based on the

18   evidence, I think I would need for it to be compelling, yes.

19              THE COURT:  Any follow-up?

20              MR. REMAR:  Yes, Your Honor, if I may?

21              My name is Robert Remar and I represent

22   Mr. Stogner, Ms. Drew, Mr. Williams, and Mr. Wilson and

23   Mr. Thomas represents Mr. Jones.

24              If the Judge was to instruct you on the law and was

25   to indicate that the standard of proof that you were to apply
```

1    would be basically more likely than not, what we lawyers call

2    preponderance --

3              PROSPECTIVE JUROR NO. 16 HINES:  Of the evidence.

4              MR. REMAR:  -- would you be able to follow the

5    Judge's instructions and to apply the facts that are brought

6    out in the courtroom to that standard and make a fair and

7    impartial decision?

8              PROSPECTIVE JUROR NO. 16 HINES:  I believe so.

9              MR. REMAR:  Thank you.

10             THE COURT:  Well, "I believe so" is different than

11   a commitment to that.

12             You said that you would have to have blatent -- it

13   would have to be blatantly obvious.  Would that conflict with

14   the preponderance of the evidence standard at least in your

15   mind?

16             PROSPECTIVE JUROR NO. 16 HINES:  I don't think so.

17             THE COURT:  And why not?

18             PROSPECTIVE JUROR NO. 16 HINES:  The preponderance

19   of the evidence would push me one way or the other over the

20   middle.

21             THE COURT:  All right.  Any follow-up?

22             MR. REMAR:  No, Your Honor.

23             MR. BOWERS:  No, Your Honor.

24             THE COURT:  All right.  Thank you very much.

25             PROSPECTIVE JUROR NO. 16 HINES:  Thanks.

```
 1                    (Ms. Hines leaves the courtroom.)

 2               THE COURT:  All right.  The next is -- do we have

 3     anything for 17?

 4               MR. WILSON:  Just the Trigger Burke question.

 5               MR. BOWERS:  And where she retired from.

 6               MR. WILSON:  Oh, yes.

 7               THE COURT:  Could you ask Ms. Turner to come in,

 8     please?

 9                    (Prospective Juror No. 17 Turner enters the

10     courtroom.)

11               THE COURT:  Hi, Ms. Turner.

12               PROSPECTIVE JUROR NO. 17 TURNER:  Hi.  I'm going --

13     which one?

14               MR. WILSON:  That one.

15               THE COURT:  I'm just your basic ubiquitous judge.

16               You said that you quit your job to retire?

17               PROSPECTIVE JUROR NO. 17 TURNER:  Yes, sir.

18               THE COURT:  We are all happy for you.

19               From what business did you retire?

20               PROSPECTIVE JUROR NO. 17 TURNER:  I was an

21     assistant administrator for a nursing facility.

22               THE COURT:  And was that --

23               PROSPECTIVE JUROR NO. 17 TURNER:  A nursing home.

24               THE COURT:  Was that here in Atlanta?

25               PROSPECTIVE JUROR NO. 17 TURNER:  No.  In
```

1    Charleston, South Carolina.  We just moved here three years

2    ago.

3              THE COURT:  I see.  And then your father was a

4    U.S. Marshal?

5              PROSPECTIVE JUROR NO. 17 TURNER:  Yes, sir.

6              THE COURT:  In what district?

7              PROSPECTIVE JUROR NO. 17 TURNER:  Southeastern

8    District.  He was based in Charleston, and this was from

9    about -- I guess he went on under Truman.  My years -- I was

10   young, and I don't remember the exact years.  But he was a

11   marshal for twelve years.

12             THE COURT:  And he was involved in some case that

13   you cited?

14             PROSPECTIVE JUROR NO. 17 TURNER:  Yeah,

15   Trigger Burke.

16             THE COURT:  Do you remember what that was about?

17             PROSPECTIVE JUROR NO. 17 TURNER:  Yes.  He was

18   associated with a mob in New York, and his calling card was

19   if somebody was in the way, that he cut them up and put them

20   in hat boxes and sent them back to the family.

21             And he was -- they were looking for him everywhere,

22   and he ended up getting a tip that he was renting a house out

23   at Folly Beach just outside of Charleston.

24             THE COURT:  I see.  So that's where he was arrested

25   ultimately?

```
 1              PROSPECTIVE JUROR NO. 17 TURNER:  Yes.

 2              THE COURT:  And that's why your father was

 3    involved?

 4              PROSPECTIVE JUROR NO. 17 TURNER:  Yes.  And he was

 5    the one that took him to New York on the train.

 6              THE COURT:  All right.  Anything else for

 7    Ms. Turner?

 8              MR. REMAR:  No, Your Honor.

 9              MR. BOWERS:  No Your Honor.

10              THE COURT:  Thank you, Ms. Turner.

11              PROSPECTIVE JUROR NO. 17 TURNER:  Thank you.

12              (Ms. Turner leaves the courtroom.)

13              THE COURT:  At least that was interesting.

14              All right.  Do you have something for -- yes,

15    Ms. Elsner.  Remind me again what you wanted to go over with

16    her?

17              MR. ANULEWICZ:  The same, No. 67, Judge.

18              THE COURT:  All right.  Can we ask Ms. Elsner to

19    come in?

20              (Prospective Juror No. 18 Elsner enters the

21    courtroom.)

22              THE COURT:  Hi, Ms. Elsner.

23              PROSPECTIVE JUROR NO. 18 ELSNER:  Hi.

24              THE COURT:  A couple of questions.  I would like to

25    follow up on this DeKalb County project that you are involved
```

1    in, DeKalb CASA?

2              PROSPECTIVE JUROR NO. 18 ELSNER:  CASA,

3    Court-Appointed Special Advocates.

4              THE COURT:  And you, reading between the lines,

5    have some concern about the county and its relationship to

6    that program.  Could you explain that further?

7              PROSPECTIVE JUROR NO. 18 ELSNER:  Well, I'm

8    currently working on a community-building team, and my

9    project is DeKalb CASA and helping them to fundraise since

10   they don't have -- they are really short on cash.

11             And just listening to them and seeing what services

12   they do, I think they should get more money, and it's a

13   really good service they provide.  So that's why I put that

14   in there.

15             THE COURT:  All right.  That concern that you have

16   about the funding, this of course is a case brought against

17   the county.

18             PROSPECTIVE JUROR NO. 18 ELSNER:  Oh, no, it's not

19   a case.

20             THE COURT:  No, I understand.  This is a case.

21             PROSPECTIVE JUROR NO. 18 ELSNER:  Oh, yes.

22             THE COURT:  I mean, in this courtroom there is a

23   case.  I understand yours is CASA, and that is not a

24   case.  It's a concern.

25             Would your concern about the CASA funding impact

1   your ability to fairly and objectively evaluate this case and

2   the people in it, and could you apply the law that I give to

3   you?

4            PROSPECTIVE JUROR NO. 18 ELSNER:  I do not see the

5   DeKalb CASA having any relevance to this case, so I don't

6   think it will have anything to do with my judgment.

7            THE COURT:  Okay.  Then there is another question,

8   the question was do you have an opinion on whether a person

9   of any race, including those persons who are white, is

10  entitled to or should receive -- should assert a claim for

11  race discrimination?  If so, what is your opinion?

12           Then you say:  Yes, only if it is clearly

13  present.

14           What do you mean by that?

15           PROSPECTIVE JUROR NO. 18 ELSNER:  As far as --

16  well, if there is evidence that something has actually

17  occurred, there has been actual discrimination, then, yes, it

18  should be brought forward.

19           THE COURT:  Now, I would tell you what standard you

20  would have to apply, and you would have to apply that

21  standard even if you didn't agree with it.  Could you do

22  that?  The standard of proof, that is.

23           PROSPECTIVE JUROR NO. 18 ELSNER:  Oh, the standard

24  of proof?  Yes.

25           THE COURT:  All right.  Anything else for

1    Ms. Elsner?

2            MR. ANULEWICZ:  No, Judge.

3            MR. REMAR:  No, Judge.

4            THE COURT:  Okay.  Thank you.

5            MR. WILSON:  We do have a follow-up, Your Honor.

6    We also wanted to question her with respect to 62 and 65.

7            THE COURT:  I mean, she gives a pretty good

8    explanation of 62.  What do you want to know in addition to

9    what she's provided?

10           MR. WILSON:  The basis of the claim and whether or

11   not that would affect her ability, Your Honor.

12           THE COURT:  62 was the one where you had a

13   friend -- listen to what you said.  You have a friend who was

14   fired because of his race, and he was smarter than this

15   boss.  His boss was a minority and felt threatened by his

16   success, and I guess your friend filed a lawsuit?

17           PROSPECTIVE JUROR NO. 18 ELSNER:  Yes, sir.

18           THE COURT:  How close a friend was this?

19           PROSPECTIVE JUROR NO. 18 ELSNER:  I used to babysit

20   his kids.  I have known him 25 years.

21           THE COURT:  So he's older than you?

22           PROSPECTIVE JUROR NO. 18 ELSNER:  Yes.  And of my

23   parents.

24           THE COURT:  And then in 65, I think it's the same

25   person?

```
 1              PROSPECTIVE JUROR NO. 18 ELSNER:  Uh-huh.

 2              THE COURT:  You say the person was fired with no

 3    reason given, but everyone knew it was racial, et cetera.  He

 4    has filed a lawsuit.  His boss was a minority and felt

 5    threatened by his brains and success.

 6              Is that the same incident?

 7              PROSPECTIVE JUROR NO. 18 ELSNER:  It's the same

 8    incident, yes.

 9              THE COURT:  So here there is somebody that you --

10    I won't say you are close to, but you obviously respect, he's

11    filed a lawsuit, the lawsuit is still pending.

12              This is a lawsuit involving claims of

13    discrimination, and the case has to be tried with people that

14    are sitting in the jury box who can consider only the

15    evidence in this case.  You couldn't consider anything about

16    what happened to your friend.  You could only consider the

17    evidence that I admit, and you would have to follow the law

18    that I give to you as it applies to the evidence that's

19    presented in this case only.

20              Could you do that?

21              PROSPECTIVE JUROR NO. 18 ELSNER:  Yes.

22    I definitely understand that.

23              THE COURT:  Any follow-up?

24              MR. BOWERS:  None, Your Honor.

25              MR. REMAR:  No, Your Honor.
```

```
 1                THE COURT:  Thank you very much.

 2                (Ms. Elsner leaves the courtroom.)

 3                MR. REMAR:  Your Honor, we did request Juror 12.

 4                THE COURT:  Next time I will just bring everybody

 5      in.

 6                Would you bring in Mr. McCord?

 7                (Prospective Juror No. 12 McCord enters the

 8      courtroom.)

 9                THE COURT:  Mr. McCord, I have a couple

10      follow-up.

11                One, I think you missed a page.

12                PROSPECTIVE JUROR NO. 12 McCORD:  I'm sorry if

13      I did.

14                THE COURT:  I know, you are not the first

15      person.  Let me just ask you the questions.  We won't have

16      you fill it out.

17                Do you have any bumper stickers on your car and

18      have you had any in the last couple of years?

19                PROSPECTIVE JUROR NO. 12 McCORD:  One that says

20      U.S. Navy.

21                THE COURT:  Is that because you are a veteran?

22                PROSPECTIVE JUROR NO. 12 McCORD:  Yes, and I have a

23      flag on the front windshield.

24                THE COURT:  Do you have a personalized license

25      plate?
```

1        PROSPECTIVE JUROR NO. 12 McCORD:  No, sir.

2        THE COURT:  Do you have any feelings or opinions

3  about DeKalb County or its administration?  And if so, what

4  are they?

5        PROSPECTIVE JUROR NO. 12 McCORD:  No, none at all.

6        THE COURT:  Are you a regular patron of the parks

7  or other public recreational facilities in DeKalb?

8        PROSPECTIVE JUROR NO. 12 McCORD:  No, sir.

9        THE COURT:  And have you ever watched the

10  DeKalb County Commission meetings that are sometimes shown on

11  TV?

12        PROSPECTIVE JUROR NO. 12 McCORD:  No, huh-uh.

13        THE COURT:  There is another question.  Here is the

14  question:  Have you, an immediate family member or close

15  friend in the past five years attended any seminars or taken

16  any courses in human resources, psychology or workplace

17  conduct?  If yes, what were they?

18        Yes, you took a workplace conduct and harassment

19  seminar I assume at your last job?

20        PROSPECTIVE JUROR NO. 12 McCORD:  Right, sir.  I

21  worked at Carlisle Corporation out at Stone Mountain.

22        THE COURT:  What is Carlisle?

23        PROSPECTIVE JUROR NO. 12 McCORD:  I was a

24  supervisor, and we had to go through that.

25        THE COURT:  And what does Carlisle do?

1          PROSPECTIVE JUROR NO. 12 McCORD:  We build, we

2    manufacture air conditioning and refrigeration compressors,

3    which I no longer work there now.

4          THE COURT:  Then there is a Question 58:  Do you

5    believe you were discriminated against or mistreated by your

6    employer?  If so, did you complain?  What did you say and to

7    whom?  And if you did not complain, please explain why you

8    chose not to?

9          And you answered, yes, you were laid off when you

10   were 64.  You had worked 35 years at the same company, and

11   then you received an early retirement.

12         PROSPECTIVE JUROR NO. 12 McCORD:  I received a

13   package.  And I just went ahead and left, no contesting,

14   anything of that nature.  I just signed it and left.  I was

15   ready to go.

16         THE COURT:  Why did you -- I mean, did you think

17   about complaining?  And if so --

18         PROSPECTIVE JUROR NO. 12 McCORD:  Not really.

19         THE COURT:  -- why didn't you?

20         PROSPECTIVE JUROR NO. 12 McCORD:  Not really.  I

21   mean, I was treated fairly all the way through.  I knew it

22   wasn't a matter of -- a question of if, just when.  They were

23   downsizing and other people were leaving, and I knew it was

24   going to happen to me.

25         THE COURT:  Do you think you were singled out

1    because of your age, or was it something else?

2         PROSPECTIVE JUROR NO. 12 McCORD:  Not really.

3    I guess it was in a sense, but I didn't look at it as a fault

4    or anything.  They had to do what they had to do, and that

5    was common --

6         THE COURT:  So business --

7         PROSPECTIVE JUROR NO. 12 McCORD:  -- with

8    businesses like that, Your Honor.

9         THE COURT:  Carlisle's business was --

10        PROSPECTIVE JUROR NO. 12 McCORD:  No, sir.  It

11   was -- I think there they were -- at the most, I think there

12   was 20 people that were let go.

13        THE COURT:  There is another question:  Have you,

14   an immediate family member or close friend ever been

15   discriminated against because of race, sex, age, religion,

16   national origin or disability?  If so, please explain.

17        You said:  Only my last job.  I am over it now.  I

18   know I can't work anywhere at my age.

19        Is that related to what you just told us?

20        PROSPECTIVE JUROR NO. 12 McCORD:  Yes.  I mean,

21   I knew that I couldn't -- I went on the internet and I put in

22   applications, but there wasn't anything, you know, exciting

23   there happening.  And I understood that.

24        I went ahead and took Social Security and took my

25   package and took what I had left in my --

1          THE COURT:  Retirement?

2          PROSPECTIVE JUROR NO. 12 McCORD:  -- retirement

3    fund.  And that was it, I left it.

4          THE COURT:  All right.  Any other follow-up?

5          MR. BOWERS:  None from us, Your Honor.

6          MR. REMAR:  No, Your Honor.

7          MR. WILSON:  Just one, Your Honor, if I may?

8          PROSPECTIVE JUROR NO. 12 McCORD:  Yes, sir.

9          MR. WILSON:  You said you had a flag on your

10   windshield?

11         PROSPECTIVE JUROR NO. 12 McCORD:  It's just a

12   pasted-on thing on the windshield.  It has been there for

13   years.

14         MR. WILSON:  What kind of flag is it?

15         PROSPECTIVE JUROR NO. 12 McCORD:  United States

16   flag.  It is just on the windshield.  I think it has been

17   there ever since I got it five or six years ago, and it's

18   been there ever since.

19         MR. WILSON:  Thank you, sir.

20         No further questions.

21         THE COURT:  Thank you, Mr. McCord.

22         PROSPECTIVE JUROR NO. 12 McCORD:  Thank you, sir.

23         (Mr. McCord leaves the courtroom.)

24         THE COURT:  Any other questions to be asked of any

25   of the Jurors 12 through 20?

```
 1              No other questions from anybody for any of the

 2   Jurors 12 through 20?

 3              All right.  There not being any --

 4              MR. REMAR:  Your Honor, I'm sorry.  We did have a

 5   question for Juror 19 who indicated -- Question 46, where she

 6   said she lived in DeKalb County but did not like it.

 7              And also -- I think that was the only question,

 8   Your Honor.

 9              THE COURT:  Would you call in Ms. Franklin,

10   please?

11              MR. REMAR:  And Juror 20, who left a number of

12   questions blank.

13              (Prospective Juror No. 19 Franklin enters the

14   courtroom.)

15              THE COURT:  Hi, Ms. Franklin.

16              PROSPECTIVE JUROR NO. 19 FRANKLIN:  Hi.

17              THE COURT:  A couple follow-up questions.

18              In 46, I will just read your answer.  The question

19   is really not that important.  You have lived in

20   DeKalb County, you didn't like it, and then you said it was

21   different than living in Fulton County.

22              What did you mean by not liking DeKalb County?

23              PROSPECTIVE JUROR NO. 19 FRANKLIN:  I had been so

24   used to living in Fulton County, I have been in the Atlanta

25   area for almost twenty years, so I was used to living in
```

1    Fulton County.  It was different, adjusting to

2    DeKalb.  I didn't necessarily like the neighborhood that

3    I lived in.

4              THE COURT:  How was it different?

5              PROSPECTIVE JUROR NO. 19 FRANKLIN:  A little quiet,

6    which was probably a good thing.

7              But also the neighborhood that I lived in, some of

8    my neighbors were a little nuisance.  They had a dog that

9    really kind of barked all the time.

10             I got cited a couple of times for garbage, trash

11   that was on the side of my house that I tried to move.

12             So it was just a lot of personal stuff for me.

13             THE COURT:  All right.  Would that experience in

14   DeKalb, even comparing it to your experience in Fulton,

15   because this is a case involving DeKalb County as one of the

16   defendants and there are DeKalb County people that are

17   defendants, would your experience in DeKalb County impact

18   your ability to fairly and objectively evaluate the evidence

19   in the case or follow my instructions?

20             PROSPECTIVE JUROR NO. 19 FRANKLIN:  Would I be able

21   to follow your instructions fairly?  I guess I probably

22   could.

23             THE COURT:  Well, that would indicate that maybe

24   your feelings about DeKalb are stronger than -- are strong.

25             I mean, what we are trying to do is we are trying

1   to pick people that will be fair and we are trying to see if

2   somebody has a life experience that impacts their ability

3   to --

4          PROSPECTIVE JUROR NO. 19 FRANKLIN:  Then my

5   experience of DeKalb would impact my being able to be fair.

6          THE COURT:  Would or would not?

7          PROSPECTIVE JUROR NO. 19 FRANKLIN:  It would.

8          THE COURT:  Did you leave DeKalb and move back to

9   Fulton --

10          PROSPECTIVE JUROR NO. 19 FRANKLIN:  I did.

11          THE COURT:  -- or are you still there?

12          PROSPECTIVE JUROR NO. 19 FRANKLIN:  No, I moved

13   back to Fulton.

14          THE COURT:  And how long ago was that?

15          PROSPECTIVE JUROR NO. 19 FRANKLIN:   Since

16   September of '09 I have been in Fulton County.

17          THE COURT:  There was another question -- actually

18   a couple more.  There is a Question 56 asking about whether

19   you had left your job, and you said yes, that you had

20   violated some company policy and had been fired?

21          PROSPECTIVE JUROR NO. 19 FRANKLIN:  Right.

22          THE COURT:  Can you just tell me a little bit more

23   about that?

24          PROSPECTIVE JUROR NO. 19 FRANKLIN:  I was in a

25   position where I was able to help families, and I kind of

1  bent some of the rules.  They didn't necessarily live in the

2  actual service area that we serviced, and I allowed them to

3  attend a program.

4         THE COURT:  And what kind of work was that?

5         PROSPECTIVE JUROR NO. 19 FRANKLIN:  Child care.  It

6  was a Head Start program.

7         THE COURT:  Oh, okay.  Did that experience --

8  I mean, this has to do with employment relationships and, in

9  fact, there is one claim where somebody said it impacted them

10  in such a way where they left their job not voluntarily.

11         Would your experience impact your ability to fairly

12  and objectively evaluate the evidence in this case and follow

13  the law that I give to you?

14         PROSPECTIVE JUROR NO. 19 FRANKLIN:  Yes.

15  I definitely learned my lesson from losing my job, because it

16  was a job that I had for 18 years.

17         THE COURT:  I see.  So you are owning up to that?

18         PROSPECTIVE JUROR NO. 19 FRANKLIN:  Yes.

19         THE COURT:  Was there anything else to follow up on

20  with this person?

21         MR. REMAR:  No, Your Honor.

22         MR. BOWERS:  No, Your Honor.

23         THE COURT:  All right.  Thank you very much.

24         PROSPECTIVE JUROR NO. 19 FRANKLIN:  Thank you.

25         (Ms. Franklin leaves the courtroom.)

```
 1              THE COURT:  Let's see if we have to bring 20 in.
 2              Are there any objections for cause to -- well, are
 3    there to which there are no objections to cause between 20
 4    and -- 12 and 19?
 5              MR. BOWERS:  Yes, Your Honor.  We have one,
 6    Juror 16, Ms. Hines.
 7              THE COURT:  Let's just keep that for a second.
 8              MR. BOWERS:  Yes, sir.
 9              THE COURT:  Mr. Remar, do you have any objections
10    for cause in this group?
11              MR. REMAR:  No, Your Honor.
12              THE COURT:  All right.  So that means -- I'm just
13    seeing what I have to do with 16.  Hold on a second.
14              So I have that there are no objections for cause to
15    the following people.  This will just tell me how many more
16    we need.  2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15, or
17    there was an objection to cause that I overruled.
18              So are those the people in the panel so far from
19    which we will strike; is that correct?
20              MR. REMAR:  That's correct, Your Honor.
21              MR. BOWERS:  Yes, Your Honor.
22              THE COURT:  So we have -- we need three more panel
23    members.
24              So let's take up your objection to Juror No. 16.
25              MR. BOWERS:  Your Honor, our objection is based
```

1  upon her answers to the questions about discrimination

2  against whites.

3        I understand what she ultimately said, but her

4  answers were so equivocal that I do not believe that that

5  juror can be fair in evaluating a case involving

6  discrimination against someone other than a minority race.

7  And that's the basis of our objection.

8        THE COURT:  Well, I'll tell you what troubled me

9  was when I asked her what that meant, she said it would have

10 to be blatent -- I think she said blatantly obvious before

11 she could find that a white had been discriminated against,

12 and she talked about the historical context.

13       Now, she ultimately came down when pressed.

14 I frankly think she understood that she might not be able to

15 sit unless she answered the questions the way that she did,

16 which is why I simply asked her what she meant by that.

17       And I have never had anybody answer a question like

18 this where they said that before they could find anybody was

19 discriminated against, that the discrimination had to be

20 compelling and in her case blatantly obvious.

21       MR. REMAR:  May I be heard, Your Honor?

22       THE COURT:  You may.

23       MR. REMAR:  If the standard is to be applied as the

24 Court has applied it, and if the question in the

25 questionnaire is not in and of itself sufficient, Ms. Hines

1   made it clear that when she understood what the burden of

2   proof was and what the Court would instruct, that she could

3   be fair.  And in fact, she specifically said that it would be

4   based upon the balance of the evidence and whether one

5   outweighed the other.

6          And I think that if -- that the standard to be

7   applied here is that she committed that she could be fair and

8   impartial and follow the Court's instructions, which is what

9   Your Honor has asked the other jurors.

10          And we believe that there is no basis for cause

11   given her answers.

12          THE COURT:  Well, that's not the standard, of

13   course, in the circuit.  The standard in the circuit is, as I

14   have stated already in applying it to another in which

15   I think I sustained your objection, was that I have to be

16   satisfied that the juror can lay aside their opinions and

17   render a verdict based on the evidence presented in court and

18   determine whether they have such fixed opinions that they

19   could not judge impartially the evidence.

20          And I have been doing this long enough to know

21   I never had anybody state in a case like this in a pretty

22   direct question saying, you know, what would you need to show

23   and have somebody make a -- present a higher standard when

24   they are asked the question a second time.  It went from

25   compelling to blatantly obvious.

1        I'm going to grant the challenge for cause.  Based

2    upon the manner in which she answered questions, I believe

3    that she was answering in a way such that she diminished her

4    true feelings in the case, which I think by the manner in

5    which she was asked the first two questions, that she began

6    with a very high standard, and that that is embedded in her

7    life experience.  She told us that, about the history of

8    discrimination in the country.

9        And that I don't believe that she can set that

10   aside, despite the manner in which she ultimately expressed

11   her opinion.

12       All right.  17, is there any for-cause objection to

13   17?

14           MR. BOWERS:  No, Your Honor.

15           MR. REMAR:  No, Your Honor.

16           THE COURT:  18?

17           MR. REMAR:  No, Your Honor, not from the defendant,

18   Your Honor.

19           MR. BOWERS:  No, Your Honor.

20           THE COURT:  19?

21           MR. BOWERS:  None from us, Your Honor.

22           MR. REMAR:  No, Your Honor.

23           THE COURT:  All right.  That seems to me then to

24   give us the twelve from which the principal jury will be

25   struck, and then four from which the alternates will be

 1    struck.

 2            So by my calculation, the jury will be struck from

 3    the following members of the panel:  2, 3, 4, 6, 7, 8, 9, 10,

 4    11, 12, 13, and 14.

 5            Do the parties agree?

 6            MR. REMAR:  Yes, Your Honor.

 7            MR. BOWERS:  Yes.

 8            THE COURT:  And then the alternates will be struck

 9    from Panel Members 15, 17, 18 and 19.

10            Does everybody agree that those are the four panel

11    members from which the alternates will be struck?

12            MR. BOWERS:  Agreed, Your Honor.

13            MR. REMAR:  Yes, Your Honor.

14            THE COURT:  Do you want a few minutes for a break

15    and then to decide how you want to exercise peremptory

16    challenges?

17            MR. WILSON:  I would request it, Your Honor.

18            MR. BOWERS:  Please.

19            MR. REMAR:  Yes, Your Honor.

20            THE COURT:  How long do you think?  If we came back

21    at quarter after, would that be enough?

22            MR. BOWERS:  It's enough for us, Judge.

23            MR. REMAR:  That's fine, Your Honor.

24            THE COURT:  All right.  We will be in recess until

25    quarter after.

```
 1              Would you please tell the jurors, the people that
 2   are sitting in the courtroom, that we have a 20-minute break,
 3   and the next time we bring them in, we will be able to tell
 4   them who is going to serve on the jury.
 5              THE COURT SECURITY OFFICER:  Very well.
 6              THE COURT:  Thank you.
 7              (A recess is taken at 2:57 p.m.)
 8                             --  --  --
 9              (In open court without prospective jurors present
10   at 3:23 p.m.:)
11              THE COURT:  All right.  Anything we need to bring
12   up?
13              MR. REMAR:  No, Your Honor.
14              MR. BOWERS:  No.
15              THE COURT:  Before I forget, we would like for you
16   to deliver to Jessica your copies of the questionnaires so
17   that we -- since there is a lot of private information in it,
18   so that we can have custody of those when we are done with
19   this process.
20              Just a couple of other housekeeping things before
21   we do peremptory challenges.  In looking over the law over
22   the lunch hour about Mr. Moody's testimony, I have one
23   question about whether or not I give a limiting instruction.
24   But that depends upon how the evidence comes in and under
25   what rule.
```

1          So it would help me that before he testifies, I

2   would like to get a proffer from him so I could make that

3   determination.

4          All right.  We will begin the peremptory

5   challenges.

6          Remember that for this first round, you will be

7   challenging only through Panel Member 14.  The panel members

8   after that are reserved for determining who the alternates

9   are.

10          So we will begin with peremptory challenges.

11   Jessica, would you give the chart to Mr. Bowers?

12          (Selections are made.)

13          THE COURT:  I have as the jurors in the case

14   Juror No. 4, Juror No. 7, Juror No. 8, Juror No. 10, Juror

15   No. 11, and Juror No. 12.

16          Does that comport with your records?

17          MR. BOWERS:  Yes, Your Honor.

18          MR. REMAR:  Yes, Your Honor.

19          THE COURT:  All right.  Are there any challenges

20   to -- well, first, is there any objection to the manner in

21   which the voir dire was conducted through the course of the

22   exercise of peremptory challenges?

23          MR. BOWERS:  None from the plaintiffs, Your Honor.

24          MR. REMAR:  Your Honor, other than the Court's

25   having denied our motion for cause on that one juror, no.

1          THE COURT:  All right.  And are there any

2     objections to the manner in which these peremptory challenges

3     were exercised by either side?

4          MR. BOWERS:  Not from the plaintiffs, Your Honor.

5          MR. REMAR:  We do, Your Honor.  We challenge the

6     manner on which the peremptory strikes for Jurors No. 9 and

7     13 were struck.

8          These are both -- of the three African-American

9     jurors on the panel, two out of three were struck.  And of

10    those, one of them, juror -- I believe it was

11    Ms. Braithwaite, the only conceivable reason is that her

12    husband works at the landfill in DeKalb County.  No other

13    questions were asked of her.  And --

14         THE COURT:  Well, there were a lot of questions

15    asked of her.  There were about ninety questions asked of

16    her.

17         MR. REMAR:  And Juror No. 13, I think the only -- I

18    can't think of any reason why.  She said she loved

19    DeKalb County, but then indicated that she could be

20    completely fair and impartial.

21         THE COURT:  All right.  There have been, although

22    it's not been said, I understand these are *Batson* challenges

23    and that we follow the *Batson* framework?

24         MR. REMAR:  Yes, Your Honor.  We believe we have

25    made a *prima facie* case, Your Honor.

1          THE COURT:  All right.  Then it's up to the

2    plaintiffs to state what legitimate nondiscriminatory

3    rationale they have for the strike.

4          MR. ANULEWICZ:  Your Honor, with regard to

5    Juror No. 13, she did on her questionnaire list that she

6    did love DeKalb County.  When she came in and was

7    questioned about it, I don't believe she gave an adequate

8    answer as to why that is.  To us that indicated a bias on her

9    part.

10          Moreover, during the initial questioning in this

11   case, the juror was in the back and she was sleeping, at

12   least according to our eyes, and we don't think that she

13   could be attentive.

14          We think her level of education for the case isn't

15   sufficient for her to understand the complexities of this

16   case.

17          For those three reasons, we struck her.

18          THE COURT:  All right.  I find that all of those

19   reasons are legitimate reasons, including the reason that she

20   was not attentive during the course of the voir dire.

21          Therefore I find that under the facts and

22   circumstances, that they have shown a legitimate

23   nondiscriminatory rationale for the challenge, and that

24   challenge is overruled.

25          Next is as to Juror No. 13.

```
 1              MR. ANULEWICZ:  Juror No. 9, Judge?

 2              THE COURT:  9, I'm sorry.

 3              MR. ANULEWICZ:  Juror No. 9, our reason for

 4    striking her is that her husband is an employee of

 5    DeKalb County, and, Judge, we find that is compelling, no

 6    matter where he works in DeKalb County.

 7              This case is about folks in DeKalb County, all

 8    different levels, and the impact of their employment in

 9    coming forward and doing things.  We think that's going to be

10    be on her mind as she's on this jury.  And for that reason we

11    struck her.

12              THE COURT:  And I find that also to be a legitimate

13    nondiscriminatory rationale for the strike, and the challenge

14    is overruled.

15              Now, then, let's do peremptory challenges for the

16    alternates, and those will be from Jurors 15, 17, 18 and 19.

17              MR. ANULEWICZ:  Judge, we don't have any

18    strikes.  Do we have to exercise one?

19              THE COURT:  We want two alternates, so you each get

20    one peremptory challenge.

21              MR. ANULEWICZ:  And we choose not to exercise one.

22              THE COURT:  All right.

23              MR. REMAR:  Your Honor, just so I'm clear on where

24    we are now, would that mean then the jurors -- the next --

25    they would be seated in order?
```

```
 1              THE COURT:  No.  There is only going to be two

 2    alternates.  I would just -- the two lowest juror numbers

 3    would be the two alternates.

 4              MR. REMAR:  I see.  So if 18 and 19 are struck,

 5    then it would be 15 and 17?

 6              THE COURT:  Yes, but you only get one challenge.

 7              MR. REMAR:  I know.  Thank you, Your Honor.

 8              (The selection is made.)

 9              THE COURT:  So the two alternates will be Juror 15

10    and Juror 17.

11              Is there any disagreement on that?

12              MR. ANULEWICZ:  No, Judge.

13              MR. REMAR:  No, Your Honor.

14              THE COURT:  Are there any challenges -- I guess you

15    can't challenge peremptory challenges exercised by the

16    plaintiffs since they had none.

17              Are there any objections to the peremptory

18    challenge made by the defendants?

19              MR. ANULEWICZ:  No, Judge.

20              THE COURT:  All right.  Then that gives us the jury

21    and the alternates.

22              What we will do is here in a second bring them in,

23    I will explain to them that we have conducted the remainder

24    of the voir dire and also have done the -- selected the

25    jury.  I will have them called up and seat them in the jury
```

1    box.

2              And then as soon as they are seated, I intend to

3    swear them in, give them their preliminary instructions,

4    after which I will ask the plaintiff to make their opening

5    statement and then ask the defendant to make their opening

6    statement.  And then we will begin with presentation of

7    evidence.

8              Any question about the process?

9              MR. BOWERS:  None, Your Honor.

10             MR. REMAR:  No, Your Honor.

11             THE COURT:  All right.  So now let me get all the

12   people that are in the press, if they would please go back to

13   their assigned seats, which is --

14             THE CLERK:  The very first row.

15             THE COURT:  This is the only time I get to tell the

16   press what to do, so -- thank you for cooperating.  We just

17   need all those seats to bring the panel members back in.

18             All right.  Would you bring the panel members back

19   in, please?  And they don't have to sit in the same seats

20   they had before.  They just need to sit in the gallery.

21             (In open court with the prospective jurors

22   present:)

23             THE COURT:  Ladies and gentlemen, thank you for

24   being patient with me.

25             I told you that through this process that I would

1   do my best to use your time efficiently so that we were

2   moving the case along and the process along without unduly

3   requiring you to sit around and watch the process.  To the

4   extent that we could, I wanted to make sure that you had some

5   freedom as we went through this fairly long process of

6   selecting a jury.  But we have selected a jury.

7          Before we call those that will serve as the jurors

8   and alternates in the case, I want you to know that I have

9   listened very carefully especially to all of your personal

10  circumstances.

11         One of my responsibilities as a matter of fairness

12  is to make sure that I make decisions on those requests that

13  are offered to me about being relieved, and I have to do that

14  in a way that I think has integrity, at the same time

15  protects the rights of both of the parties to make sure that

16  they have a true cross-section of the community to decide the

17  issues in this case.

18         And so I trust that you will accept what I'm

19  telling you, that we have and that I have personally tried my

20  best to go through the process in a way that's fair to

21  everybody, including fair to you personally.

22         And with that, I am going to have Jessica Birnbaum

23  who will call those that will sit as the jurors in this

24  case.

25         When your name is called, would you please come and

1    take a place in the jury box.

2              THE CLERK:  Shelly Goble?

3              Corey Deal?

4              Alec Durham?

5              Elton Sims?

6              Michael Ostrowski?

7              James McCord?

8              David Allen?

9              And Carolyn Turner?

10             THE COURT:  It's probably best to have four in each

11   row starting with this first chair here, so if you will move

12   down a bit.

13             All right.  Mr. Morgan, is this your jury?

14             MR. J. THOMAS MORGAN:  Yes, Your Honor.

15             THE COURT:  Mr. Bowers, is this your jury too?

16             MR. BOWERS:  Yes, Your Honor.

17             THE COURT:  Mr. Remar, is this your jury?

18             MR. REMAR:  It is, Your Honor.

19             THE COURT:  Ladies and gentlemen, you are now the

20   jury in the case.  The function that you have now is

21   different than the function that you had before.

22             And I guess just out of an abundance of caution,

23   Mr. Wilson, is this your jury?

24             MR. WILSON:  Yes, Your Honor.  Thank you.

25             THE COURT:  You took an oath to begin with, and

    1    that was an oath that you took to tell the truth during the
    2    course of voir dire.
    3            Your function now is different.  And because it's
    4    different, we administer a different oath to you because your
    5    duties are different than they were in just answering
    6    voir dire questions.
    7            So what I would like to do now is swear you in as
    8    the jury in this case and have you take the oath that you
    9    will have to take in order to be the jurors in this case.
   10            And so if you would all please raise your right
   11    hand, and after I give the oath, I would ask for each of you
   12    to say I will.
   13            Will you well and truly try the issues joined
   14    between Kristy Bryant Yule as the administrator of the estate
   15    of Michael Bryant, John Drake, Becky Kelley and Herb Lowe,
   16    plaintiffs, versus Vernon Jones, Marilyn Boyd Drew,
   17    Morris Williams and Richard Stogner, and DeKalb County,
   18    defendants, and render a true verdict according to the law
   19    and the evidence, so help you God?
   20            If you will do that, say I will.
   21            (The oath is taken by the jury.)
   22            THE COURT:  You have now been sworn as the jury in
   23    the case, and by your verdict you will decide the disputed
   24    issues of fact.
   25            As I told you during voir dire, it's my

1   responsibility to decide all questions of law and procedure

2   that arise during the course of the trial, and before you

3   retire or go back to the jury room at the end of the trial to

4   deliberate or discuss your verdict and decide the case, I

5   will instruct you -- that is, I will explain to you the rules

6   of law that you must apply and follow in making your

7   decision.

8           The evidence presented to you during the trial will

9   primarily consist of the testimony of witnesses, and tangible

10  things including papers and documents.  We call them

11  exhibits, and you will see those referred to as exhibits

12  throughout the trial.

13          You have to pay close attention to the testimony,

14  because it will be necessary for you to rely upon your

15  memories concerning the testimony that is offered by those

16  people, those witnesses that testify at trial.

17          Although you can see that Nick Marrone here, who is

18  our court reporter, is -- you have seen enough TV to know

19  that he is typing on something and making a verbatim

20  transcript of everything that is said during the course of

21  the proceedings.  That will be available at some time

22  later.  It will not be available to you during the course of

23  your deliberations because it's not possible to do that.

24          So don't expect to receive the transcript of the

25  testimony and what's gone on here, because it won't be

1  available.  You will have to rely upon your memories.  Of

2  course, there are multiple memories, and that's an aid to

3  you.

4          Now, while the transcripts won't be available, all

5  the exhibits that are admitted into evidence will be

6  available for your use during your deliberations.

7          So if something is admitted into evidence but you

8  haven't fully examined it or read it if it's a document -- in

9  fact, in a document sometimes the focus will be on just a

10  portion of the document, and that might even be shown to you

11  on the screens in front of you.

12          And sometimes you will see that and you will say,

13  I really wish I had the context for that rather than just

14  hearing about that portion which is being brought to my

15  attention.  Don't worry about that, because the context will

16  be made available to you.  Because the document containing

17  the portion that was talked about in the trial will be with

18  you, and you can use that document to the extent that you

19  find it necessary to understand the evidence.

20          You will see that I have given you a pad and a

21  pencil.  That's because I allow you to take notes during the

22  trial.

23          And it's totally up to you whether or not you want

24  to take notes.  People learn and assimilate information in

25  different ways.

1           There are some people that tend to remember things,

2   as I do, if I take notes.  That helps me.  There are other

3   people that don't take notes because the taking of notes

4   impacts their ability to hear and assimilate information.

5   Everybody is different.

6           Just because I have given you a pad and a pencil

7   doesn't mean that you are required to take notes.  It depends

8   upon how it is that you can best understand and remember the

9   evidence that is presented.

10          But remember, whatever notes you have are only an

11  aid to your memory.  And if later you find that your memory

12  differs from your notes, you should rely upon your memory and

13  not your notes.

14          And notes taken by other people don't have any

15  undue weight.  It's your own individual recollection that may

16  be aided by your notes that is important in the case and what

17  you should use during your deliberations.

18          During the trial you should keep an open mind and

19  avoid reaching any hasty impressions or conclusions.  Reserve

20  your judgment until you have heard all of the testimony and

21  the evidence and the closing arguments -- which we sometimes

22  call summations -- of the lawyers, and then finally my

23  instructions on the law that I will give to you as I explain

24  the law to you as it applies at the end of the trial.

25          Because of your obligation to keep an open mind

1    during the trial, coupled with your responsibility to

2    decide the case only on the basis of the testimony and the

3    evidence that's presented, you must not discuss this case

4    amongst yourselves or with anybody else while the trial is

5    ongoing.

6            The rule that I have given to people who are jurors

7    in this courtroom is you each likely will go home to people

8    that you care a lot about as you leave the trial day.  They

9    are going to be immensely interested in what you have been

10   doing with your day, and they will probably be interested in

11   what you saw and what you heard.

12           Whenever you have engaged somebody and begin

13   explaining what happened, explaining the evidence, it often

14   leads to a discussion about it, and that in a way is a

15   deliberation.  You are getting other people's impressions of

16   evidence, even if they are people that you care deeply

17   about.  And you can't do that.

18           And my strong suggestion, if not an instruction to

19   you, is until this trial is over, do not discuss, explain the

20   evidence that was presented, or engage anybody, even those

21   closest to you, about the case or what the evidence has been,

22   their impressions of these kinds of cases.

23           And if somebody were to try to do that to you, you

24   should tell them not to.  Because you have taken this oath,

25   it's your responsibility after all the evidence is in and

1    only after you get my instructions on the law can you, those

2    of you that are the jurors deliberating, the only discussion

3    you would have about the evidence and the laws that applies

4    to that evidence is exclusively amongst you and nobody

5    else.

6            If somebody tries to approach you and to discuss

7    the case with you, do not let them do that.  And I want you

8    to report that to me immediately.

9            There is probably going to be press coverage of

10   this case.  When you go home, somebody may be watching a

11   broadcast of the news, there might be information that's

12   delivered to your house in the form of a newspaper.  You may

13   not read the newspaper accounts and you may not read or hear

14   the press accounts.

15           That I think you would understand would follow from

16   the fact that the only thing that you can consider is what

17   happens in this courtroom, whether it's evidence or

18   testimony, and not some reporter's interpretation or account

19   of what happened.

20           Because often they don't even see everything that

21   happens here.  And that's your responsibility, it's not

22   theirs, and you need not listen to their reports or not to

23   read their reports.

24           We are in a very electronic age, and a lot of

25   the news and a lot of the discussions, sometimes it's in

1    news websites, sometimes it's in blogs, sometimes it's in

2    e-mail communications.  Anything having to do with this case

3    you may not read and you may not hear and you may not listen

4    to and you may not consider.

5            So I caution you that anything that's on the

6    internet about this case or the evidence in the case or these

7    kinds of cases you may not review and you may not listen to

8    and you may not consider while the case is ongoing.

9            To the extent that there is any discussion about

10   places, you may not visit them.  Why?  Because the only

11   evidence that you are allowed to consider is the evidence

12   presented here in court.

13           So no private research, no private excursions,

14   because that would be a violation of your responsibility and

15   a violation of the oath that you have taken to consider only

16   the evidence that is presented in the case.

17           Now, from time to time I may be called upon to make

18   rulings.  I told you it's my responsibility to determine the

19   law.  It's also my responsibility to determine procedure.

20           One of the procedures is when somebody introduces

21   something into evidence, I have to make a legal determination

22   whether or not in a federal court in a case of this kind it

23   is permitted to be introduced, because I have to make sure

24   that you only consider evidence that is admissible.

25           I have had a long discussion with the lawyers for

```
 1   the plaintiffs and for the defendants, and they are good
 2   lawyers, they know their case well, and that if something is
 3   going to come up -- and they often know that; in fact, most
 4   of the time they know that -- I said our obligation right now
 5   is to you.
 6           When you are here, it's our responsibility to make
 7   sure that we use your citizen participation in a way that
 8   maximizes and makes it most convenient for you, and also
 9   makes the presentation of evidence to you as coherent and
10   continuous as possible.
11           That means when you are here, you ought to be
12   listening to evidence.  I have told them that, and I have
13   told them that it's our responsibility, if something is going
14   to come up that they need a ruling from me, that it's not
15   only their responsibility, but it's my personal
16   responsibility to be available to listen to those on our
17   time, and not on your time.
18           Whether we have to do that before you get here or
19   after you leave or during a break, that our goal is to use
20   your time to maximum efficiency, which means when you are
21   here, you are listening to evidence.
22           This is not a perfect world, and this is a very
23   dynamic process for the reason that it involves human
24   events.  And so there are things that may occur that we can't
25   predict, that the lawyers can't predict or anticipate, and it
```

1   may from time to time be necessary for me to consider

2   something that somebody believes can be admitted, for me to

3   make a ruling on that, so that I know that if it is admitted,

4   that I am comfortable that the law allows it to be admitted,

5   or if it is not, that I'm comfortable that it is not to be

6   admitted.

7          We lose the whole ability for me to do that and we

8   lose the impact if I decide that something is not admissible

9   if we have that full discussion with you here.

10          So there may be -- although we are going to try to

11  keep it down, all of us are going to try to keep it down to a

12  minimum, there may be an occasion when I have to have a

13  private discussion with the lawyers so I can get the

14  information I need to make a ruling.

15          Sometimes we will ask you to go back into the jury

16  room to do that.  Sometimes I will ask them to come up and do

17  it here privately in front of me.  We have a sound system

18  that will create what we call white noise.  I don't know why

19  we call it that, except it's noise that you can hear, but it

20  will allow you not to hear what we discuss.

21          But if we have to do that, understand that I have

22  made a decision that I need more input so that I can do my

23  job the way I'm supposed to be able to do it in applying the

24  rules.

25          If there is an objection made that leads to that,

1    that leads to a private discussion with us, whatever I do

2    with that objection, whether I say it's sustained, meaning

3    that the objection is one that I agree with, or it's

4    overruled, meaning it's an objection I don't agree with,

5    please do not read anything into that.  I'm simply making a

6    determination that something is or is not allowed to be

7    permitted.

8         Don't guess or speculate what it might have been if

9    it came in.  Simply accept only and consider only the

10   evidence that's presented during the course of the trial.

11        Here is the order of the trial.

12        In a couple moments, the lawyers for each of the

13   parties will be allowed to give you what we call opening

14   statements.  That's their chance to give you a preview of the

15   evidence that they expect to be presented during the trial by

16   each of the parties.  After they -- and the first person to

17   do that would be the plaintiffs.

18        After the plaintiffs and the defendants make their

19   statements, then the plaintiffs then present evidence.  And

20   we call when they present evidence on their side initially in

21   trying to prove their claims, we call that their case in

22   chief.

23        What they will do is they will present the evidence

24   that they want to present in their case in chief, and then

25   they will do what you have seen on TV is that they will rest,

which means they are done presenting their case in chief.

       After that, their case in chief is done, then the defendants have a chance to present evidence in what we call their case in chief.

       And then if there is evidence that is presented during the defendants' case in chief and I decide that there are matters that came up that would make sense to allow the plaintiffs to respond to things that might not have been in their case in chief, I will allow what we call rebuttal, which is responsive evidence to what was presented in the defendants' case in chief.

       I don't know if I will do that in this case or whether the parties will even want to do that.  But it will be evidence I think would be admissible on the claims and the contentions of the parties in this case.

       After the evidence is all in and then all parties have rested -- that is, that they are done presenting evidence to you -- they will make what we call closing arguments or closing summations, which is their chance to discuss for you the evidence that is before you in the context and the perspective of their clients.  It might suggest how you might view the evidence, and both parties have the chance to do that.

       And then when that is done and when the arguments are finally over, it's still not yet time for you to

1    deliberate, because you can't consider the evidence until

2    I tell you what law applies.  And so before you go into your

3    deliberations, I will charge you or, that is, explain to you

4    what the law is.

5         And then and only then can you begin your

6    deliberations, knowing that now throughout the trial you have

7    considered and heard only the evidence that's presented in

8    the case and now you have the law to apply to that evidence,

9    and then it's time to have your discussions.

10        The arguments that you are about to hear, or their

11   opening statements as we sometimes call them, are

12   presentations to you by the lawyers.  The evidence doesn't

13   begin until the witnesses begin testifying.

14        So whatever the lawyers say is not evidence.  It's

15   simply an aid to allow you to understand the evidence that

16   will be presented.

17        So with that background and those preliminary

18   instructions, we begin the case.

19        And, Mr. Bowers, you may make your opening

20   statement.

21        And I know that you in the back would love to sit

22   around, even though you have no responsibility in the case,

23   but it is now my time -- of course, it's a public

24   proceeding.  If you want, you may watch.

25        But otherwise, I will excuse you.  You should go

 1    back to the jury assembly area for further instructions.  And

 2    I want to thank you on behalf of the court and on behalf of

 3    your community for your participation in the process.

 4              (The prospective jurors not selected leave the

 5    courtroom.)

 6              THE COURT:  Now that everybody is settled,

 7    Mr. Bowers, you can begin.

 8              MR. BOWERS:  Thank you, Your Honor.

 9              Ladies and gentlemen, my name is Mike Bowers.

10    Along with Chris Anulewicz, J. Tom Morgan, Jim Hollis, the

11    young man sitting on the front row, Alex Khoury, we represent

12    the four plaintiffs in this case, the four people who have

13    brought this lawsuit.

14              We will show you in the evidence that beginning in

15    the year 2001, the DeKalb County government under the

16    leadership of Vernon Jones embarked on a wholesale program to

17    get rid of white managers and replace them with

18    African-Americans.  That's what this case is about.

19              The evidence will show that Becky Kelley,

20    Mike Bryant, who has passed away, John Drake, were all

21    discriminated against on the basis of their race and suffered

22    a hostile work environment, and in addition Ms. Kelley

23    endured a constructive discharge.

24              Herb Lowe, sitting on the front there in the blue

25    suit, we will also show you that he endured retaliation

1    because he wouldn't go along with this wholesale plan.  He

2    endured retaliation from the defendant Marilyn Drew.

3            Some of the evidence that you will see and hear is

4    very specific as to specific defendants, specific

5    plaintiffs.  Some of it is of a more general nature.  But it

6    will all show you that this plan existed, and the

7    extraordinarily adverse impact it had on the four people

8    sitting on the front row to my right.

9            The first thing that you are going to hear is

10   evidence from two gentlemen by the name of Joe Stone and

11   Morris Williams.  Morris Williams is a defendant.  Joe Stone

12   is the current and former Director of Human Relations for

13   DeKalb County.  Morris Williams is the former and current

14   Assistant County Administrator.

15           You will hear testimony from them concerning this

16   wholesale plan, and there is not going to be one iota of

17   doubt about the nature of it because it's on tape.

18           You will hear a tape, it lasts three or four

19   minutes, and it is going to lay the plan out in some detail

20   as it relates to the Fire Department.

21           Now, this case and the four people involved here

22   were in the Recreation and Parks Department, but this is an

23   overall scheme throughout county government, and the Fire

24   Department is the subject of this tape.

25           And I want to warn you, I apologize for the

1    language on the tape.  I won't tell you I have never used

2    some of the language, but it's not language I want my

3    grandchildren to hear, and I apologize in advance.  It's

4    pretty rough.  But it shows what these defendants over here

5    really thought about how hiring and promotions and race

6    should be dealt with in DeKalb County.

7          You are next going to hear from a lady named

8    Faye McCommon.  You will hear from her on cross-examination

9    also, as you will with Mr. Stone and Mr. Morris Williams.

10   Ms. Faye McCommon is a county administrator in the Human

11   Relations Department.  She runs the information technology, a

12   computer person.

13         And she's going to show you through her testimony

14   statistical evidence that establishes pretty conclusively

15   that the scheme to replace white managers with

16   African-Americans from '01 to '05 worked.  And there is not

17   much doubt about it.  The numbers say what they say.

18         You are also going to hear from a very

19   distinguished gentleman by the name of Eddie Moody.

20   Mr. Eddie Moody is a former police chief in DeKalb County,

21   and he's going to tell you about the defendant Vernon Jones'

22   reaction to Mr. Moody's having promoted two white people to

23   be assistant police chiefs.

24         The next evidence you are going to hear is from one

25   of my clients, Becky Kelley, sitting right over there in the

1    front row.

2         Becky Kelley is a 26-year veteran of the

3    DeKalb County Department of Parks and Recreation.  She worked

4    there from the time she got out of the University of Georgia

5    until 2002 when she got run off.  The last ten years she

6    spent as the director of that department.  She is currently

7    the director of all the state parks.  After she left DeKalb,

8    she landed a job with the state.

9         The evidence will show you that beginning in early

10   January of 2001, Ms. Kelley observed increasing emphasis by

11   the new Vernon Jones administration on race and personnel and

12   other matters.

13        She will also testify that she observed

14   increasingly a work environment that became increasingly

15   unpleasant and hostile toward her, and saw her duties

16   dramatically diminished and reduced, all because of the color

17   of her skin.

18        When she voiced concerns about this to the

19   defendant over here Mr. Richard Stogner, these are the

20   responses she got.

21        When she went to Mr. Stogner to say, Mr. Jones'

22   chief of staff, Pamela Holmes, there is something wrong

23   there.  Mr. Stogner said, Well, Pam, Ms. Holmes was too

24   biased against white people.

25        On another occasion when Ms. Kelley went to

1    Mr. Stogner to ask, What's going on, what do I need to do to

2    fit in and be productive here?  This is what she was told,

3    and the evidence will be clear about it:  You don't

4    understand the geopolitical issues in DeKalb County, and you

5    don't understand how to deal with powerful black men.

6            On a third occasion she went, and she was told by

7    Mr. Stogner, You are just out of touch, you are not director

8    material.  You need to showcase black employees and showcase

9    black parks.

10           Ms. Kelley's replacement, defendant Marilyn Drew,

11   seated over here, was hired in the spring of '01.  She's an

12   African-American.

13           As soon as she came on board as the deputy director

14   to Ms. Kelley, Ms. Kelley noticed, I'm getting bypassed.  The

15   people from the front office were coming to her and not even

16   telling me what's going on.

17           Ms. Drew, the evidence will show you beyond doubt,

18   is less qualified, less experienced, but she replaced

19   Ms. Kelley, and Ms. Kelley was demoted to a program called

20   Greenspace.

21           She went from having a job where she supervised

22   three hundred full-time employees, three hundred part-time

23   employees, a budget between 18 and 20 million dollars, to

24   coloring maps.  And if that wasn't bad enough, Ms. Drew tried

25   to put her in what was essentially a closet for an office,

1    all because of the color of her skin.

2          It ended her career with DeKalb County.  She will

3    tell you, she loved DeKalb County.  She went to high school

4    there.  It ended her career.  She was degraded, humiliated,

5    belittled.  Her heart was broken.

6          Next you will hear from Mike Bryant, and

7    unfortunately you will hear from Mike Bryant via

8    videotape.  Mr. Bryant passed away on the 10th day of

9    February of this year.  His adopted daughter is sitting

10   there, Kristy Yule.  She's the acting administrator, and she

11   is appearing here on Mike's behalf.

12         When Ms. Drew became the Director of the Department

13   of Parks and Recreation, Mike Bryant was working there.  He

14   couldn't even get Ms. Drew to do a performance review on him

15   which was necessary to get just an automatic upgrade in pay.

16   And when she got questioned about it, she said, Well, I found

17   his and other performance reviews under my credenza.  But she

18   did them for African-Americans.

19         Ms. Drew stripped Mike Bryant of his duties, which

20   went to an African-American, Detrick Stanford.  She

21   continually belittled him.

22         He had an operation on his neck.  He asked to be

23   allowed to come back on light duty.  She refused him.  She

24   allowed African-Americans to do that.

25         He filed an EEO complaint against her.  No result,

no word whatsoever for eighteen months until after this

lawsuit got filed six years ago.

She did two reprimands on him within a two-day

period, and he had never had a reprimand before in his

career.

Was he a perfect employee?  No.  None of these

folks are perfect.  But he had never had a reprimand, and had

two the evidence will show in two days.

They moved him -- Ms. Drew moved him to the

Tucker Recreation Center from the main office of the

Department of Parks and Recreation to a job he wasn't

qualified for, to a job which when she had it was in the main

office.  But they sent Mike out to the Tucker Rec Center as

humiliation.

When Mike Bryant asked to be allowed to use comp

time for that neck operation I mentioned just a minute ago,

he was denied.  Ms. Drew allowed African-Americans to do so,

and even allowed it for herself, but not for ol'

Mike Bryant.

Ms. Yule is going to testify live after

Mike Bryant's video about the devastation which he endured

because of the actions of these defendants.

You are next going to hear from Mr. John Drake,

seated right over here.  Mr. Drake is a 32-year career

employee of DeKalb County, retired in '07.  He rose from an

1  entry-level manager all the way up to the Deputy Director of

2  Purchasing and Contracting for DeKalb County.

3          But when Marilyn Drew was brought in to replace

4  Becky Kelley, guess what?  John Drake got moved.  He got put

5  in as acting assistant director of Parks and Recreation for

6  the express purpose of propping Ms. Drew up.  There was no

7  other purpose in that but to prop up Ms. Drew.  He, like

8  Mike Bryant, was stripped of his duties, career crushed,

9  devastated, humiliated, belittled.

10         You are also going to hear from Mr. Herb Lowe.

11 Mr. Herb Lowe is an African-American, sitting there in that

12 front row.

13         The evidence will show that he has been for about

14 twenty years an acquaintance of Vernon Jones.  He was brought

15 into the DeKalb County Department of Recreation -- Parks and

16 Recreation in '02 as the Deputy Director of Strategic

17 Management and Development.

18         And very shortly after he came there, as Mr. Lowe

19 will testify to you, he was told what his job really was, to

20 help get rid of white folks, to get dirt on white people so

21 they could be run off.

22         How were they to be run off?  Well, the purpose

23 was, as Mr. Lowe will testify, to make DeKalb County a darker

24 administration, and do it through reorganizations,

25 intimidation, double filling of slots which happened with

1   Mr. Lowe, create a negative work environment so people just

2   would not stay.

3          And Mr. Lowe had the courage to say no, the power

4   of one voice to say no, I'm not doing that.  And then he got

5   retaliated against.

6          In the spring of '03, after he refused to go along

7   with this plan to get rid of white people, replace them with

8   African-Americans, he was moved from the second floor of the

9   admin building where Parks and Recreation was up to the sixth

10  floor so Vernon Jones could keep an eye on him.

11         He was told by Vernon Jones, You are not a team

12  player.  You are not a team player.  Then his job was double

13  filled, and Marvin Billups was brought in.

14         Mr. Jones recommended the abolition of Herb Lowe's

15  job, and in the 2002 budget the only job removed from the

16  Department of Parks and Recreation was, guess whose,

17  Herb Lowe's, the nonteam player.

18         The conduct of the defendants cost Mr. Lowe his

19  job.  It's destroyed his personal life.

20         You are also going to hear in our case in chief

21  from Mr. Jones himself, the architect of this plan.  You are

22  going to hear how he was focused on removing whites and

23  installing African-Americans.

24         And you are also going to hear his view of this

25  tape, which I respectfully submit is going to shock you.  And

1   his statement was, will be:  I have no opinion at all.  He

2   did no investigation, he did no inquiry, no discipline, no

3   counseling of the people who engaged in the conduct reflected

4   on the tape that you will hear.  Nothing.

5         He hand-picked Joe Stone, his Human Relations

6   Director, who is on this tape, Morris Williams, Assistant

7   County Administrator, Richard Stogner, Marilyn Williams.

8         You will hear from Mr. Stogner, and the thing about

9   Mr. Stogner that is most significant is how he handled the

10  bringing on as a director Marilyn Drew.

11        He did no review of her qualifications, he did not

12  look at her resume', he did not check her references, he did

13  not call her previous employer in Memphis.  He did not call

14  anyone at the previous employer.  He didn't even check with

15  Becky Kelley with whom she had been working and under whose

16  supervision she had been working.

17        And he hired John Drake to prop Ms. Drew up, and

18  the evidence will show you that Ms. Drew was terminated in

19  2009 for incompetence.

20        In conclusion of this opening, I respectfully

21  submit that you will get evidence that is virtually

22  undisputed on several items.

23        The tape, you can't change the tape.  The tape is

24  what it is, and it shows a plan of discrimination

25  county-wide.

```
 1            You are going to hear Becky Kelley talk about
 2   Richard Stogner's comments to her about not relating to the
 3   powerful black men and the like.
 4            There is no question Marilyn Drew got hired by
 5   Richard Stogner to replace Becky Kelley.  No review of any
 6   kind, none.
 7            There is no question John Drake got moved,
 8   according to Mr. Stogner, to buttress, which I believe is
 9   bureaucratic language for prop up.
10            And there is no question Mike Bryant and John Drake
11   had their duties stripped.
12            And there is no question that Vernon Jones and
13   Richard Stogner didn't lift a finger once they learned in
14   2006 of the tape that you will hear most likely tomorrow.
15            Becky Kelley, Mike Bryant and John Drake have been
16   humiliated, degraded, put down, and devastated.  Herb Lowe
17   has been retaliated against.  And that's the story you will
18   hear.
19            Thank you.
20            THE COURT:  Thank you, Mr. Bowers.
21            Mr. Remar?
22            MR. REMAR:  Yes, Your Honor.  May we have a second
23   to set this laptop up?
24            Ladies and gentlemen, we wouldn't be here today if
25   my clients didn't categorically and unequivocally deny the
```

1    allegations of racial discrimination that you have just

2    heard.

3              And it is your job, ladies and gentlemen, to find

4    the facts and the truth, and we believe the evidence at the

5    end of this case will be that there was no discrimination on

6    the basis of race, no scheme, and no harm that affected any

7    of those people.

8              Let me introduce myself again, ladies and

9    gentlemen.  My name is Robert Remar, my associate

10   Kerri Gildow, and we have our trusty IT man,

11   Bryan Devine.  We are from the law firm of Rogers & Hardin,

12   and we represent Richard Stogner, Morris Williams and

13   Marilyn Drew.  And my colleagues Brent Wilson and

14   Dwight Thomas represent Vernon Jones.

15             Now, let me introduce two of the people that

16   Mr. Bowers claims are racists.  And that's what he is

17   claiming, that they engaged in a scheme to discriminate

18   against white people.  I want you to know who the people

19   are who he's making the allegations against and the people

20   that he's asking pay these people money out of their own

21   pocket.

22             Now, first, Richard, would you get up and let me

23   introduce you to the jury?

24             Richard Stogner was the Executive Assistant in

25   DeKalb County.  He was appointed by Mr. Jones and he was

confirmed by the County Board of Commissioners, and he

served in that position from January 2001 until December

2008.  He acted as the chief operating officer for the

county.

Mr. Stogner has 40 years of government service.  He

served under three mayors of Atlanta, Sam Massell,

Maynard Jackson and Andrew Young.  He was at one time the

chief operating officer for the City off Atlanta.  He was the

deputy chief financial officer for the Atlanta Committee for

the Olympic Games.

He has a long and distinguished career, and there

is no motive, no reason why Mr. Stogner would jeopardize his

integrity and his background to engage in some type of racial

scheme.

I want to tell you one thing, and I don't want to

embarrass Richard, but he has a tendency sometimes to close

his eyes when he's answering questions.  So if he does that

on the witness stand, it's not because he's being rude.  It's

just -- it's a habit he has.

Richard, thank you.

Let me now introduce you to Morris Williams.

Morris was the Assistant County Administrator for

DeKalb County.  He was hired by Vernon Jones' predecessor,

Liane Levetan, and Mr. Jones retained him as County

Administrator.  And as County Administrator he's in a

supervisory position over numerous county departments, one of
which is Parks and Recreation.

Morris has a long career in public service.  He
worked for the City of Macon.  He worked for the City of
Albany.  He even has a Master's degree in Public
Administration.

Morris Williams would never jeopardize his career
or reputation to engage in such a scheme.

And I will tell you when we hear the evidence,
Mr. Lowe, who is really the only one who can testify that
there was some scheme, he says that the very first time he
met Morris Williams, he said he was hired to dig up dirt on
white people.  He said this to a total stranger.

I will talk a little more about Mr. Lowe as we go
along, ladies and gentlemen.

Marilyn Drew, who you heard engaged in all kinds of
horrible conduct.  Ms. Drew was hired by Becky Kelley.  She
was hired as the Deputy Director of the Department of
Parks and Recreation.

She moved from Memphis, Tennessee, to Georgia to
take that job, and she served in that capacity until she was
appointed by Mr. Stogner and Mr. Jones as director of that
department in 2002.

And the reason they didn't need to check her
references?  She had been there for a year already and had

1    been performing in that department.

2         Marilyn has devoted her entire career to the area

3    of parks and recreation.  She herself has a Master's degree

4    in Parks and Recreation.

5         Thank you, Marilyn.

6         And my colleagues are going to introduce to you

7    Vernon Jones when they get an opportunity to talk with

8    you.  I can tell you, he was the two-term Chief Executive

9    Officer of DeKalb County.

10        Now, ladies and gentlemen, the theory here is that

11   these individuals, some of whom never really even knew each

12   other at the beginning and who had conflicts that you will

13   hear about, engaged in some scheme to eliminate upper-level

14   white managers in the county, but for some reason they

15   focused their efforts on the Parks Department.

16        And the testimony that there was some scheme is

17   based almost entirely on the testimony of Mr. Lowe, because

18   he's the only one who will testify that any of these people

19   ever said anything to him about digging up dirt or having a

20   scheme.

21        So I want to have you think about three things

22   during the course of this trial.

23        The first is do you believe Mr. Lowe's testimony

24   that there was a scheme?  And you will have to weigh his

25   credibility, that is, his believability.

1          One of the things you will look at is his job

2     application which he submitted to the county which he

3     admitted has numerous inaccuracies and misstatements.  You

4     will need to look at that when you weigh his credibility.

5          And you will also have to compare his testimony to

6     the testimony of Mr. Jones, Mr. Stogner, Ms. Williams,

7     Marilyn Drew, Mr. Stone, who is the Human Resources person

8     and is not a defendant, and Mr. Curt LeBlanc, who doesn't

9     even work for the county anymore, who will tell you that

10    Mr. Lowe never said anything to them about a scheme and never

11    had any discussions with him about a scheme, that it is

12    something that he has concocted to give himself a claim after

13    his position was eliminated.

14         Second, I want to ask you, do you believe that

15    these four people would actually conspire, would actually get

16    engaged in a scheme to do this?  You will see that there were

17    many conflicts between the four people who have been sued

18    here.

19         Vernon Jones has a very forceful personality, and

20    some people can find that personality to be abusive.

21    Marilyn Drew is going to tell you that she thought that

22    Mr. Jones hated her and from time to time said things that

23    she found to be offensive.  She would never have engaged in

24    some kind of scheme with Mr. Jones.

25         The third thing -- and this is really important,

1    ladies and gentlemen -- did anything of a racially-hostile

2    nature happen to these people?   Because that's what this

3    case is about.   It's about a racially-hostile work

4    environment.

5         And you will see that there were no racial slurs in

6    the workplace, no racial jokes, no racial conduct.

7         Yes, there was friction.   There was friction

8    between Mr. Drake and Mr. Bryant and Ms. Drew.   Quite

9    frankly, I don't think they liked each other.   I don't think

10   they liked Ms. Drew's management style.

11        But our Constitution is not a workplace "be nice"

12   code.   It's designed to protect against fundamental

13   discrimination, and I submit to you that you will hear that

14   there was no such discrimination.

15        Now, because we have these plaintiffs and four

16   defendants and different claims, I want to try and just

17   briefly, if I can, go through what it is that is at issue

18   here.

19        The first thing is:   Was there a racially-hostile

20   work environment?

21        John Drake and Mike Bryant, who is deceased, claims

22   that Vernon Jones, Richard Stogner, Morris Williams and

23   Marilyn Drew and DeKalb County as an entity, there was some

24   kind of county policy, subjected them to a racially-hostile

25   work environment.

1          Well, what is a racially-hostile work environment?

2          We anticipate that at the end of the case when

3     His Honor gives you the charge, one of the things that will

4     be in that charge will be one of the elements of what is a

5     racially-hostile work environment.

6          And it's something that is permeated -- that is,

7     it's everywhere -- with discriminatory intimidation, ridicule

8     or insult of sufficient severity or pervasiveness that it

9     materially affected the conditions of employment.

10          It's not just we didn't get along or I didn't get a

11     performance evaluation.  It's something that was

12     racially-hostile.

13          Now, you will see that there were no racial slurs,

14     there was no racial intimidation, ridicule or insults.

15     Mr. Drake never complained to anyone until he filed this case

16     in August of 2004.

17          Mr. Bryant in 2003, he did file an internal

18     complaint.  But you know what it was about?  He said age, sex

19     and race.  He sort of threw it all into the pot.

20          That was investigated, and Mr. LeBlanc, who did the

21     investigation, that you will hear, he will tell you that

22     Mr. Drake said, no, he didn't see any discrimination, and the

23     investigation found that there was no discrimination.

24          Now, was there a racially-hostile work environment

25     and constructive discharge?  And that is Ms. Kelley's claim,

and she makes that claim against Mr. Jones, Mr. Stogner,
Mr. Williams and the county.  She doesn't make the claim
against Ms. Drew.

So she has to show you not only that her workplace
was so permeated with racial insult that it was hostile, but
she has to show you that she was constructively discharged.
And what's that?  That is her working conditions were so
intolerable that a reasonable person would have felt
compelled to resign.  It's so bad I can't take it anymore, I
have got to quit.

Well, the evidence will be that there was no racial
slurs, no racial intimidation, ridicule or insult.

She went to the Greenspace Bond Program.  I do
agree with my friend, Mr. Bowers, that she was transferred to
the Greenspace Bond Program.  And you know what?  That was
the program to administer a $130 million bond program that
DeKalb County had enacted.  It was one of the
administration's top priorities.

She was in the same office.  Yes, when they brought
the group to show them where their new office space would be,
she was shown a small office, she said no, and she never
moved.

You are telling me someone is going to quit their
job because they were shown a little office and they said no
and they got to keep their own office?

1            And she didn't -- as Mr. Bowers said, after she

2    left DeKalb, she landed a job with the state.  She resigned

3    from DeKalb County because she had been offered and accepted

4    another job with the State of Georgia, a much more

5    prestigious job, as Director of the Division of Parks and

6    Historic Sites for the Georgia Department of Natural

7    Resources.

8            Now, there is a claim of racially-discriminatory

9    transfer, and that's by Ms. Kelley, Drake and Bryant

10   against just the county.  It doesn't involve any of the

11   individuals.

12           And what are they claiming?  They are claiming that

13   this was an adverse employment action based on their

14   race.  Once again, it has to be something that is adverse and

15   race-based.

16           Mr. Drake, now, he was in the Purchasing Department

17   and he was transferred to be the Assistant Director of

18   Parks and Recreation.  He was transferred because he had

19   experience in administration and finance and had worked in

20   the Parks and Recreation Department.

21           And while he claims that it was a horrible

22   transfer, he got a salary increase.  His salary went up about

23   forty-four hundred dollars a year, and he got a car

24   allowance.  That's his claim of discriminatory transfer.

25           Mr. Bryant was asked to go when Ms. Drew became

director to become director of Recreation Services.  That was

a work assignment he had had under Ms. Kelley.

         And, yes, Ms. Drew asked him to go to Tucker

because that's where the Recreation Services Department was

basically based.  That's where -- it was the place where the

people who he was going to supervise worked.

         And in fact, when Mr. Bryant -- when Ms. Kelley was

the director, Mr. Bryant had recommended that Ms. Drew be

reassigned to this same recreation center.  And Mr. Bryant

had the same salary and the same benefits.

         Ms. Kelley, I have already pointed out to you, her

transfer, same salary, same benefits, same office, and she

got to administer a program of great significance.

         And lastly, Mr. Lowe.  Was there retaliation?  His

claim is he was retaliated for not participating in this

alleged scheme, and that is a claim only against

Marilyn Drew.  So when you talk about the county, the county

did this, the county did that, Mr. Lowe wants you to award

money damages out of Marilyn Drew's pocket to him for what he

calls retaliation.

         He claims his position was eliminated for refusing

to participate in this so-called scheme.  There was no

scheme.  But moreover, Lowe, Mr. Lowe was not under

Ms. Drew's supervision or control when his position was

eliminated.

1          Mr. Bowers just told you he had been moved up to

2     the sixth floor.  Everyone talks about the sixth floor in

3     this case.  That's where the CEO's office was, that's where

4     Mr. Stogner's office was.

5          Mr. Lowe was transferred up there because he

6     couldn't do the job in Parks and Recreation, and they thought

7     they could provide another position for him.  Hardly

8     retaliation.

9          And it was the Board of Commissioners who

10    eliminated his position, not Marilyn Drew.  And you know how

11    she learned his position was being eliminated?   Mr. Drake

12    told her that the budget had the position being eliminated.

13         Ladies and gentlemen, those are the claims that are

14    in this case.

15         Now, one of the things I want you to think about is

16    not the race issue here, but the fact that when Mr. Jones

17    came into office, it was a change in administration in

18    DeKalb County.

19         Vernon Jones and Richard Stogner -- by the way, why

20    if Mr. Jones was going to have a scheme to eliminate

21    upper-level white managers would he hire as the highest

22    upper-level white manager a white guy?

23         They had a different -- Mr. Stogner and Mr. Jones

24    have a different management style.  It's much more

25    centralized than it had been under the previous

1    administration.  There was less autonomy that the heads of

2    the departments had.

3           Ms. Kelley, for example, will complain that she

4    wasn't allowed to go to the media anymore directly, or to go

5    to the County Commissioners anymore directly.  Well, you know

6    what?  That applied to all of the department heads.  She

7    wasn't singled out.  But she chafed under it because it was a

8    new way of doing business.

9           What Mr. Bowers told you about is that there was a

10   series of very isolated incidents that occurred over a space

11   of years, nothing that was constant, nothing that was

12   day-to-day.  They were all minor incidents that occurred and

13   are commonplace in the workplace when there is a change in

14   administration and people are dealing with new managers.

15          Now, let me just -- I want to give you, ladies and

16   gentlemen, some of the key dates in this case.

17          Vernon Jones takes office January 2001.

18          Now, one of the key things for the administration

19   was this Greenspace Program, and that's the reason for all

20   these transfers.

21          DeKalb County is one of most heavily-developed

22   counties in Georgia, and Mr. Jones saw that the county's open

23   space was rapidly being taken up.

24          So there was a special election for sheriff that

25   was held in March of 2001, and they put on the ballot a bond

1   referendum.  And the citizens of DeKalb County passed a bond

2   referendum.

3          Mr. Stogner then went about putting together how he

4   was going to administer this, and he hired Tina Arbes as

5   Assistant County Administrator, a white woman.

6          They then issued this executive order, and it

7   assigned Ms. Kelley to administer the Greenspace Program, and

8   it assigned Mr. Drake to Parks and Recreation.

9          That was the motive for these transfers.  Not

10  race-based, but because there was an important program that

11  was going on that needed to be handled, and it needed to be

12  handled properly.

13         Now, in June of 2002 -- now we are into 2002 --

14  Mr. Bryant is assigned to the Recreation Services

15  Department.  And I have explained to you, that was a transfer

16  that was done in the ordinary course of business.

17         Ms. Kelley, now she's in Greenspace, and she claims

18  it's such a horrible work environment.  But you know what?

19  She's not applying to other jobs.

20         In fact, the evidence will show you in early 2001

21  she applied for a job with the Charleston, South Carolina,

22  rec department, and later withdrew it, and didn't apply for

23  another job, even though things were so terrible, until the

24  Commissioner of the Department of Natural Resources asked her

25  to apply for a job, which she did.

1          Now, Mr. Lowe didn't get hired until September of

2     2002.  So when Mr. Drake and Mr. Bryant talk about all the

3     horrible things that happened to them, it comes from Mr. Lowe

4     who didn't get hired until September of 2002.

5          And was he going to dig up dirt on Becky Kelley?

6     Well, nine days after he came on, she submitted her

7     resignation to go to work to the state.  And her last day of

8     work, even though things were so terrible, she stayed another

9     two weeks, and Mr. Stogner let her take annual leave until

10    the middle of November so that there would be no break in

11    service to her new job.  Hardly something that was

12    discriminatory.

13         Mr. Lowe gets transferred to the sixth floor in

14    March of 2003 because he couldn't do the job in Parks.  The

15    Board of Commissioners abolishes his position.

16         He then in May, after his position is abolished, he

17    then tells these other folks about the so-called scheme.  He

18    keeps all this to himself for all these years and tells it to

19    them only after his position is eliminated.  And then what

20    happens?  Then they filed this lawsuit.

21         Now, I want to just briefly tell you that you are

22    going to hear this tape from Morris Williams and Joe Stone

23    who were in their office talking.  Somehow this tape

24    recording is picked up on Mr. Mike Amato's voice mail, who at

25    the time is head of Information Services.  A white guy, by

1   the way.

2          And he keeps this tape for three years, doesn't

3   tell anyone about it until he starts having employment

4   problems, and he brings the tape to the plaintiffs' lawyers.

5          And that tape does have vulgar, offensive and

6   embarrassing language on it, and you are going to hear that

7   tape.

8          But I want you to keep in mind, it has nothing to

9   do with the Parks Department, it has nothing to do with

10  Morris Williams, it has nothing to do with Marilyn Drew, it

11  has nothing to do with Richard Stogner.

12         Morris happened to be sitting there hearing

13  Joe Stone talking.  And you know what they are talking

14  about?  The Fire Department.  And they are talking about

15  promotions in the Fire Department where a deputy is trying to

16  undermine the brand new fire chief who has been appointed by

17  Vernon Jones who is a white male.

18         The other thing you are going to hear is -- not

19  statistics, because there is no statistics in this case.  You

20  are going to hear some data about how the number of

21  African-American employees at a certain pay grade increased

22  and the number of whites stayed about the same.

23         The Pay Grade 33 you will hear about is one that

24  the plaintiffs' lawyers put together.  It has nothing to do

25  with what the county considers to be upper management.  There

1   is no evidence of who the applicants were during this time,

2   what the pool of applicants were.  The information is

3   essentially meaningless.

4          I want to give Brent some time, so let me just say,

5   at the end of the case I want you to think about Mr. Lowe's

6   credibility, whether there was any scheme, what actually

7   happened to these people, and whether Ms. Drew was the one

8   who actually eliminated Mr. Lowe's position.

9          I think you are going to find no scheme, you are

10  going to find no racial harassment, and you are going to find

11  no retaliation.

12         Thank you, ladies and gentlemen.

13         THE COURT:  All right.  Thank you, Mr. Remar.

14         Mr. Williams?

15         MR. WILSON:  Good afternoon, ladies and gentlemen.

16         I'm going to try and speak very fast because I'm on

17  the clock.  My name is Brent Wilson, and along with my

18  partner Sharon Morgan for over twenty years, and my friend

19  Dwight Thomas, who I have known for almost forty years, we

20  are representing Vernon Jones.

21         Vernon Jones is being sued in his individual

22  capacities.  These plaintiffs are asking you to award money

23  to them directly from Vernon Jones as an individual.

24         First and foremost, we completely, unequivocally,

25  categorically deny these allegations.  We deny these claims.

We deny these allegations that the complainants are making.

Mr. Remar has already given you some of the facts that you will hear.

The fact that Ms. Kelley was transferred to a $130 million Greenspace Program.  When she first met Vernon Jones when he was a state legislator, she came to him seeking greenspace money for DeKalb County.

Mr. Drake, Mr. Bryant, transfers from one job to another, no loss in prestige, no loss in salary, and indeed in one case more money and a car allowance.

Mr. Herb Lowe.  Mr. Herb Lowe does not have a claim against Vernon Jones.  And do not be fooled and do not let all of this evidence just get jumbled up in your minds so that you think Mr. Lowe has a claim against Vernon Jones.  He has no claim against Vernon Jones.  The Court has dismissed those claims.

Now, we have got to talk about race, ladies and gentlemen.  Sometimes it's uncomfortable.  Sometimes it's unpleasant.  But plaintiffs want you to look at this case through the jaundiced eyes of racism, that everything that happened to them in some way was controlled by Vernon Jones, and it happened to them because of their race and because of his race.

Uncomfortable sometimes to talk about, but let me tell you this.  When you talk about race, race is not

1    necessarily racism.

2            Plaintiffs ask you to accept that proposition, that

3    if there is a difference in race, then there must be some

4    racism, and that every action and interaction in the

5    workplace is somehow controlled or was somehow controlled by

6    racism.

7            We submit that everything is not racial and that

8    this case is really not about race.  This case is really

9    about change.

10           Now, DeKalb County was a sleepy little agrarian

11   rural county that was mostly white.  It is a county now of

12   almost seven hundred thousand people.  It is urban.  It is

13   diverse.

14           And that didn't happen because of some scheme by

15   Vernon Jones or some scheme by anybody else.  It is change,

16   change that is constant, change that is inevitable.  But

17   change that also is uncomfortable, change for some that is

18   difficult, change that is feared, change that is rejected,

19   change that oftentimes is disliked.

20           Now, Vernon Jones brought his style of change to

21   DeKalb County, a different style of management.  A style of

22   management that could be described as confrontational, a

23   style of management that could be described as brusque,

24   direct.  People may not have liked it.

25               He's in the political arena.  He has political

1   supporters, he has political enemies.  People may have voted

2   for him, people may not have voted for him.  But Vernon Jones

3   got things done for DeKalb County.

4          Vernon Jones lowered taxes.  Vernon Jones created

5   jobs.  He paved roads.  He put in sidewalks.  He filled in

6   potholes.  He opened up a senior citizens center that my

7   87-year-old mother-in-law goes to three times a week.  He

8   restored confidence in public safety in DeKalb County.

9          He brought a customer service focus that had not

10  been there before.  He brought the formality of the Georgia

11  state legislature where he had served for numerous terms, and

12  he brought a corporate approach to county government.

13         Vernon, I would ask you to stand up, please?

14         This is Vernon Jones.  This is the change agent for

15  DeKalb County.

16         Vernon was born in rural North Carolina.  Worked

17  the tobacco fields.  Great parents, dad was a veteran.  First

18  male in his family to graduate from college.  Worked for

19  major corporations, IBM, MCI, BellSouth.  Elected to the

20  Georgia legislature, served numerous terms.  Served as CEO of

21  DeKalb County.  A candidate for the U.S. Senate, and a

22  candidate now for the U.S. Congress.

23         What is the -- thank you, Vernon.

24         What is the evidence against Vernon Jones?  Well,

25  Mr. Remar has already told you that you are not going to hear

1      any evidence of any racial epithets, any signs, pictures,

2      e-mails, anything of that nature that came from

3      Vernon Jones.  You are not going to hear the plaintiffs say

4      that they ever heard anything of that nature directly to them

5      from Vernon Jones.

6              The only person that you are going to hear that

7      says that they overheard Vernon Jones say anything in this

8      regard is Mr. Herbert Lowe.

9              And we submit to you that Mr. Lowe is a braggart.

10     Mr. Lowe is an opportunist.  The evidence will show that

11     Mr. Lowe made misrepresentations with respect to his job

12     application for DeKalb County, and Mr. Lowe should not be

13     believed.

14             Mr. Remar asked you about this.  Ask yourselves

15     why, if Mr. Jones is this great architect of racial

16     discrimination against white people, would he assign his

17     number one responsibilities to Richard Stogner, a white man?

18     Why would he appoint a white director of Public Safety?   Why

19     would he appoint a white fire chief?   Why would he appoint

20     one of your jury venire members, Bill Linkous, the county

21     attorney?

22             THE COURT:  Mr. Wilson, you are stepping over the

23     line.

24             MR. WILSON:  Thank you, Your Honor.

25             THE COURT:  And you are out of time.

1          MR. WILSON:  I submit to you that at the conclusion

2     of this case, you will determine that Mr. Jones and none of

3     these defendants engaged in any racial discrimination.

4          Thank you.

5          THE COURT:  Ladies and gentlemen, in light of what

6     Mr. Wilson just argued, I remind you that what they say, what

7     Mr. Wilson says is not evidence.

8          There are a number of things that he said that I

9     believe will never be evidence in this case, and you need to

10    be careful about statements -- opening statements like

11    this.  The purpose of this was to give you an outline of the

12    evidence, and anything that is not evidence in the case

13    you are to disregard.

14         It's almost 5:00.  It's my practice that we will

15    try to conclude every day about 5:00.  There are a couple

16    matters I need to take up with the lawyers this evening on

17    our time, not yours.

18         It's been a long day, so what we are going to do is

19    we are going to break for the evening.  We will start

20    promptly tomorrow morning at 9:00 and we will have a full day

21    of testimony because the evidence will begin coming in

22    tomorrow.

23         As I told you, do not discuss this case even with

24    those closest to you at home, don't discuss it with anybody,

25    do not watch any press reports, read any press reports, or

```
 1    view any press reports on the internet or any other place,

 2    and no independent research.

 3              With that, have a good evening, and we will see you

 4    tomorrow morning.

 5              (In open court without a jury present:)

 6              THE COURT:  Mr. Williams, you come up here and

 7    stand at this podium.

 8              MR. WILSON:  Wilson, Your Honor.

 9              THE COURT:  I'm sorry, Mr. Wilson.

10              MR. WILSON:  Thank you.

11              THE COURT:  I have never seen ever somebody refer

12    to something that is clearly not in evidence, which is the

13    race of a person on a panel during an opening statement.  It

14    was totally inappropriate.

15              MR. WILSON:  I apologize, Your Honor.

16              THE COURT:  Well, you need to think about what you

17    can and cannot do in this courtroom.

18              MR. WILSON:  Yes, Your Honor.

19              THE COURT:  But that was totally out of line,

20    totally inappropriate, and totally unprofessional.

21              There are rules to be followed in this courtroom,

22    and you will, as an officer of this court, follow them.  Do

23    you understand that?

24              MR. WILSON:  Absolutely, Your Honor.

25              THE COURT:  You may be seated.
```

1           MR. WILSON:  Thank you.

2           THE COURT:  All right.  We have a matter to take up

3   involving Mr. Amato.

4           MR. BOWERS:  Yes, Your Honor.

5           I think Mr. Amato is outside.  He was directed to

6   be here.  We are only going to ask him about fifteen

7   questions.

8           Do you want me to bring him in for that, or do you

9   want me to just make a proffer of what the questions will be

10  and the answers will be?

11          THE COURT:  That's fine, so long as it's accurate.

12          MR. BOWERS:  I am confident it is accurate,

13  Your Honor.

14          This will be the questions:

15          Name?

16          Current occupation?

17          Employer?

18          Ever employed by DeKalb County?

19          When?

20          In what capacity?

21          Did you have voice mail on your DeKalb County

22  office phone?

23          Did you on or about March the 25th of '03 discover

24  a conversation between Joe Stone and Morris Williams on your

25  voice mail at your DeKalb County phone?

```
 1              Did you have anything to do with that conversation
 2    being recorded on your voice mail?
 3              Did you make a copy of that?
 4              How did you make a copy?
 5              And he will say he went to -- what's the name of
 6    it?
 7              MR. ANULEWICZ:  Radio Shack.
 8              MR. BOWERS:  -- Radio Shack and bought a recorder,
 9    made a copy, and gave it to J. Tom Morgan in about January of
10    '06.
11              Did you discuss the Jones/Williams voice mail with
12    any of the plaintiffs or their lawyers prior to when you
13    provided Mr. Morgan a copy in January of '06?
14              And I think he will say no, Your Honor.
15              And did you ever have a conversation with Joe Stone
16    about this case?
17              To which I think he will respond yes.
18              And what did he say?
19              That he would -- they were going to bleed
20    Mr. Morgan's law firm dry.
21              And that's the totality of the examination.
22              THE COURT:  And through whom do you intend to
23    introduce the tape?
24              MR. BOWERS:  The tape will be introduced through
25    Joe Stone, whom we plan to call first.
```

1          I mean, given that we had moved Amato, we were

2    going to call Joe Stone first.  We can put Amato up first in

3    the morning.  It doesn't matter to us.

4          But Stone -- either Stone or Amato will come up

5    first.  Stone will put the tape in.  He will be followed by

6    Mr. Williams.

7          THE COURT:  And my understanding from reviewing the

8    briefing is that Mr. Stone and Mr. Williams admit that it's

9    their voices on the tape; is that correct?

10         MR. BOWERS:  That is correct, Your Honor, and admit

11   the content of the tape.

12         THE COURT:  Is that true, Mr. Remar?

13         MR. REMAR:  It is, Your Honor.

14         And we have never objected to Mr. Amato's testimony

15   on everything up to the point of the conversation with

16   Mr. Stone.

17         THE COURT:  Go over again the manner -- the

18   conversation, being the "bleed them dry" conversation?

19   That's what's really being contested here; is that right?

20         MR. REMAR:  Yes, Your Honor.

21         THE COURT:  Summarize again the circumstances of

22   that particular conversation and that statement?

23         MR. BOWERS:  Your Honor, I did not get into the

24   circumstances that gave rise to that conversation because of

25   objections that had been made.

1          That occurred during the time we were seeking some

2   information and weren't getting the responses that we thought

3   we ought to get, and that's when that conversation took

4   place.

5          THE COURT:  Well, go into that a little bit more.

6   Are you talking about during discovery?

7          MR. BOWERS:  It was an Open Records request,

8   Your Honor, as best I remember, and there was -- I sent a

9   letter to begin with, then Mr. Morgan sent a letter, and

10   there may have been one or two other back-and-forths with

11   Mr. Linkous.

12          And a discussion ensued between Mr. Amato and

13   county people as to the availability of this information.

14   Mr. Amato determined that it was available, and we believe he

15   was told not to furnish the information, at which time at or

16   about that time the comment was made.

17          THE COURT:  All right.  Mr. Remar, what's your

18   response to the comment about bleeding the plaintiffs dry?

19          MR. REMAR:  Yes, Your Honor.

20          I believe that Your Honor has already ruled -- I

21   think Your Honor ruled at the pretrial conference that

22   discussions about the Open Records Act case and

23   discussions that may have occurred in the context of

24   the county and its attorneys defending that case that

25   Mr. Amato might have been present at were not relevant

1     and would not be admitted.

2           Our concern is that if Mr. Amato contends that this

3     conversation took place in the presence of the county's

4     attorneys, that that conversation would be privileged.  We

5     don't believe that any such comment even occurred, but we

6     don't have the context in which it occurred.

7           Secondly, I believe, Your Honor, I already raised

8     the issue, we don't believe that this comment is relevant

9     under 401 or 402.  And to the extent that it might be

10    relevant to the issues in the case, which is whether there

11    was in fact any discrimination against these people, that its

12    probative value is clearly outweighed by the prejudice to the

13    jury to hear there was some comment of this nature allegedly

14    made after the lawsuit was filed.

15          THE COURT:  Well, it's interesting.  I have read

16    over the weekend four cases.

17          This is not an uncommon thing that people say to

18    each other, and in some cases it gets admitted and some cases

19    it doesn't.  But it surprisingly came up within the short

20    research we did a variety of different circumstances.

21          Some it's clear that on the issue of attorneys

22    fees, when somebody says I'm going to bleed you dry, it

23    increases attorneys' fees, and that's relevant on that.

24          But there are a couple of other instances where it

25    came up that I found surprising, a little bit vindictive,

1   whether or not somebody was doing something to interfere with

2   relations between other people, making it more difficult to

3   do business.  There is not a lot of clear law on this.

4           On what issue is it probative, Mr. Bowers?

5           MR. BOWERS:  Your Honor, I can't tell you one off

6   the top of my head.  I just can't do that.  And I'm not going

7   to try to flummox you.  I can't do it.

8           THE COURT:  I appreciate not trying to be

9   flummoxed.  Sometimes it's a rare occurrence.

10          I don't find that it's relevant to any probative

11  issue, and therefore I'm going to exclude it.

12          MR. BOWERS:  Very good.

13          THE COURT:  Now, let me go back for a second.

14          For all of you -- Mr. Wilson, for you.  I mean,

15  I obviously thought that what you did was totally

16  inappropriate.

17          MR. WILSON:  And I apologize, Your Honor, to the

18  Court.

19          THE COURT:  Well, it was done in front of the

20  jury it was done in front of all these spectators and it was

21  done in front of the press and it was done in front of

22  citizens that come here to see that this proceeding is done

23  with integrity and that what we do is we try cases on the

24  facts.

25          And every time a lawyer decides to take it upon

1    their own to make some speech on behalf of their client,

2    which is frankly what I thought a lot of what you said was,

3    that we distract the jury and we distract the public from

4    what this is all about, which is a forum in which people that

5    can't settle their disputes or people that feel strongly as a

6    matter of principle or for whatever reason that have claims,

7    they get to be resolved in this court.

8            It is a privilege for all of us to do this, and

9    people respect what we do and see this as a place where

10   they can seek refuge, whether you are a defendant or a

11   plaintiff, especially when the professionals understand that

12   what we do is present facts to get a decision from impartial

13   people in the community.  And that's what I expect of all of

14   you.

15           And does it irritate me when I see that somebody

16   goes beyond that bounds?  Yes.  Especially the lawyers in

17   this case, because you are experienced.

18           I know it's a tough case, but this is a case that

19   needs to be tried on the merits and not on the rhetoric.

20           So I want this to be the beginning of a

21   relationship between each other and me that allows this jury,

22   who is getting paid less than any of us, some of whom are

23   sitting here because they believe it is their duty as

24   citizens to sacrifice -- which they are, we all know they

25   are.  And our job is to present to them a fair case on the

1    evidence, zealously advocated, but fairly presented.

2              And I want us to all pledge that in this case, that

3    we will all do that.  And I hope I have your commitment to do

4    so.

5              MR. WILSON:  Absolutely.

6              MR. REMAR:  You do, Your Honor.

7              MR. BOWERS:  You do, Your Honor.

8              THE COURT:  Is there anything else we need to

9    discuss before we adjourn?

10             MR. BOWERS:  Nothing from the plaintiffs,

11   Your Honor.

12             MR. THOMAS:  I have one request to the Court in

13   terms of the Court's procedures.

14             THE COURT:  I don't want to ignore you.  I hope you

15   join in on our commitment.

16             MR. THOMAS:  Thank you, Your Honor.  I hope the

17   Court won't.

18             Some courts I practice before will allow jurors to

19   ask questions.  And I didn't know whether Your Honor allows

20   jurors to ask questions --

21             THE COURT:  I do not.

22             MR. THOMAS:  -- in your proceedings.

23             THE COURT:  That's an unusual practice, unusual in

24   this court, and I do not allow it.

25             MR. THOMAS:  Thank you.

1          THE COURT:  All right.  Anything else?

2          As you know, before Mr. Moody goes up, I want a

3    proffer from him to determine whether or not there is an

4    appropriate limiting instruction.

5          MR. J. THOMAS MORGAN:  Your Honor, Mr. Moody is my

6    witness.  Do you want me to put him up or proffer his

7    testimony in the same way?

8          THE COURT:  Well, if you can give me the sort of

9    detail that Mr. Bowers did so that I can and so that

10   Mr. Remar or whoever else wants to weigh in can have a clear

11   picture that won't change when he testifies, I don't mind

12   taking a proffer.

13         And if I have some reservations about the proffer

14   and whether I need more, I will let you know.  I don't know

15   when he intends to testify, but we need to find the time to

16   do that on our time and not theirs.

17         Okay.  What do we do tomorrow?  What's the order of

18   witnesses?

19         MR. BOWERS:  Your Honor, given what's happened this

20   evening, we will probably call Mr. Amato first.  That ought

21   not to take just a couple of minutes.

22         Then we will call Joe Stone, who is under

23   subpoena.

24         We will call Mr. Morris Williams.

25         We will put up Mr. Eddie Moody -- or excuse me,

1   Ms. Faye McCommon, Eddie Moody, then we will go into

2   Becky Kelley, and down the line.

3          THE COURT:  Okay.  I think that gives us a picture

4   of what the order of witnesses are and --

5          MR. REMAR:  It does, thank you.  We appreciate

6   that, Your Honor.

7          THE COURT:  Anything else we need to discuss?

8          MR. BOWERS:  Nothing, Your Honor.

9          THE COURT:  All right.  We will be in recess.

10          I do want to start at 9:00.  I want them walking in

11   the door so that they can begin listening to testimony.

12          We will be in recess.

13               (Proceedings adjourn at 5:05 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3   UNITED STATES OF AMERICA        :
                                     :
4   NORTHERN DISTRICT OF GEORGIA     :

5

6           I, Nicholas A. Marrone, RMR, CRR, Official Court

    Reporter of the United States District Court for the Northern

7   District of Georgia, do hereby certify that the foregoing 172

8   pages constitute a true transcript of proceedings had before

9   the said Court, held in the city of Atlanta, Georgia, in the

10  matter therein stated.

11          In testimony whereof, I hereunto set my hand on

12  this, the 11th day of April, 2010.

13

14

15

16                          /s/ Nicholas A. Marrone

17          _____
                            NICHOLAS A. MARRONE, RMR, CRR
18                          Registered Merit Reporter
                            Certified Realtime Reporter
19                          Official Court Reporter
                            Northern District of Georgia

20

21

22

23

24

25